UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| WILLIAM SIFUENTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:10-cv-02178-RDR-JPO |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

ARMSTRONG TEASDALE LLP

BY:     */s/ Jennifer L. Arendes*
Jennifer L. Arendes, #77944
Narcisa P. Symank, #78179
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314.621.5070
314.621.5065 (facsimile)
jarendes@armstrongteasdale.com
nsymank@armstrongteasdale.com

and

Laurence R. Tucker, #70074
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
816.221.3420
816.221.0786 (facsimile)
lrtucker@armstrongteasdale.com

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNCONTROVERTED FACTS ................................................ 6

ARGUMENT ..................................................................................................... 28

I.      PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM FAILS .......................... 29

        A.      PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM IS
                TIME-BARRED ................................................................................ 29

        B.      PLAINTIFF CANNOT ESTABLISH THAT HE WAS
                CONSTRUCTIVELY DISCHARGED ........................................................ 31

II.     PLAINTIFF CANNOT ESTABLISH A CLAIM OF DISABILITY
        DISCRIMINATION ................................................................................ 36

        A.      PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE
                OF DISABILITY DISCRIMINATION ........................................................ 37

                1.      Plaintiff Cannot Establish That He Is Disabled Under the
                        ADA ................................................................................ 37

                2.      Plaintiff Cannot Establish That He Suffered Any Adverse
                        Employment Action ............................................................. 40

                3.      Plaintiff Cannot Establish a Causal Connection Between
                        Any Alleged Adverse Action and His Alleged Disability ................. 42

        B.      PLAINTIFF CANNOT ESTABLISH PRETEXT ......................................... 44

III.    PLAINTIFF CANNOT ESTABLISH A CLAIM OF HARASSMENT IN
        VIOLATION OF THE ADA ...................................................................... 48

IV.     PLAINTIFF CANNOT ESTABLISH THAT UPS FAILED TO
        PROVIDE HIM WITH A REASONABLE ACCOMMODATION IN
        VIOLATION OF THE ADA ...................................................................... 49

V.      PLAINTIFF CANNOT ESTABLISH THAT UPS RETALIATED
        AGAINST HIM OR ENGAGED IN INTERFERENCE IN VIOLATION
        OF THE ADA ........................................................................................ 53

        A.      PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE
                OF RETALIATION/INTERFERENCE UNDER THE ADA ...................... 54

VI.     PLAINTIFF CANNOT ESTABLISH A CLAIM OF RACE OR AGE

DISCRIMINATION ................................................................................................. 57

    A.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE
            OF RACE OR AGE DISCRIMINATION ....................................................58

            1.    Plaintiff Cannot Establish That He Suffered an Adverse
                  Action.................................................................................................59

            2.    Plaintiff Cannot Establish a Causal Connection Between
                  Any Adverse Action and His Race or His Age .................................59

    B.    PLAINTIFF CANNOT ESTABLISH PRETEXT........................................61

VII.    PLAINTIFF'S WORKERS' COMPENSATION RETALIATION
        CLAIM FAILS AS A MATTER OF LAW................................................................63

    A.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE
            OF WORKERS' COMPENSATION RETALIATION OR
            PRETEXT ..................................................................................................64

CONCLUSION.....................................................................................................................68

COMES NOW Defendant United Parcel Service, Inc. ("UPS" or "Defendant"), by and through counsel, and for its Memorandum in Support of Its Motion for Summary Judgment states as follows:

## INTRODUCTION

Plaintiff William Sifuentes was hired by UPS in 1971 and worked as a tractor-trailer ("feeder") driver from 1977 until he voluntarily retired on February 1, 2011, the date on which he reached forty (40) years of service with the company. Between 2001 and 2011, plaintiff worked as a feeder driver at UPS' Kansas City, Kansas ("James Street") facility driving tractor-trailers with packages to/from various destinations. From 2006 until he retired in 2011, Plaintiff was not disciplined, demoted or discharged. On the contrary, he performed his job well and worked as a highly paid "mileage" driver, a position he wanted. Mileage jobs are considered premium jobs which are usually held by high seniority drivers.

Pursuant to the collective bargaining agreement between UPS and the International Brotherhood of Teamsters, mileage drivers receive both an hourly pay rate plus a specified dollar amount per mile driven. They spend most of their workday on the road driving, not at the facility handling equipment or loads. When they report to work each day, their tractor-trailers are hooked up and ready to go. When they clock in each day, they perform a pre-trip inspection of their equipment, receive their dispatch (listing trailers), and leave to drive their routes. When they return, they perform a post-trip inspection of their tractor and trailer(s), sign a vehicle inspection report and clock out. In 2009 and 2010, plaintiff worked Monday through Friday driving over 500 miles round trip per day to Williams, Iowa and back.

Plaintiff performed his job well and voluntarily retired with his full pension benefit of $4,128.00 per month and full health insurance coverage.

In his eight count Complaint, Plaintiff alleges he was discriminated against, harassed, retaliated against/interfered with, and denied an accommodation because of his disability in violation of the Americans with Disabilities Act, as amended, 42 U.S.C§§ 12101 *et seq*. ("ADA") (Counts I through V).  In Counts VI and VII Plaintiff alleges that he was discriminated against because of his age and race in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq*. ("ADEA"), the Kansas Age Discrimination in Employment Act, K.S.A. §§44-1 111 *et seq*. (" KADEA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. C. §§ 2000e *et seq*. ("Title VII"), and the Kansas Act Against Discrimination, K.S.A. §§ 44-1001 *et seq*. ("KAAD").  Finally, Plaintiff alleges a claim of workers' compensation retaliation in violation of Kansas law (Count VIII).

Plaintiff claims that he was constructively discharged due to his alleged disability, age and race/ethnic background and in retaliation for allegedly requesting an accommodation for a disability and reporting injuries and filing workers' compensation claims.  Specifically, he claims that his Feeder supervisor Steve Stuke (age 63) and Feeder manager Joe Dooley (age 53) discriminated against and harassed him by requiring him to receive additional safety training pursuant to UPS' safety program when he reported injuries (like other drivers) and failed to prevent UPS from assigning older, rough-riding tractors to his bid jobs, changing the start time of his May 2009 bid job by forty-five minutes, and infrequently changing his trailers from doubles to singles.  Plaintiff also claims that from the late 1980s through 2009,[1] Scheduler Gerald Reeves (age 59) assigned old, rough-riding, unsafe tractors to his bid jobs.

---

[1] Ironically, Plaintiff testified that in 2010, he drove a better tractor than he had for several years. (Exh. A, Deposition of William Sifuentes ("Sifuentes Dep."),  In the driver vehicle inspection reports Plaintiff signed for the tractors assigned to his bid jobs in 2010, plaintiff did not note any safety-related issues or indicate that any tractor he was driving was unsafe or failed to comply with DOT safety regulations.  (Exh. B)

Plaintiff alleges that UPS undertook these actions due to his alleged disability, Mexican-American heritage, and age, and to retaliate against Plaintiff for exercising his rights under the Americans with Disabilities Act and filing workers' compensation claims.  Plaintiff claims that, as a result of what he perceived as unfair treatment, he had no choice but to retire on his fortieth anniversary date following a six-month leave of absence for shoulder surgery during which he was off work with little contact with UPS employees except to request that UPS schedule his vacation weeks for early 2011, process his retirement paperwork and provide his vacation check in January 2011.

Summary judgment should be granted as to Plaintiff's claims because he cannot establish a genuine issue of material fact supported by competent admissible evidence.  Nor can he establish the essential elements of each claim.  Plaintiff's constructive discharge claims under the ADA, ADEA, Title VII, the KAAD and the KADEA are barred because plaintiff failed to exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC/KHRC alleging that he was constructively discharged in 2011.  Instead, Plaintiff filed his Charge in April 2009 nearly two years *before* he stopped working at UPS.  Although Plaintiff referenced "constructive discharge" in his 2009 Charge, he was working at UPS when he filed the Charge and it is undisputed that he continued to work as a feeder driver at UPS (with the exception of vacations, holidays, medical leaves and other approved time off) until he voluntarily retired in 2011.  Moreover, UPS' alleged conduct does not rise to the level necessary to establish a constructive discharge claim nor can he establish discriminatory or retaliatory animus.

Plaintiff's disability discrimination/harassment/interference and ADA retaliation claims as well as his age/race discrimination and workers' compensation retaliation claims also fail as a matter of law because plaintiff cannot establish the prima facie elements of each or that UPS'

legitimate, non-discriminatory reasons for the actions he challenges are a pretext for unlawful discrimination or retaliation.  For example, contrary to the allegations in his Complaint, Plaintiff testified in his deposition that he is not disabled nor is he claiming disability discrimination in this lawsuit.  In his deposition, Plaintiff also admitted that: (1) he was able to and did perform all the duties of his feeder driver jobs without accommodation for many years, (2) he has no evidence that UPS took any actions toward him due to an alleged disability, and (3) he never requested or required an accommodation.  In addition, none of the conduct Plaintiff complains of rises to the level of an adverse employment action under the ADA.

Plaintiff admits that he and his healthcare providers never told UPS that he could not perform his job or needed to transfer to a different job.  During his employment, Plaintiff had no permanent medical restrictions and continued performing his regular feeder driver job duties after each injury, illness or surgery (other than when he chose to retire in 2011).

Indeed, UPS was not aware that Plaintiff was disabled or that he requested or required an ADA accommodation.  Nonetheless, when Plaintiff filed his EEOC Charge in 2009 alleging that disability discrimination and failure to accommodate, UPS gave plaintiff the ADA accommodation paperwork to complete so UPS could gather information regarding his unidentified disability and begin the interactive process under the ADA.  Plaintiff refused to fill out the paperwork on the advice of his attorney.  Plaintiff testified that no one at UPS retaliated or took any action against him for allegedly requesting an accommodation.

Plaintiff similarly cannot establish a prima facie case of age or race discrimination or workers' compensation retaliation.  He was not subjected to any adverse actions and there is no evidence that UPS took any action concerning Plaintiff under circumstances that give rise to an inference of discrimination or workers' compensation retaliation.  The assignment of tractors

plaintiff believed were less desirable than tractors assigned to other bid jobs from time to time, a 45 minute change in the start time of his bid job, or a change from pulling double to single trailers once in a while do not constitute actionable adverse employment actions for purposes of his discrimination claims.

There is similarly no evidence that any decision made with respect to Plaintiff's employment was motivated by discriminatory animus.  The Kansas Feeder Scheduler often makes changes in tractors assigned to bid jobs and the start times/loads for various bid jobs for a variety of business reasons without knowledge of which driver is performing that particular bid job.  It is undisputed that Caucasian and younger drivers also drove old, rough riding tractors assigned to their bid jobs.  Similarly, the Scheduler made changes to the start times and loads assigned to bid jobs held by Caucasian and younger drivers.

Plaintiff's workers' compensation retaliation claim fails because he cannot establish that he was terminated or constructively discharged or that any such alleged action was caused by his injury reports or workers' compensation claims.  Plaintiff and many other UPS employees reported injuries and filed many workers' compensation claims, and were not disciplined or discharged.  As part of its Health & Safety program, UPS requires that all drivers who report automobile accidents and/or work-related injuries undergo additional safety training to ensure that they are performing their job in a safe manner, regardless of disability, race, age, or whether they seek medical treatment for an injury or file a workers' compensation claims.

Because Plaintiff cannot establish a prima facie case or pretext with respect to any of his claims, UPS' Motion for Summary Judgment should be granted in its entirety.

## STATEMENT OF UNCONTROVERTED FACTS

The following are material facts as to which UPS contends no genuine dispute exists.

1.      Plaintiff William Sifuentes was born in Kansas City, Kansas in 1948.  (Pretrial Order (ECF Doc. #132), p. 2)

2.      Defendant United Parcel Service, Inc.'s business involves the global transportation and delivery of customer packages in accordance with established rates and schedules.  (Exh. C, Declaration of Ernie Christie ("Christie Decl."), ¶ 2);

**UPS FEEDER OPERATIONS**

3.      UPS' Feeder Operation is responsible for ground transportation of millions of packages between UPS facilities, customer locations, and rail yards throughout the country each year.  (Christie Decl., ¶ 3)

4.      UPS' Feeder Operations are divided geographically by region, each of which is supervised by a Feeder division manager.  (Christie Decl., ¶ 4)  Each region consists of several state Feeder operations, e.g., Kansas District Feeders.  (Christie Decl., ¶ 4; Exh. G, Declaration of Gerald Reeves ("Reeves Decl."), ¶ 6)

5.      Feeder drivers at UPS drive tractor-trailer trucks with packages between UPS facilities, and on some bid jobs/routes, between UPS locations,   customer businesses and/or the rail yard.[2]  (Christie Decl., ¶ 5; Exh. E, Declaration of Joseph Dooley ("Dooley Decl.), ¶ 8)

6.      Since 2006, UPS has employed between 180-200 feeder drivers at its Lenexa, Kansas facility and approximately 80-90 drivers in its Kansas City, Kansas ("James Street") Feeder Department.[3]  (Christie Decl., ¶ 6; Dooley Decl., ¶ 12)

---

[2] Some feeder bid jobs involve driving trailers to a "meet point" and exchanging trailers with a UPS feeder driver from another state/area.  (Christie Decl., ¶ 5)

[3] These totals include shifters who work in the yard moving trailers and hooking up equipment. (Christie Decl., ¶ 6 fn 2; Dooley Decl., ¶ 12 fn. 2)

7.      Feeder drivers at UPS' James Street facility report to Feeder on road supervisors, each of whom supervises a group of drivers.  (Dooley Decl., ¶ 8; Christie Decl., ¶ 7)

8.      Feeder supervisors report to the James Street Feeder Manager.  (Exh. F, Deposition of Steve Stuke ("Stuke Dep."), p. 15; Dooley Dep., p. 83, Christie Decl., ¶ 7)

9.      The job duties of Feeder supervisors and managers include training, evaluating, supervising and disciplining drivers.  (Christie Decl., ¶ 9)

10.     Joe Dooley was the James Street Feeder Manager from March 2006 to March 2007 and March 2008 to present.  (Dooley Dep., pp. 4, 8-9, 83)  Allen Kirby held that position between March 2007 and March 2008.  (Stuke Dep., p. 15)  The James Street Feeder Manager reports to the Kansas Feeder Division Manager.  (Christie Decl., ¶ 8)

11.     Ernie Christie has been the Kansas Feeder Division Manager since 2007, and oversees UPS' Feeder operations at its Lenexa and James Street facilities.[4]  (Christie Decl., ¶ 1; Exh. D, Declaration of Gayle Ferguson ("Ferguson Decl."), ¶ 8)

**FEEDER SCHEDULING**

12.     UPS has a Feeder Scheduler for each state/district whose duties include, among others, working with schedulers in other states/regions to schedule and coordinate the efficient movement of trailers and packages based on information provided by UPS' Industrial Engineering Division.[5]  (Christie Decl., ¶ 10; Reeves Decl, ¶ 12)

13.     During most of the period from the late 1980s until May 2010, Gerald Reeves (age 59) was the Kansas Feeder Scheduler responsible for scheduling bid jobs/routes, tractor

---

[4] Mr. Christie also oversees Feeders at UPS' "extended" facilities in Kansas, e.g., Salina, Topeka, Wichita, Pittsburg/Parsons and others.
[5] In May 2010, UPS reorganized and combined the Kansas District with four other districts (e.g. Missouri, Iowa, etc.) to form the Central Plains District.

assignments, and tractor trailer moves.[6]  (Reeves Decl., ¶ 1; Dooley Decl., ¶ 14)  At that time

Mr. Reeves became the Central Area Region Scheduler and performed these same job duties for

Kansas and Arkansas until January 2012. (*Id.)*

14.     Until May 2010, the Kansas Scheduler, reported to a region scheduling manager.

(Reeves Decl., ¶ 13)  The Kansas Feeder Scheduler has worked at UPS' Lenexa facility for the

past twenty years.  (Reeves Decl., ¶ 13; Dooley Decl., ¶ 15).

15.     Feeder drivers are generally well-trained, highly skilled, experienced, and

knowledgeable employees who work long hours.

16.     UPS expects feeder drivers to perform their jobs duties in accordance with U.S.

Department of Transportation ("DOT") regulations/rules, the labor contract and UPS' safety

policies and procedures.

17.     These regulations, policies/procedures and contract provisions are intended to

protect UPS employees, customers and the general public from automobile accidents, injuries

and fatalities.  (Christie Decl., ¶ 14; Exh. H, Declaration of Thomas Greco ("Greco Decl."), ¶ 7)

**PLAINTIFF WILLIAM SIFUENTES**

18.     Plaintiff William Sifuentes was hired by UPS in 1971 as a package car (local

brown delivery truck) driver.  (Sifuentes Dep., p. 25)  Plaintiff bid into a tractor-trailer ("feeder")

driver job in 1977.  (*Id.*)

19.     As a feeder driver, plaintiff drove a tractor-trailer truck with packages on a bid

route and was a member of Teamsters Local 41.  (Sifuentes Dep., pp. 27-28)

---

[6] Ross Siren was the Kansas Feeder Scheduler in 2004 and part of 2005.  Joe Dooley held the
Scheduler position for a few months in 2007 and George Davis held the position from August
2007 through early 2009.  (Reeves Decl., ¶ 1; Dooley Decl., ¶ 3; Exh. I, Declaration of George
Davis ("Davis Decl."), ¶ 11)

20.     Plaintiff worked at UPS' James Street facility from approximately 2000 or 2001 through 2011.  (*Id.* at 25-27)

21.     Plaintiff retired from UPS on February 1, 2011 when he reached 40 years of employment with the Company.  (*Id.*; Exhs. J and K)

22.     During most of the period from mid 2006 until plaintiff retired, plaintiff reported to supervisor Steve Stuke (age 63).  (Exh. L, Declaration of Steven Stuke ("Stuke Decl.") ¶ 7) Mr. Stuke was born in the same month and year as plaintiff and retired in March 2011. (Sifuentes Dep., pp. 46-47; ECF Doc. #132; Stuke Dep., pp. 7, 15; Stuke Decl., ¶ 1)

23.     Plaintiff testified that he performed his job well and enjoyed working at UPS. (Sifuentes Dep., pp. 40-41; *see also* Dooley Decl., ¶ 23; Stuke Decl., ¶ 20)

24.     Plaintiff was not demoted, suspended or discharged by UPS.  (*Id.* at 46; Dooley Decl., ¶ 24; Stuke Decl., ¶ 18; Exh. M, Kirby Decl., ¶ 16)

25.     UPS has no record of plaintiff receiving any discipline between January 2008 and early 2011 when he retired.  (Dooley Decl., ¶ 24; Kirby Decl., ¶ 16; *see also*  Exh. J)

26.     In May 2009 and April 2010, plaintiff bid onto jobs KWL2 and KWL4, respectively, in which he drove trailers from Kansas City, Kansas to Williams, Iowa and back. (Exh. N; Sifuentes Dep., pp. 50, 52; Exh. O, Start Time Lists – UPS-WS-8945-46, 9053-54; Dooley Decl., ¶ 25)

27.     In those jobs, plaintiff drove approximately 540 miles per day which normally took 9-10 hours per day.  (Sifuentes Dep., p. 51)  On certain days, his job brought back loads from Iowa that had to arrive at the Kansas City rail yard by a specific time.  From the rail yard he would return to James Street. (Reeves Decl., ¶ 21; Dooley Decl., ¶¶ 25-26)

28.     In 2009 and 2010, Plaintiff generally worked Monday through Friday approximately 9-11 hours per day.  (Sifuentes Dep., p. 30, 51-52; Exh. N)

29.     The terms and conditions of plaintiff's employment were governed by the labor contract between UPS and the Teamsters.  (Sifuentes Dep., pp. 27-28; Exh. P, Declaration of William Margrave ("Margrave Decl.), ¶¶ 13-18; Exh. P)

**FEEDER DRIVER JOB BID PROCESS**

30.     Under the labor contract, feeder drivers bid on a "job" which consists of a start time and destination.  (Dooley Decl., ¶¶ 29-30; Exh. Q, labor contract; Sifuentes Dep., pp. 25, 49)

31.     Drivers do not bid on or have the right to drive or operate specific tractors, loads or trailers.  (Sifuentes Dep., pp. 49-50; Christie Decl., ¶ 23; Margrave Decl., ¶ 35)

32.     Vacant feeder driver jobs are filled pursuant to the seniority system set forth in the labor contract.  (Margrave Decl., ¶ 23; Exh. Q)

33.     Under the current (2008) labor contract, drivers bid on jobs/routes in  April and their bid selections become effective in early May.[7]  (Margrave Decl., ¶ 25; Christie Decl., ¶ 24; Exh. Q)   In the bid process under the labor contract, drivers select bid jobs/routes based on seniority.  (Margrave Decl., ¶ 25; Christie Decl., ¶ 24; Exh. Q; *see also* Exhs. N, and R, bid sheet and seniority list)

34.     Because feeder driver jobs are generally considered some of the most desirable hourly (union) jobs at UPS, they are typically held by higher seniority UPS employees. (Margrave Decl., ¶ 23; Ferguson Decl., ¶ 17)

---

[7] In 2006 and 2007, Feeder drivers bid on their jobs/routes twice a year in the April and December.  (Christie Decl., ¶ 24 fn 6; Margrave Decl., ¶ 25)

35.     From 2008 until he retired in 2011, plaintiff was among the top ten (10) drivers at the James Street Feeder Department in terms of full-time seniority.  (Exh. R; Christie Decl., ¶ 26; Margrave Decl., ¶ 26)

36.     UPS has both hourly jobs and "mileage" jobs.[8]  (Margrave Decl., ¶ 27; Christie Decl., ¶ 27)

37.     Mileage jobs are considered premium jobs due to their compensation (hourly rate plus specified amount per mile plus any overtime) and the nature of the job duties involved. (Margrave Decl., ¶ 30; Christie Decl., ¶ 27)

38.     Mileage drivers drive long distances to/from their destinations each day, and generally spend about one hour or less per day at their UPS facility.[9]  (Christie Decl., ¶ 28; Dooley Decl., ¶ 35; Stuke Decl., ¶¶ 16-17; Sifuentes Dep., pp. 50-57)

39.     Mileage jobs, like other Feeder driver bid jobs qualify for over-time pay under the contract.  (Margrave Decl., ¶ 30; Christie Decl., ¶ 31; Dooley Decl., ¶ 37; Exh. Q)

40.     Feeder drivers are required to follow a schedule for their bid job to ensure timely delivery of customer packages, some of which must be delivered in other locations across the country in less than twenty-four hours. (Christie Decl., ¶ 29; Reeves Decl., ¶ 28)

41.     The schedule for each bid job includes start time, lunch, breaks, and other elements of the specific job such as turnaround time.  (Christie Decl., ¶ 30; Dooley Decl., ¶ 36)

42.     From 2006 until he retired, plaintiff held "mileage" jobs in which he was paid an hourly wage plus a certain dollar amount per mile driven.  (Christie Decl., ¶ 32; Margrave Decl.,

---

[8] Some hourly Feeder jobs involve driving trailers to other UPS facilities outside the Kansas City area.  James Street Feeders also "city" routes in which the driver generally transports loads to Lenexa and to other locations in the KC metro area, e.g., customers and/or the rail yard. (Christie Decl., ¶ 5)

¶ 33; Dooley Decl., ¶ 39; *see* Exh. Q and. S)  As a "mileage" driver, plaintiff was paid overtime

if he performed "extra work" after finishing his mileage job.  (Exh. S; Dooley Decl., ¶ 39)

43.     Between 2008 and June 2010 when he went on leave for shoulder surgery,

plaintiff generally worked about ten hours of overtime on average per week**.**  (Sifuentes Dep., pp.

52, 29-30, 134; Exh. T)

## TRACTORS ARE ASSIGNED TO THE BID JOBS (NOT DRIVERS) BY THE KANSAS FEEDER SCHEDULER

44.     Between 2006 and 2011, UPS' Kansas Feeder fleet had approximately 200-220

tractors.[10]  (Reeves Decl., ¶ 33; Davis Decl., ¶ 26; Foth Decl., ¶ 21)

45.     The Kansas Feeder Scheduler is responsible for assigning tractors to bid jobs in

the State. (Reeves Decl., ¶ 33; Christie Decl., ¶ 35; Davis Decl., ¶ 26)

46.     The Scheduler assigns a specific tractor (by number) to each bid job and a certain

number of spare tractors to each location.  (Reeves Decl., ¶ 33)

47.     Tractors are assigned to bid jobs, not drivers.  (Reeves Decl., ¶ 33, 38; Exh. U,

Deposition of Gerald Reeves ("Reeves Dep."), pp. 101-103; Exh. V; Christie Decl., ¶ 36; Dooley

Decl., ¶ 44; Davis Decl., ¶26)

48.     Driver seniority plays no role in tractor assignment.  (Reeves Decl., ¶ 33; Davis

Decl., ¶ 26; Dooley Decl., ¶ 44)

49.     When the Scheduler assigns/changes tractors on bid jobs, he does not know or

consider which driver is performing or will perform each job.  (Reeves Dep., pp. 28-37; 57, 101-

103, 122-123; Reeves Decl., ¶ 36; Davis Decl., ¶ 29; Dooley Decl., ¶ 48)

---

[10] Between 2006 and 2011, the James Street Feeder Dept. generally had some spare tractors for
drivers to use if their tractors were taken out of service due to inspection, repair or maintenance
or other reasons, e.g., an automobile accident.[10]

50.     Before each Feeder annual bid, the Scheduler analyzes and makes changes to various bid jobs/routes and tractors assignments for business reasons, including but not limited, to changes in tractors, job start times and/or loads.  (Reeves Decl., ¶ 37;  Christie Decl., ¶ 42; Dooley Decl., ¶ 49; Davis Decl., ¶ 30)

51.     The Scheduler assigns tractors to bid jobs based on the following factors:  UPS building, miles driven on that job per day, terrain, hours needed/dual use of tractors (two bid jobs in 24-hour period), type of axle required (single/double), and type of loads/weight pulled. (Reeves Dep., p. 28-37, 101-103, 122-123; Reeves Decl., ¶ 40; Dooley Decl., ¶ 45; Davis Decl., ¶ 26; Exh. V)

52.     The Scheduler makes changes which he believes are necessary to transport customer packages in a timely, efficient manner in conjunction with other UPS schedulers. (*Id.*; Exh. V)

53.     The Scheduler uses "ghant" charts (excel spreadsheets) to manage/assign tractors to bid jobs based on the factors set forth above and his judgment regarding the optimal business use of the tractors available.  (Reeves Decl., ¶ 38; Dooley Decl., ¶ 50; Exh. V)  The ghant charts show Kansas feeder bid job numbers and the tractor assigned to each bid job at that time.[11] (Reeves Decl., ¶ 38; Dooley Decl., ¶ 50; Davis Decl., ¶ 31)

54.     They also contain additional information regarding the tractors such as year, manufacturer, single/double axle, whether it is used on more than one job in a 24-hour period ("dual use"), etc.  (Exh. V; Reeves Decl., ¶ 40)

---

[11]The Scheduler updates the ghant charts when Kansas receives tractors or tractors are transferred out or disposed of. (See Reeves Decl.¶ 39)

55.     Feeder managers and supervisors have no responsibility or authority to assign or change the tractors which the Scheduler assigns to bid jobs and do not supervise the Scheduler. (Christie Decl., ¶ 38; Reeves Decl., ¶ 41; Dooley Decl., ¶ 46)

56.     Feeder manager/supervisors also have no responsibility or authority for repair, maintenance or inspection of Feeder tractors.  (Id.)

57.     The Feeder Scheduler changes the tractors assigned to bid jobs due to business/customer needs, schedules and equipment availability.  (Reeves Decl., ¶ 45; Dooley Decl., ¶ 60; Davis Decl., ¶ 38)

58.     Since 2006, this has happened to many jobs held by Caucasian employees and employees who were younger than plaintiff.  (Dooley Decl., ¶ 58; Stuke Decl., ¶ 49)

59.     When a tractor is temporarily out of service, due to breakdown, repair, maintenance, inspection or collision, the Feeder dispatch person at the facility generally helps the driver find another tractor on site to drive temporarily (typically from spares and any other tractors on property).  (Dooley Decl., ¶ 54; Davis Decl., ¶ 35; Kirby Decl., ¶ 24)

60.     Between 2001 and 2009, the James Street facility had a slightly larger number/percentage of older tractors than UPS' Feeder operations in Salina and a few other locations.  (Reeves Decl., ¶ 43, 44)

61.     From 2006 to present, several Caucasian drivers at the James Street facility have driven older, rough-riding tractors assigned to their bid jobs.  (Dooley Decl., ¶ 57; Stuke Decl., ¶ 31; Reeves Dep., pp. 58-59, 120-121; Sifuentes Dep., pp.  188-190, 254-255; Exh. W Deposition of Wesley Epperson ("Epperson Dep.") pp. 29, 38-39; Shockley Dep., pp. 29-30, 53, 152-153)

62. From 2006 to present, several James Street drivers who are younger than plaintiff have driven old, rough riding tractors assigned to their bid jobs. (Reeves Decl., ¶ 44; Christie Decl., ¶ 51-55; Dooley Decl., ¶ 57; Stuke Decl., ¶ 32; Exh. X, Deposition of Robert Hill ("Hill Dep."), p. 42; Exh. Y, Deposition of James Shockley ("Shockley Dep."), pp. 29-30, 53, 152-153; Exh. HHH)

**63.** The Scheduler has the responsibility to determine/change bid job start times and schedules. (Reeves Decl., ¶ 45; Davis Decl., ¶ 39) The Scheduler does not know/consider which driver holds a particular bid job when making such decisions. (Reeves Decl., ¶ 46; Davis Decl., ¶ 39)

64. Since 2006, the Schedulers have changed feeder job start times on many Kansas feeder bid jobs held by Caucasian drivers and drivers who are younger than plaintiff. (Reeves Decl.; Davis Decl.; Stuke Decl., ¶ 48; Dooley Decl., ¶ 59; Exh. Z; also Exh. O)

65. The loads/trailers assigned to bid jobs are also changed from time to time due to changes in volume, equipment and other business reasons. (Dooley Decl., ¶ 60; see, e.g., Exh. Z)

66. Since 2006, this has happened many times to jobs held by Caucasian drivers and drivers older/younger than plaintiff. (Reeves Decl., ¶ 46; Davis Decl., ¶ 40)

**UPS SAFETY PROGRAMS/TRAINING**

67. UPS' Feeder operations are governed by U.S. Department of Transportation, OSHA and other federal, state and local laws and regulations.

68. Due to UPS' philosophy and the nature of its business -- the global transportation of millions of packages per year -- and applicable government regulations, UPS emphasizes safety and invests substantial resources to ensure the safety of employees, customers and the

general public by providing ongoing employee training and awareness programs.  (Ferguson Decl., ¶ 37; Greco Decl., ¶ 17; Margrave Decl., ¶ 45; Sifuentes Dep., p. 31**)**  As part of these efforts, UPS has developed and implemented a series of corporate safety training programs over the years to promote safe work practices. (Ferguson Decl., ¶ 40; Greco Decl., ¶ 16; Margrave Decl., ¶ 45)

69.    UPS' Health & Safety programs include, among other things, safety committees, ongoing safety training (including various types of quizzes to ensure that employees understand the information they are given), extensive safety policies and procedures (including "safe work methods"), and communications with employees concerning safety and prevention of injuries and accidents.  (*See ,* e.g., Exh. AA; Exh. BB; Exh. Q; Exh. J)**;** Sifuentes Dep., p. 31-35; Ferguson Decl. ¶¶44-46)

70.    UPS has Corporate, region and district/area-level Health & Safety Departments. Since the 1990s, UPS has had designated safety managers and supervisors at its James Street and Lenexa facilities.  (Greco Decl., ¶ 15)

71.    For decades, UPS and the Teamsters have had joint Health & Safety committees to address safety issues and concerns, resolve safety-related employee grievances and attempt to ensure compliance with DOT rules and regulations. (Greco Decl., ¶ 16; Margrave Decl., ¶ 44 )

72.    As part of UPS' Health & Safety programs, Feeder, Hub and Package car (brown delivery truck) management are required to provide periodic safety training to their employees in conjunction with Health & Safety Department employees.  (Ferguson Decl., ¶ 42; Greco Decl., ¶ 19; Margrave Decl., ¶¶ 47-48)

73.    As part of their job duties, Feeder and Package car managers and supervisors observe drivers performing their duties, including pre-trip and post-trip inspections of their

equipment and safe work methods. periodic safety rides with drivers.  (Ferguson Decl., ¶ 44; Greco Decl., ¶ 20; Margrave Decl., ¶¶ 47-48)

74.     Between at least 2001 and 2012, Feeder and Package "on-road" supervisors, including Steve Stuke, were required to perform annual and other "safety" training rides with drivers (including plaintiff) and observe their job performance and use of safe work methods. This training is intended to prevent injuries/fatalities and automobile accidents and help employees perform their jobs safely.  (Christie Decl., ¶ 112; Greco Decl., ¶ 21; Ferguson Decl., ¶ 46; Dooley Decl., ¶ 65; Rosner Decl., ¶ 4)

75.     UPS employees are trained on UPS' "safe work methods" developed by Health & Safety Department employees over many years.  (Ferguson Decl., ¶ 41; Greco Decl., ¶ 19; Margrave Decl., ¶¶ 46-47; Exh. J)

76.     UPS employees are trained and required to immediately report any unsafe condition or equipment to management.  (Christie Decl., ¶ 69; Dooley Decl., ¶ 71; Greco Decl., ¶ 22; Ferguson Decl., ¶ 51; Sifuentes Dep., p. 30-33)

77.     UPS employees are also trained and required to immediately notify their supervisor or manager of any work-related injuries or automobile accidents, regardless of severity.  (Christie Decl., ¶ 70; Dooley Decl., ¶ 72; Greco Decl., ¶ 23; Exh. AA; Exh. CC

78.     If an employee has a work-related injury or accident, he/she receives follow-up safety training pursuant to UPS policies and procedures to keep that employee safe in the future.. (Christie Decl., ¶ 71; Dooley Decl., ¶¶ 69-70; Exh. AA; Exh. BB)

79.     Also, when a driver reports an automobile accident or workplace injury, supervisors are required to perform observations and ride with the drivers to ensure that they are

following safe work methods and other UPS safety training.  (Christie Decl., ¶ 67; Dooley Decl., ¶ 69; Greco Decl., ¶ 23; Stuke Decl., ¶ 60; Exh. DD)

80.     All UPS employees receive ongoing training regarding safe work methods and other safety-related training (developed by UPS Corporate H&S).  As part of the safety training, employees are required to pass various safety-related tests/quizzes each year.  (Ferguson Decl., ¶ 41; Christie Decl., ¶ 105; Greco Decl., ¶¶ 17-19; Rosner Decl., ¶ 4)

81.     If an employee has a work-related injury or accident, he or she receives follow-up safety training to keep that employee safe in the future, including a safety training ride/observation.  (Greco Decl., ¶ 23; Ferguson Decl., ¶ 47; Dooley Decl., ¶¶ 69-70; Rosner Decl., ¶ 4)

82.     Between 2006 and 2011, numerous employees at the James Street facility have reported injuries and taken time off for medical treatment/recovery.  (Christie Decl., ¶ 72; Exh. EE, Declaration of Jurgen Rosner ("Rosner Decl.), ¶ 35)  Those employees received follow up safety training.  (Ferguson Decl., ¶ 48; Greco Decl., ¶ 25; *See e.g.,* Exh. FF Investigation report form for 1 of WS injuries; Exh. DD)

83.     Plaintiff never filed a DOT complaint during his employment at UPS.  (Sifuentes Dep., p. 38, 62; Greco Decl., ¶ 76;)

84.     Plaintiff also never filed an OSHA complaint or notified OSHA or the DOT of any safety issues or concerns at UPS.   (Sifuentes Dep., p. 226; Greco Decl., ¶ 76; )

**FEEDER OPERATIONS ARE GOVERNED BY U.S. DEPARTMENT OF TRANSPORTATION REQUIREMENTS AND SAFETY REGULATIONS**

85.     UPS' Feeder operations are governed by extensive DOT safety rules and regulations

86.     UPS' Automotive Department is responsible for maintaining feeder tractors and other equipment in safe operating condition in accordance with U.S. Department of Transportation ("DOT") regulations.  (Exh. GG policy; Exh. HH, Declaration of Brad Foth ("Foth Decl."), ¶ 35; Christie Decl., ¶ 74; Exh. Q CBA)

87.     UPS' Automotive Department performs inspections, repairs and maintenance of feeder tractors as required by DOT regulations and UPS policies/procedures.  (Dooley Decl., ¶ 78; Foth Decl., ¶ 35; Exh. GG policy; see also Exh. II)

88.     UPS inspects each tractor annually and at regular intervals based on specified mileage or days since last inspection, depending on which occurs first.  (Exh. GG; Exh. II PMI; Exh. JJ procedure; Foth Decl. ¶ 36)  UPS performs additional inspections and maintenance of tractors beyond what the DOT regulations require.  (Foth Decl., ¶ 36; Christie Decl., ¶ 76)]

89.     UPS' Automotive Department has a list of DOT safety and other items which are evaluated by its mechanics during the periodic inspections and maintenance of tractors.  (Foth Decl., ¶ 63; Exhs. KK and LL)  Automotive replaces equipment on tractors and makes repairs which the mechanics and/or Automotive supervisors believe are necessary.  (Foth Decl., ¶ 37; Christie Decl., ¶ 78)

90.     Automotive mechanics and supervisors determine whether they believe tractors which are written up by drivers in the DVIRs are safe to drive and comply with DOT requirements.  (Foth Decl., ¶ 41; Christie Decl., ¶ 78; Dooley Decl., ¶ 75)

91.     In the DVIR, the driver states whether he believes an issue he has identified regarding a tractor is safety or non-safety related.  (*See* Exh. MM,  DVIR)

92.     Brad Foth has been UPS' Kansas Automotive Fleet Manager since approximately mid-2010, and is responsible for the maintaining and the recordkeeping of the Kansas Feeder equipment.  (Foth Decl., ¶ **1**)

93.     Due to differences in responsibilities, Automotive, Feeders and Scheduling are separate divisions at UPS and report to different region/division managers.  (Christie Decl., ¶ 80)

94.     Feeder drivers are required by DOT regulations and UPS policy to perform a pre-trip inspection of their tractors before they leave to drive their routes.  (Exhs. LL and Q; Christie Decl., ¶ 82; Sifuentes Dep., p. 61; Dooley Decl., ¶ 80; Foth Decl., ¶ 39; *See also* Exh. NN)

95.     DOT regulations and UPS policy require that after driving their bid route each day, drivers must inspect their tractors and sign the DVIR stating whether they found any safety and/or non-safety related issues regarding that tractor.  (Christie Decl., ¶ 83; Foth Decl., ¶ 40)

96.     If the driver finds a safety-related item, they are instructed and expected to write it up in the DVIR, and give the tractor key and a copy of the DVIR to Automotive to address before the tractor is driven again.  (Foth Decl., ¶ 40; Christie Decl., ¶ 84; Exhs. Q and KK policies re DVIR/red tag; see Exh. MM)

97.     UPS drivers are trained and instructed to report unsafe tractors to management and not drive any unsafe tractors or other equipment.  (Sifuentes Dep., pp. 32, 35-36, 65; Exh. OO; Exh. BB; Dooley Decl., ¶¶ 71-72; Stuke Decl., ¶63; Kirby Decl., ¶ 21)

98.     Plaintiff testified that he repeatedly received the training about reporting unsafe equipment (*Id.*)

99.     Plaintiff testified that from 2006 until he retired, he never knowingly put himself or the public at risk by driving an unsafe tractor or knowingly violate any DOT rules or regulations.  (Sifuentes Dep., pp. 38, 42)

100.    Indeed, Plaintiff testified that if he found a safety-related issue or problem with his tractor, he would write it on the DVIR, take it to the Automotive Shop and have the item repaired.  (Sifuentes Dep., p. 61)

101.    If an Automotive supervisor or mechanic were to allow a driver to operate a tractor with a reported safety issue that had not been addressed, that Automotive employee would be subject to discipline, up to and including termination.  (Foth Decl., ¶ 44; Christie Decl., ¶ 93)

102.    The driver vehicle inspection reports ("DVIRs") which Plaintiff filled out and signed for the tractors he drove during the first six months of 2010 (before he left for shoulder surgery), do not list any safety-related items regarding those tractors..[12]  (Exh. MM; Foth Decl., ¶ 62; Christie Decl., ¶ 94; Dooley Decl., ¶ 93)

103.    Under UPS policies, if a tractor is taken out of service (red tagged) due to a safety issue, it cannot be driven until an Automotive employee signs off safe to drive.

104.    From at least 2006 until he retired, Plaintiff did not file any grievances which mention tractors or any issues Plaintiff allegedly had with any tractor during that period. (Sifuentes Dep., pp. 143, 206; Dooley Decl., ¶ 94; Margrave Decl., ¶ P; Exh. PP, Declaration of Steve Mitchell ("Mitchell Decl."), ¶ 54)

105.    Plaintiff did not file any complaints with UPS's corporate concern hotline regarding any tractors.  (See Dooley Decl.; Ferguson Decl.; Foth Decl.)

---

[12] DOT regulations require that UPS and other trucking companies retain DVIRs for ninety days. As a result, UPS does not have DVIRs signed by plaintiff before January 2010.  (Dooley Decl; ¶ 93 n.7)

**PLAINTIFF'S BID JOBS**

106.    In May 2008, plaintiff bid onto mileage job KWM2 in which he drove trailers to/from O'Fallon, Illinois  (Sifuentes Dep., p. 144-45; Dooley Decl., ¶ 95; Exh. N)

107.    A newer tractor 270818 was assigned to that job in 2008.  (Exh. N; Sifuentes Dep., pp. 117, 151)  Plaintiff wrote up the seat in that tractor as a non-safety item on the DVIR because he thought it was too stiff.  (Sifuentes Dep., pp. 92, 117; Dooley Decl., ¶ 95)

108.    An uncomfortable seat is not considered a safety-related item by the DOT or UPS Automotive.  (Sifuentes Dep., p. 65; Dooley Decl., ¶ 95; Kirby Decl., ¶ 33; Foth Del, ¶ 46; see PMI list)

109.    In response to plaintiff's DVIR notation, Automotive repaired or replaced the air valve on the seat and adjusted the seat to address plaintiff's concern.  (Exh. QQ, 270818 Repair History; Sifuentes Dep., p. 92; Stuke Decl., ¶ 11)

**PLAINTIFF PERFORMED HIS FEEDER DRIVER JOB SATISFACTORILY**

110.    From 2001 through his retirement, plaintiff performed his feeder driver bid jobs and testified that he did so without accommodation.  (Sifuentes Dep., pp. 40-41, 73, 75-76, 82-84, 90, 110-111, 219-220, 224; *see* also Stuke Decl., ¶¶ 54, 85)

111.    During his employment at UPS, plaintiff had no permanent medical restrictions. (Sifuentes Dep., pp. 69-70)

112.    From January 2006 until he retired, plaintiff passed all his DOT physical examinations.  (Sifuentes Dep., pp. 69-70; Ferguson Decl., ¶ 63; Exh. RR)

113.    Plaintiff testified that during the past six years, no doctor has given UPS documentation stating plaintiff was not able to work as a feeder driver.  (Sifuentes Dep., p. 69; *see also* Dooley Decl., ¶ 102; Rosner Decl., ¶ 62)

114.    Plaintiff testified (and alleged in his Complaint) that he was able to perform his feeder driver job duties without accommodation.  (Sifuentes Dep., pp. 75-76, 82-84, 90, 110, 224; *see also* Stuke Decl., ¶ 54; Dooley Decl., ¶ 99)

115.    Plaintiff had prostate surgery on November 25, 2008.  (Exh. SS)   Plaintiff's doctor kept him off work until December 12, 2008 when he was released to work with a temporary twenty-five pound lifting restriction.  (Exh. TT: Sifuentes Dep., p. 70; Rosner Decl., ¶ 19)

116.    This temporary restriction was in effect from December 12, 2008 through December 29, 2008 when plaintiff was released to regular duty by his physician.  (Exh. UU; Sifuentes Dep., pp. 70, 160, 166; Rosner Decl., ¶ 19)

117.    Plaintiff took his scheduled vacation from early January through mid February 2009 and returned to work in his bid job in February 2009.  (Exh.VV; Sifuentes Dep., pp. 166, 167; Dooley Decl., ¶¶ 118, 120)  When Plaintiff returned to work in February 2009, he had no medical restrictions.  (Dooley Decl., ¶ 118; Exh. UU; Ferguson Decl., ¶ 67)

118.    Plaintiff returned to working as a feeder driver after each leave of absence (except the last when he retired) and performed his regular duties.  (Dooley Decl., ¶ 100; Ferguson Decl., ¶¶ 65-66, 71; Rosner Decl., ¶ 27; Exh. J; Exh. T)

119.    Plaintiff never told UPS management or human resources that he was unable to perform his job and continued working a feeder driver.  (Sifuentes Dep., pp. 71, 91, Stuke Decl., ¶ 54 Dooley Decl., ¶ 101; Kirby Decl., ¶ 72; Ferguson Decl., ¶ 69; Rosner Decl., ¶ 23)

120.    Plaintiff testified that he never gave UPS a document from any healthcare provider stating that he could not perform the essential functions of his feeder driver job.  (*Id.* at 73; *see also* Rosner Decl., ¶ 24; Ferguson Decl., ¶ 69)

121.    No doctor informed UPS that plaintiff had a disability or was unable to work as a feeder driver without accommodation.  (Sifuentes Dep., pp. Sifuentes Dep., pp. 40-41, 71-76, 82-84, 90, 110-111, 219-220, 224); Rosner Decl., ¶ 25; Dooley Decl., ¶ 102; Stuke Decl., ¶ 56; Ferguson Decl., ¶¶ 74-75)

122.    Neither plaintiff nor any of his healthcare providers requested that UPS transfer plaintiff from his feeder driver job to any other job.  (Sifuentes Dep., pp. *Id., 27*; Dooley Decl., ¶ 104; Stuke Decl., ¶ 57; Rosner Decl., ¶ 28)

123.    UPS was not aware that plaintiff required or requested an accommodation for any alleged disability.  (Rosner Decl. 62)

124.    As a result of plaintiff's allegations regarding accommodation in his EEOC Charge, in June 2009 UPS' Occupational Health Supervisor, Jurgen Rosner, sent plaintiff a letter enclosing the paperwork concerning the ADA accommodation process.  (Rosner Decl., ¶ 32; Exh. WW; *see also* Sifuentes Dep., pp. 220-221)

125.    Plaintiff told UPS that he would <u>not</u> fill out the paperwork or sign the medical records release as requested by UPS based on instructions from his attorney.  (Sifuentes Dep., pp. 220-221, 223-224; Rosner Decl., ¶ 33; Exh. XX**)**

126.    Plaintiff worked as a feeder driver at UPS after he refused to fill out the ADA paperwork.  (Sifuentes Dep., p. 224; Rosner Decl., ¶ 34)

**PLAINTIFF'S INJURIES AND WORKERS' COMPENSATION CLAIMS**

127.    During his employment at UPS, plaintiff reported numerous work-related injuries and filed several workers' comp claims during the past twenty years. (Exhs. YY and ZZ; Rosner Decl., ¶ 37; Ferguson Decl., ¶ 139)

128.    During the past five years, UPS' Kansas District has provided light duty/temporary alternate work to many employees who sustained workplace injuries and

returned to work with medical restrictions.  (Rosner Decl., ¶ 47 Greco Decl., ¶ 59; Exh. AAA)

For example**,** James Street feeder driver Harry Hall returned to work with medical restrictions

and performed light duty work.  (Dooley Decl., ¶ 112; Ferguson Decl., ¶ 79)

129.    In addition, several employees, e.g., Feeder specialist Deborah Ammons, returned

to work with medical restrictions after a non-work related injury/surgery and were given

assistance performing their job duties. **(**Exh. BBB Ammons note; Dooley Decl., ¶ 131; Stuke

Decl., ¶ 80; Jurgen Decl., ¶47-48)

130.    Since at least 2006, plaintiff did not file a grievance alleging that UPS took any

actions toward him due to age, race/ethnic background, disability, failed to accommodate any

medical conditions, or retaliated against him because he filed an EEOC charge or requested an

accommodation.  (Sifuentes Dep., pp. 147, 150, 220; Margrave Decl., ¶ 71; Dooley Decl., ¶ 162)

**PLAINTIFF VOLUNTARILY RETIRED FROM UPS IN 2011**

131.    On January 1, 2011, there were approximately 81 drivers[13] in the James Street

Feeder Dept.  (Ferguson Decl., ¶ 86 and Exh. CCC thereto)  Only 5 of these drivers were under

age 40.  Of the 81 James Street feeder drivers in January 2011, 59 drivers were over age 50 and

13 drivers were over age 60.  (*Id.*)

132.    Under the terms of the UPS/Teamsters pension plan applicable to Feeder drivers,

employees are eligible to retire at age 57 if they have twenty years of service with UPS.

(Ferguson Decl., ¶ 84)

133.    Between 2008 and 2011, a substantial number of James Street feeder drivers,

including plaintiff, were eligible to retire at any time without providing notice to Feeder

Management.  (Ferguson Decl., ¶ 87; Dooley Decl., ¶ 122)

---

[13] A few like Jerry Graham were working in the yard as shifting and hooking up equipment.

134.    UPS' Kansas District Operations management, Human Resources, Workforce Planning and Industrial Engineering work together regarding staffing plans and filling positions which become vacant each year.  (Ferguson Decl., ¶ 5)

135.    As part of this process, they attempt to anticipate the number and types of of vacant positions that may occur in each department or division, including Feeder in the next several months.  (*Id*. at 10)  This is important to UPS' ability to meet its customers' needs regarding timely delivery of packages.  (*Id*.)

136.    As part of this planning process, Feeder and other Operations management are encouraged to poll their employees from time to time regarding their career plans, including retirement plans, in an effort to determine whether there will be vacant positions in the next several months.  (*Id*. at 10  Staffing needs in Feeders and other divisions are fluid and change from month to month.  (*Id*.)

137.    Periodically during the year, UPS reviews its staffing and determines whether and when to schedule Feeder driving training schools based on the number of feeder driver bid jobs it anticipates will need to be filled in the next several months.  (Ferguson Decl., ¶ 15)

138.    UPS management must train a sufficient number of new drivers to fill positions that will become vacant in the next several month**s**.  (Stuke Decl., ¶ 71; Ferguson Decl., ¶¶ 6, 15)

139.    In mid June 2010, plaintiff took a leave of absence for shoulder surgery. (Sifuentes Dep., pp. 49, 462; Rosner Decl., ¶ 63)  Plaintiff was released by his doctor to return to work regular duty January 2, 2011 without  medical restrictions.  (Sifuentes Dep., pp. 78-79; Rosner Decl., ¶ 63; Exh. CCC; Ferguson Decl., ¶ 71)

140.    Plaintiff took his previously-scheduled vacation weeks in January 2011 and retired February 1, 2011.  (Sifuentes Dep., pp. 79-80; Dooley Decl., ¶ 150)

141.    However, in January 2011, plaintiff contacted Gayle Ferguson to request assistance with his retirement paperwork.  (Ferguson Decl., ¶ 4)  He told Ms. Ferguson that although he had notified UPS Corporate Retirement Department that he planned to retire in early 2011, he had not yet received the retirement paperwork/information. (Ferguson Decl., ¶ 97; Sifuentes Dep., pp. 40-41, 73, 75-76, 82-84, 90, 110-111, 219-220, 224, 412-413)

142.    Ms. Ferguson assisted plaintiff in getting his retirement paperwork processed so he could retire in early 2011 as planned.  (Ferguson Decl., ¶ 97; Exh. K)

143.    No one in UPS management/Human Resources told plaintiff that he could not return to work because he filed a workers' compensation claim or reported an injury.  (Sifuentes Dep., p. 412; *see also* Dooley Decl., ¶ 151; Stuke Decl., ¶ 64)

**UPS HAS WRITTEN POLICIES PROHIBITING DISCRIMINATION, HARASSMENT AND RETALIATION**

144.    UPS has policies which prohibit age, race and disability discrimination/ harassment and retaliation, as well as an "open door" policy regarding complaints.  (Ferguson Decl., ¶¶ 103-105; *see*, *e.g.*, Exh. DDD)  These policies are contained in UPS' Code of Business Conduct, Policy Book, on upsers.com and other locations.  (Ferguson Decl., ¶¶ 103-105)

145.    UPS has a Professional Conduct and Anti-harassment Policy which prohibits unlawful harassment and retaliation.  (Ferguson Decl., ¶¶ 103-104; *see*, *e.g.*, Exh. DDD)

146.    UPS has a corporate concern hotline employees can use to report any type of complaint or concern related to their employment.  (Ferguson Decl., ¶ 105; *see*, *e.g.*, Exh. DDD)

147.    UPS posts information concerning EEO laws, its non-discrimination, anti-harassment and non-retaliation policies, and the corporate concern hotline at the James Street facility.  (Ferguson Decl., ¶ 106 and exhibits thereto)

148.    The labor agreement also prohibits unlawful discrimination and harassment based on age, race/ethnicity, disability and other protected characteristics .  (Exh. Q)

149.    In January 2011, plaintiff called UPS' corporate hotline regarding the status of his retirement paperwork. (Exh. EEE; Ferguson Decl., ¶ 98)

150.    The record of this call indicates that plaintiff did not complain of discrimination, harassment, retaliation, interference under the ADA, failure to accommodate or workers' compensation retaliation.  (Id.; Ferguson Decl., ¶ 116)

151.    Plaintiff filed his EEOC/KHRC charge against UPS in April 2009.  (Exh. FFF)

152.    Plaintiff was working at UPS during April 2009 and his employment continued until he retired in 2011. (Dooley Decl., ¶ 106)

153.    Plaintiff receives a monthly pension benefit of approximately $4,100.00 and health insurance through the UPS/Teamsters Plan.  (Ferguson Decl., ¶ 102)

## ARGUMENT

It is well-established that summary judgment is not a "disfavored procedural shortcut," but an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Haney v. Preston*, 2010 WL 5392670, at *2 (D. Kan. Dec. 22, 2010) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). "While the party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact, the moving party need not negate the nonmovant's claim, but need only point out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Universal Money Centers, Inc. v. American Tel. & Tel. Co*., 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations and citations omitted).

Once the movant has met this burden, the non-movant cannot avoid summary judgment simply by showing "the mere existence of some alleged factual dispute between the parties," or "some metaphysical doubt as to the material facts." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can a plaintiff defeat a properly supported motion for summary judgment by repeating conclusory opinions, resting on speculation, or asserting allegations unsupported by fact. *See, e.g., Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242 (10th Cir. 2000); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Rather, to preclude the entry of summary judgment, Plaintiff must show the existence of disputes over material facts that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 250. He must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Haney*, 2010 WL 5392670, at *2 (*quoting Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246.

## I.   PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM FAILS

### A.   PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM IS TIME-BARRED

Plaintiff alleges that he was forced to retire/constructively discharged in February 2011, in violation of the ADA, Title VII, the ADEA, the KAAD, and KADEA, as well as that he was constructively discharged for exercising his workers' compensation rights. ECF Doc. 132, p. 4. For Plaintiff's claim pertaining to his alleged constructive discharge to be actionable under the ADA, Title VII, or the ADEA, Plaintiff had to file a charge of discrimination with the EEOC within 300 days after the "alleged unlawful employment practice occurred." *Davidson v.*

*America Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003); 42 U.S.C. §2000e-5(e)(1); *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002); *Bolden v. PRC Inc.*, 43 F.3d 545, 552 (10th Cir. 1994). Under the KAAD and the KADEA, Plaintiff had to file a charge of discrimination within six months of the alleged unlawful employment practice. K.S.A. 44-1005(i); *Wallace v. Beech Aircraft Corporation*, 87 F.Supp.2d 1138, 1145 (D.Kan. 2000).

Each discrete act of discrimination, such as a constructive discharge, starts a new clock for filing a charge. *Id.* at 1184; *Chapman v. Carmike Cinemas*, 2009 WL 57504 at *9 (10th Cir. 2009) (explaining that a constructive discharge is a discrete act which must be individually exhausted). If a party fails to file a timely charge of discrimination, the claim is time-barred. *Davidson*, 337 F.3d at 1183 (citing *Bullington v. United Air Lines Inc.*, 186 F.3d 1301, 1310 (10th Cir.1999); *see also the following for a pre- National R.R. Passenger Corp. v. Morgan analysis with the same result: D'Zurella v. State of Kansas et al.*, 930 F.2d 33, 1991 WL 47101 at *1 (10th Cir. 1991) (affirming decision that plaintiff's claim of constructive discharge which occurred three years after the EEOC charge was filed and two years after plaintiff received a right-to-sue-letter is not reasonably related to the original EEOC charge and investigation).

In the present case, Plaintiff filed only one charge of discrimination which was filed on April 3, 2009. Although Plaintiff alleged constructive discharge in the charge, Plaintiff continued working for UPS for almost two additional years – until he retired in January 2011, upon attaining exactly 40 years of service. Clearly, given that the alleged February 2011 constructive discharge had not yet occurred, Plaintiff's April 3, 2009 charge of discrimination did not exhaust administrative remedies with respect to his constructive discharge claim. Plaintiff filed no other charge of discrimination and thus never filed a charge a discrimination pertaining to the alleged 2011 constructive discharge.

As each act of discrimination starts a new clock for filing a charge, Plaintiff failed to exhaust his administrative remedies as to his claim that he was constructively discharged. *Id.* As such, his claim is time-barred. *Chapman*, 2009 WL 57504 at *1, *9-10 (affirming the District Court's decision that plaintiff's constructive discharge claim was time-barred for failure to exhaust administrative remedies where the constructive discharge occurred after plaintiff filed a charge of discrimination and plaintiff failed to amend her existing charge to allege she was constructively discharged); *see also Bolden v. PRC Inc.*, 43 F.3d 545, 552-553 (10th Cir. 1994) (affirming summary judgment for employer on plaintiff's denial of promotion claim due to failure to file timely charge of discrimination). Accordingly, Plaintiff's claim that he was constructively discharged under the ADA, Title VII, the ADEA, the KAAD, and KADEA fails as a matter of law.

### B.    PLAINTIFF CANNOT ESTABLISH THAT HE WAS CONSTRUCTIVELY DISCHARGED

Plaintiff's constructive discharge claim is clearly barred as a matter of law. Nonetheless, even if this Court were to find Plaintiff's claim is not barred by his failure to exhaust, which UPS adamantly denies, Plaintiff cannot establish that he was constructively discharged as part of his disability discrimination or any other claim.

Plaintiff alleges that he was repeatedly harassed during his employment because 1) in 2006 Dooley criticized him for being listed in the "Top 50" employees with respect to number of injuries suffered in the course of his employment with UPS, required him to take computer safety quizzes for approximately two weeks, told him that management would be observing him to ensure that he was applying UPS' safety methods and being safe, and that there would be consequences if he failed to do so, 2) after he would suffer an injury his supervisor Stuke would require that he undergo additional training,  3) he was continuously assigned "rough-riding"

31

tractors which required various repairs, and 4) UPS made changes to his bid job including his changing the start time on his bid job from 6:30 a.m. at 5:45 a.m.   Plaintiff alleges that UPS' conduct was so severe as to ultimately force him to retire in February 2011.  (ECF Doc. 132, p. 4)

The conduct alleged by Plaintiff in the present case does not rise to the level of egregiousness necessary to constitute legally actionable constructive discharge for several reasons.  A plaintiff's burden in a constructive discharge claim is "**substantial**" – it "requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but *intolerable*." *McDonald v. City of Scranton, Kansas*, 2009 WL 2777774 at *3 (D. Kan. 2009) (emphasis added).  "A constructive discharge occurs when a reasonable person in the employee's position would view [his] working conditions as intolerable and would feel that [he] had no other choice but to quit." *Tran v. Trs. of State Colls. in Colo*., 355 F.3d 1263, 1270 (10th Cir. 2004). "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Id.*

In the present case, Plaintiff cannot satisfy this high burden.   First, plaintiff had little contact with management.  (Sifuentes Dep. pp. 50-54)  As a mileage driver, Plaintiff spent most of his workdays driving a tractor-trailer from one location to another.  Plaintiff testified that he would only be at the James Street facility premises for approximately 25 minutes each morning and for approximately 15 minutes after the end of his shift.  Plaintiff testified that when he came to work in the morning, he engaged in small-talk with the dispatcher and performed a pre-trip inspection of his equipment out in the James Street feeder yard.  (Sifuentes Dep. pp. 50-54)

Plaintiff testified that he did not see his managers very often even during the limited time he was at the James Street facility each day.  (Sifuentes Dep. pp. 50 – 54; Stuke Decl. ¶¶ 16-17)

In fact, manager Dooley worked a later schedule, and was not normally at the facility while Plaintiff was there in the morning.  *Id.*  Similarly, while supervisor Stuke was usually present at the facility in the morning before Plaintiff left to drive his route, Stuke was rarely if ever there in the evening when Plaintiff returned.  *Id.*  Most days, even in cases where Stuke saw Plaintiff in the morning, Stuke did not speak with Plaintiff, except to say hello in passing.  *Id.*  Accordingly, given Plaintiff rarely saw the management employees who he alleges harassed him, Plaintiff's claim fails as a matter of law.  *McCloud v. Potter*, 2010 WL 670147 at *5 (W.D. Ky. 2010) (no constructive discharge where plaintiff rarely even worked at the same time as the alleged harasser).

Other than possibly receiving a verbal warning from Allen Kirby in 2007 for failing to wear his seat belt, Plaintiff received no discipline between 2006 and February 2011 when he retired.  (SOF 24-25; Sifuentes Dep. p. 46)  Moreover, alleged instances of close supervision by Stuke or Dooley, or even the occurrence of more severe conduct than the conduct Plaintiff alleges occurred in the present case, are insufficient to establish a constructive discharge claim. *See Tran,* 355 F.3d at 1271 (close supervision does not support a constructive discharge claim); *see also Balfour v. Medicalodges, Inc.*, 2006 WL 3760410 at *24 (D. Kan 2006) (targeting of plaintiff by supervisors for termination and threat of termination insufficient to establish objectively intolerable working conditions) (*citing Parker v. Bd. of Regents*, 981 F.2d 1159, 1162 (10th Cir.1992) (to create a constructive discharge, threat to terminate employee must amount to duress, leaving plaintiff no real choice but to resign); *Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1339 (10th Cir.2000) (placing employee on a professional development plan and requiring employee to meet weekly with her superior was not an adverse employment action).

Plaintiff's allegations concerning being assigned rough-riding tractors do not buttress his claim.  Plaintiff testified that it was his duty as a UPS feeder driver to inspect his tractor-trailer every morning before leaving for his route, as required by Department of Transportation ("DOT") regulations. (Sifuentes Dep. 56-59, 61)  Plaintiff was required to complete a DVIR every single day of his job as a feeder driver.  If there was any safety issue with the tractor, Plaintiff had to write up the issue and provide a copy to a mechanic to address before the tractor is driven again.  (SOF 85-97)  UPS' Automotive Department routinely evaluates the tractor trailers to ensure that they are safe to operate and comply with DOT regulations as well as the heightened standards maintained by UPS.  Plaintiff testified that it would be a violation of federal law and UPS policy not to report a safety issue.  (Sifuentes Dep. p. 62)  In fact, Plaintiff testified that at all relevant times he never drove an unsafe tractor or otherwise put his safety or public safety at risk.  He further testified that if he ever had a safety issue he would record it on the DVIR and report it so it could be fixed.

Moreover, given the number of older tractor-trailers in the James Street fleet, many other feeder drivers had old, rough-riding tractors assigned to their bid jobs and/or complained about the tractors being rough-riding and difficult to operate.  (SOF 61-62)  There is no evidence that the state of the tractors forced the other feeder drivers to resign.  *See Sinclair v. Kmart Corp.*, No. 95-1170-JTM, 1997 WL 45350, at *5 (D. Kan. Feb. 3, 1997) (finding no constructive discharge where other employees worked under the same conditions).  Even more significantly, Plaintiff filed no grievances pertaining to tractor conditions; the available DVIR forms (from January to June 2010) do not note any safety-related items.

Most tellingly, most of the allegedly harassing conduct Plaintiff claims caused him to resign occurred years before Plaintiff's retirement (e.g., Dooley's discussion with plaintiff in

2006 regarding injuries), or involves sporadic conduct also remote in time (Stuke requiring that he undergo additional training following injuries) – almost all of which occurred years prior to his February 2011 resignation.  Conduct remote in time – most of which occurred years prior – logically and by law, defeats Plaintiff's claim that he had no choice but to retire five years later after most of the alleged harassing conduct occurred.  (*See* cites on page 14 below).

Plaintiff's claim that the conduct cited above or any other conduct was so intolerable as to give him no choice but to retire is further bellied by the fact that no harassing conduct occurred for some eight months before Plaintiff's resignation.  Plaintiff went on leave in June 2010 for shoulder surgery, and after taking vacation, he retired without returning to work. Plaintiff requested to retire in November/December 2010, and retired in February 2011.  Plaintiff does not allege that UPS management harassed him by contacting him outside of work between June and November 2010.  As such, some six months passed between Plaintiff's last day at work and his request to retire; eight months passed between Plaintiff's last day worked and his actual retirement.  For a constructive discharge claim to be actionable, the decision to leave work must occur while the intolerable working conditions exist.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) ("Plaintiff must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship").  Given the passage of six/eight months since the harassing conduct Plaintiff's constructive discharge claim clearly fails.  *See Nowlin v. KMart Corporation*, 50 F.Supp.2d 1064, 1072 (D. Kan. 1999) (sixteen months without complaints defeats constructive discharge claim); *see also Montero v. Agco Corp.*, 192 F.3d 856, 861 (9th Cir.1999) (finding the plaintiff could not maintain a claim of constructive discharge where she left employment four months after the harassing behavior had ceased); *Taylor v. Nickels and Dimes Inc.*, 71 Fed.Appx. 440 at

*3 (5th Cir. 2003) (passage of ten months since harassing conduct ceased defeats constructive

discharge claim).  To hold otherwise would contravene the very nature of the claim - that the

conduct is presently so intolerable that the employee has no other choice but to quit.

Any claim that Plaintiff had no choice but to quit is further defeated by the fact Plaintiff

waited until he earned exactly 40 years of service before retiring from UPS.  *Shelar v.*

*Ameripride Servs. Inc.*, 2006 WL 1877010, at *9 (D. Kan. July 6, 2006) ("The fact that plaintiff

was willing to remain employed by defendant for an additional three weeks cuts against plaintiffs

claim that his working conditions were intolerable.  Giving several weeks notice of the date on

which one will be compelled to resign is unprecedented, in this court's experience, for a

successful constructive discharge claim"); *Flaherty v. Metromail Corp.*, 2002 WL 32059735, at

*2-3 (2d Cir. July 9, 2002) (90-day resignation notice cut against plaintiffs constructive

discharge claim where evidence showed that plaintiff needed to work additional time to qualify

for retirement benefits); *Johnson v. Wal-Mart Stores, Inc.*, 987 F.Supp. 1376, 1394

(M.D.Ala.1997) ("That Johnson was able to ... give Wal-Mart three weeks notice before leaving

her position strongly suggests that the conditions to which she allegedly [was] subjected were not

intolerable.")  Accordingly, Plaintiff cannot establish that he was constructively discharged.

## II.   PLAINTIFF CANNOT ESTABLISH A CLAIM OF DISABILITY DISCRIMINATION

In order to establish a claim of disability discrimination under the ADA, Plaintiff has the

burden of first proving a prima facie case of discrimination.  *Pack v. Kmart Corp.*, 166 F.3d

1300, 1302 (10th Cir. 1999); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *Reed v.*

*Nellcor Puritan Bennett*, 244 F.Supp.2d 1205, 1213 (D. Kan. 2003).  In order to demonstrate a

prima facie case of discrimination, Plaintiff must show that he:  (1) has a "disability" within the

meaning of the ADA; (2) is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) suffered an adverse employment action because of his disability. *Morgan*, 108 F.3d at 1323; *Sorensen v. University of Utah Hospital*, 194 F.3d 1084, 1086 (10th Cir. 1999); *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir. 1997).

If Plaintiff establishes a prima facie case of discrimination, UPS must proffer a legitimate, non-discriminatory reason for the adverse action. *Morgan*, 108 F.3d at 1323; *Reed*, 244 F. Supp.3d at 1213. If UPS articulates a legitimate non-discriminatory reason for the adverse action, Plaintiff must then demonstrate that UPS's reason is a pretext for intentional disability discrimination. (*Id.*) Plaintiff's claim in the present case fails because Plaintiff can establish neither a prima facie case nor pretext.

### A.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION

Plaintiff cannot establish a prima facie case of discrimination under the ADA because Plaintiff cannot demonstrate that (1) he is disabled, (2) he suffered an adverse action, or (3) establish a causal connection between his alleged disability and the alleged adverse actions he suffered.

### 1.   Plaintiff Cannot Establish That He Is Disabled Under the ADA

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" by reason of that disability. 42 U.S.C. § 12112(a). Accordingly, "to bring any claim under the ADA, Plaintiff must first establish that [he] is a qualified individual with a disability." *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1252 (10th Cir. 2001) (*citing Pack v. Kmart Corp.*, 166 F.3d 1300, 1304 (10th Cir.), *cert denied*, 528 U.S. 811 (1999). A "qualified individual with a disability" is a person with a "disability" who can perform the essential functions of the employment position, with or without reasonable accommodation. *Siemon*, 117

F.3d at 1175 (*citing* 42 U.S.C. § 12111(8)).  The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such an impairment, or (c) being regarded as having such an impairment. *Steele v. Thiokol Corp*., 241 F.3d 1248, 1253 (10th Cir. 2001) (*citing* 42 U.S.C. § 12102(2)).

As a preliminary matter, Plaintiff testified that he does not believe that he is disabled. (Sifuentes Dep. pp. 73-75, 224)  Plaintiff testified that while his knees at times bother him, they did not affect his ability to perform his job as a feeder driver.  (Sifuentes Dep. pp. 73-75)  On the contrary, Plaintiff testified that he could perform all of the duties of his job.  (Sifuentes Dep. pp. 73, 224)  Plaintiff also testified that he never told anyone at UPS that he could not perform any duties of his job or that he was disabled.  (Sifuentes Dep. pp. 71-72, 91)

Surprisingly, Plaintiff testified that he is not claiming that he is disabled or that he was discriminated against because he is disabled. (Sifuentes Dep. pp. 211)  Clearly, it is only reasonable that Plaintiff's claims of disability discrimination should be barred given Plaintiff's admission that he is not alleging disability discrimination, or that he is disabled.  *See Brown v. Principi*, 326 F.Supp.2d 1193, 1198 (D. Kan. 2004) (disability discrimination claim fails where plaintiff admitted his disorder was not a disability); *Wagoner v. Dakota's Roadhouse*, 2010 WL 1687735 at *6 (S.D. Ohio 2010) (claim of discrimination fails where plaintiff testified she did not believe she was discriminated against.[14]

Apart from Plaintiff's admission that he is not disabled, there is also no evidence that Plaintiff had a physical or mental impairment that substantially limited any major life activity or

---

[14] *See also Desyatnik v. Atlantic Casting & Engineering Corp.*, 2005 WL 3216533 at *3 (D.N.J. 2005) (hostile work environment and discrimination claims on basis of national origin fail where plaintiff testified he did not believe employer was motivated by national origin).

his ability to perform his job before retiring from UPS in February 2011.[15]  During 2009 and

2010, Plaintiff worked Monday through Friday, approximately 10 hours per day, and drove over

540 miles each day.  (Sifuentes Dep. p. 30)   Plaintiff had no permanent restrictions between

January 2006 and February 2011 when he retired from UPS.

Pursuant to DOT regulations, tractor-trailer drivers are required to undergo annual or bi-

annual "DOT physical examinations" in which a physician certifies that the driver is physically

qualified to drive a commercial vehicle.  Plaintiff passed all of his DOT physical examinations

during the last ten years of his employment with UPS.  As explained above, Plaintiff testified

during his deposition that he was able to perform his job, had no problems performing his job,

and performed all of the essential functions of his job without accommodation.[16]  (SOF,

Sifuentes Dep. pp. 73-75, 224)  Accordingly, Plaintiff cannot establish that he is disabled for

purposes of the present case.

In addition, Plaintiff does not have a record of disability.  Plaintiff's complaints over the

years involved a cough, neck and arm stiffness, and knee trouble.  However, as explained above

Plaintiff has no permanent restrictions and has never had any permanent restrictions.  Finally,

Plaintiff was not regarded as disabled by UPS.  As Plaintiff testified, he never told any of his

supervisors, or any other employee at UPS that he was unable to perform any function of his job

due to a medical condition, or that he believed that he was disabled.  (Sifuentes Dep. pp. 71-72,

91)  Neither Plaintiff nor Plaintiff's doctors ever provided any documentation to UPS indicating

---

[15] UPS is not denying that Plaintiff had various medical conditions but denies that any such conditions substantially limit one or major life activities.  At his deposition, plaintiff testified that he does not considered himself disabled and was able to perform all of his feeder driver job duties at UPS.
[16] Plaintiff also testified that in 2011 he painted one of his homes, has driven to vacation including as far as San Antonio, works out, gardens, and rides a bicycle.  (Sifuentes Dep., pp. 10-12, 14, 19-21).

Plaintiff was disabled.  There is no evidence that Plaintiff's supervisor, Steve Stuke, or the

Feeder Manager, Joe Dooley, believed that Plaintiff was disabled or regarded Plaintiff as

disabled.  Rather, Stuke and Dooley have both indicated that Plaintiff never told them he had a

disability or that he could not perform his job, nor did they regard Plaintiff as having a disability.

(Stuke Decl.¶¶ 55-58)  Accordingly, Plaintiff cannot establish that he is an individual with a

disability.  *See Whitney v. Board of Educ. of Grand County*, 292 F.3d 1280, 1285 (10th Cir.

2002) (affirming summary judgment on ADA discrimination claim where it was uncontroverted

that decisionmaker did not know about employee's disability at time of suspension decision).

2.     **Plaintiff Cannot Establish That He Suffered Any Adverse Employment Action**

While Plaintiff's primary claim is that UPS constructively discharged him, UPS presumes

that Plaintiff separately claims that UPS assigned him "rough-riding" tractors, and changed his

start time in 2009 and infrequently changed his loads from doubles to singles because of his

disabilities.  As explained in detail above, even if Plaintiff's claim concerning constructive

discharge was not time-barred, Plaintiff cannot establish that he was in fact constructively

discharged.  Nor can he establish that being assigned rough-riding tractors, a 45-minute change

in start time or a change from double to single loads from time to time constitute adverse actions.

a)     **Being Assigned Rough Riding Tractors Is Not An Adverse Action**

To constitute an adverse action, the employer's conduct must be "materially adverse" to

the employee's *job status*.  *Wells v. Colo. Dept. of Transportation*, 325 F.3d 1205, 1213 (10th Cir.

2003).  Only acts that constitute "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits" constitute adverse actions for purposes of a

discrimination claim.  *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998).

Many of the tractor-trailers at the James Street Center were older rough-riding tractors. Like Plaintiff, many other drivers were assigned and drove rough riding tractors. Plaintiff does not claim and there is no evidence that being assigned rough riding tractors impacted his route or his pay such that Plaintiff would have performed his job more efficiently and/or earned more had he been assigned a better tractor. Even in that case, the assignment of older equipment would fall far short of an actionable adverse action. That is, Plaintiff fails to establish that being assigned rough-riding tractors was materially adverse to his job status as feeder driver with UPS. *Id.*; *see also Markel v. Board of Regents of University of Wisconsin System*, 276 F.3d 906, 911 (7th Cir. 2002) (claims that plaintiff was denied better equipment, the ability to travel and make presentations, and removed from certain accounts that caused her not to receive bonuses do not amount to actionable adverse employment actions); *Virostek v. Liberty Township Police Dep't*, 14 Fed. Appx. 493, 504, 2001 WL 814933, at *6 (6th Cir. July 11, 2001) (holding that no prima facie case existed over assignment of older equipment to employee); *Gonzalez v. Fla. Dep't of Highway Safety*, 237 F.Supp.2d 1338 (S.D. Fla. 2002) (issuance of older police vehicle not adverse action). As such, Plaintiff cannot establish that being assigned rough-riding tractors was an adverse action.[17]

### b)   Modifications to Schedule or Changes to Loads Are Not Adverse Actions

Plaintiff claims certain changes to his job constituted an adverse action, specifically that UPS changed Plaintiff's job start time from 6:30 a.m. to 5:45 a.m. and on occasion changed his loads from doubles to singles. No changes were made to the number of hours Plaintiff was assigned to work, nor did these changes materially impact Plaintiff's job status in any way. As is the case with the tractor assignments, these modifications do not constitute actionable adverse

---

[17] To the extent that Plaintiff claims said rough-riding tractors exacerbated Plaintiff's existing medical conditions, the proper avenue for a claim of on the job injury is through Workers' Compensation Law and not a claim of employment discrimination.

actions.  Not everything that makes an employee unhappy is an "adverse employment action."

"Not every perceived indignity rises to the level of an adverse employment action," – a "mere

inconvenience or alteration of job responsibilities will not suffice."  *See Sanchez v. Denver*

*Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998); *Pope v. Quivira Council*, 2007 WL 4561143

at *1, 4 (D. Kan. Dec. 20, 2007).  As explained above, to constitute an adverse action, the

employer's conduct must be "materially adverse" to the employee's job status.  *See, e.g., Wells v.*

*Colo. Dept. of Transportation*, 325 F.3d 1205, 1213 (10th Cir. 2003).

A start time change or a change to the number of loads assigned to Plaintiff's route fall

far short of what constitutes an adverse action.  *See, e.g., Sims v. Boeing Company*, 2000 WL

633228 at *1 (10th Cir. May 17, 2000) (unpublished opinion) (affirming district court's finding

that a change in shift was not an adverse action); *Flores v. City And County of Denver*, 2002 WL

188956 at *1, 2 (10th Cir. Feb. 7, 2002) (lateral transfer to a different position not an adverse

action because not accompanied by change in pay or benefits); *Vann v. Southwestern Bell*

*Telephone Co.*, 2006 WL 1166120 at *5-6 (10th Cir. May 3, 2006) (involuntary lateral transfer

back to the employee's previous position at a different location in a different state was not an

adverse action); *See also Lebow v. Meredith Corporation*, 484 F.Supp.2d 1202 (D. Kan. 2007)

(change from directing a Monday-Friday morning newscast to a Wednesday-Saturday and

weekend evening newscasts (less significant newscasts) did not constitute an adverse action

because the plaintiff's job responsibilities remained essentially the same).  As such, Plaintiff

cannot establish an adverse action with respect to changes to his start time or loads transported.

### 3.   Plaintiff Cannot Establish a Causal Connection Between Any Alleged Adverse Action and His Alleged Disability

To establish the final element of his prima facie case, Plaintiff must present "some

affirmative evidence that disability was a determining factor in the employer's decision(s)"

which are at issue in this case.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001); *See Thomas v. Avis Rent a Car*, 408 Fed.Appx. 145, 2011 WL 204459, at *5 (10th Cir. 2011) (to prevail on a discrimination claim under the ADA, an employee must show the employer "intentionally discriminated against him for a reason prohibited by the Statute").

There is simply no evidence of a causal connection in the present case.  As explained above, Plaintiff testified that 1) he does not believe that he is disabled, 2) that he never told UPS or his Union that he was disabled, and that 3) he does not believe that he was discriminated against because of any alleged disability.  Plaintiff should not be permitted to proceed with a claim which he testified he is not making.

There is also no evidence of any kind that any of the conduct Plaintiff alleges UPS engaged in was motivated by Plaintiff's alleged disability.  Plaintiff voluntarily resigned and was not constructively discharged. The only individuals who Plaintiff names as the alleged discriminators in the present action are Dooley, Stuke, and Gerald Reeves, Kansas Feeder Scheduler, that is, the UPS employee responsible for tractor-trailer assignments.  Nonetheless, at no time during his deposition did Plaintiff claim that Dooley, Stuke, or Reeves made any decision with respect to his employment because of disability-based animus.  Again, Plaintiff actually testified that he does not believe he was discriminated against because of any alleged disability.  While Stuke and Dooley were aware that Plaintiff had taken time off work for various treatment including prostate surgery, neither Stuke nor Dooley believed that Plaintiff had a disability or could not perform his job.  (Stuke Decl. ¶¶ 53-57; Dooley Decl. ¶¶ 100-105)

There is also no evidence that Reeves had any knowledge of Plaintiff's medical conditions.  To the contrary, while Reeves had heard secondhand that Plaintiff alleged he had suffered diesel poisoning in the 1990s, Reeves had no knowledge of Plaintiff's medical

conditions or any restrictions on his ability to perform his job and did not believe that Plaintiff

was disabled.  (Reeves Decl. ¶¶ 68-70, 74-75)  In fact, Reeves rarely if ever saw Plaintiff – he

worked out of the Lenexa Kansas UPS facility and visited the James Street facility where

Plaintiff was employed only a few times a year. (Reeves Decl. ¶ 13)

Accordingly, given there is no evidence that any of the alleged discriminators believed

Plaintiff was disabled or regarded Plaintiff as disabled, Plaintiff cannot establish that disability-

based animus motivated any of the alleged adverse actions Plaintiff claims he suffered.  *See*

*Whitney v. Board of Educ. of Grand County*, 292 F.3d 1280, 1285 (10th Cir.2002) (affirming

summary judgment on ADA claim where it was uncontroverted that decisionmaker did not know

about employee's disability at time of suspension decision).  As such, Plaintiff fails to establish a

prima facie case of disability discrimination as he cannot establish any of the elements of a prima

facie case.

### B.       PLAINTIFF CANNOT ESTABLISH PRETEXT

Even if this Court were to find Plaintiff can proceed past the prima facie case analysis,

UPS had legitimate business reasons for each of the alleged adverse actions undertaken with

respect to Plaintiff's employment.  There is no evidence that any of those reasons are pretextual.

In order to establish pretext, Plaintiff must demonstrate "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons."  *Proctor v. United Parcel Service,* 502 F.3d 1200, 1209 (10th Cir. 2007) (internal

citations omitted).  Specifically, to demonstrate pretext, Plaintiff must show that UPS's proffered

reason is a "pretext masking discriminatory animus."  *Id*. at 1208 (*citing Piercy v. Maketa*, 480

F.3d 1192, 1198 (10th Cir. 2007).

Plaintiff alleges that in 2005 Dooley required him to undergo additional safety training because of the number of injury reports Plaintiff had during his employment.  (Sifuentes Dep. p. 43)  Plaintiff also alleges that Stuke required him to undergo additional training each time he suffered an injury.  Dooley and Stuke required Plaintiff to undergo additional training in order to ensure that Plaintiff is following UPS' policies and procedures concerning safety as required by UPS' policies and procedures.  As a UPS feeder driver, Plaintiff operated a multi-ton vehicle for some ten hours a day, five days a week. Due to the nature of UPS' business and applicable government regulations, UPS stresses the importance of safety and invests substantial resources to ensure the safety of its employees and the public by minimizing the risk of injuries and accidents.  UPS' commitment to safety, among myriad of things, includes joint UPS –Union safety committees, and extensive training provided to its employees, including management. Safety training provided to drivers includes periodic and yearly training, through various methods including various types of quizzes and extensive hands-on training on best practices, safety policies and procedures, including safe work methods.   All drivers are also required to undergo additional training following an accident and/or injury to ensure they know and are following all of the safety policies and procedures.

There is no evidence that requiring Plaintiff to undergo training is pretext for disability discrimination.  Given the number of injuries Plaintiff suffered during his employment – specifically 24 reported injuries before 2006 –  it cannot be said that Dooley and Stuke, as Plaintiff's Feeder Manager and Supervisor respectively, were not justified in wanting to ensure Plaintiff was working safely by following UPS' safe work methods and safety-related policies and procedures.  Dooley and Stuke acted in accordance with UPS' policies and procedures. There is no evidence that Dooley or Stuke's reasoning for requiring Plaintiff to undergo

additional training is pretext for disability based animus.  As set out above, there is no evidence that Dooley or Stuke were motivated by any alleged disability.  Neither Dooley nor Stuke believed that Plaintiff had a disability nor were informed by Plaintiff or otherwise had any knowledge that Plaintiff was disabled.  Plaintiff does not even believe he is disabled or that he was discriminated against because of any alleged disability.  Moreover, Plaintiff himself testified in his deposition that requiring that he undergo additional training after suffering an injury or being involved in an accident is part of UPS' policies and procedures. (Sifuentes Dep. pp. 40-41) There is absolutely no evidence Plaintiff was targeted because of any alleged disability, including no evidence that he was treated differently than any other employee.  As such, Plaintiff cannot establish pretext with respect to his claims that he was required to undergo various training and over-supervised by Dooley and Stuke.

UPS also had legitimate business reasons for the manner by which it assigns tractor-trailers.  Tractors are assigned by the Kansas Feeder Scheduler, which for most of the relevant time period was Reeves.  Tractors are assigned to a particular route, and not to a particular employee.  By virtue of the collective bargaining agreements, feeder drivers bid on start times and routes and not tractors.  Feeder drivers also have no right to a particular tractor-trailer assignment.  Tractor-trailer assignments depend upon a number of factors, including the composition of the fleet at the particular facility, the nature of the route, such as miles driven and the number of hours the particular trailer is in use (such as dual use where the tractor is used by two different drivers working different shifts in a 24 hour time-period), terrain, and the type of load/weight pulled.  What tractor-trailer is assigned to what route depends upon the nature of the particular route in comparison to what tractors are at the scheduler's disposal, including the number of miles driven, terrain, the type of load pulled, etc.   The Kansas Feeder Scheduler,

works with schedulers in other states to coordinate transport of packages and was responsible for assigning hundreds of tractors to hundreds of routes for some half-dozen UPS Kansas facilities. When a tractor is assigned to a particular job, the Feeder Scheduler, in this case Reeves, does not know which driver is performing or will perform that particular job.  There is absolutely no evidence that Reeves had any knowledge which tractors were assigned to Plaintiff, let alone intentionally assigned rough-riding tractors to Plaintiff.

Even had Reeves knowingly and/or intentionally assigned rough riding tractors to Plaintiff, there is no evidence that Reeves was motivated by Plaintiff's disability.  Reeves had no knowledge regarding whether or not Plaintiff had any disabilities, nor does Plaintiff even allege that Reeves had any such knowledge.  Moreover, numerous drivers without any disabilities were also assigned rough-riding tractors.  Accordingly, there is simply no evidence of discriminatory animus on the part of Reeves.  Further, during the brief time that Dooley was feeder scheduler, there is no evidence that Dooley knowingly and intentionally assigned rough riding tractors to Plaintiff because of any alleged disability.

UPS also has legitimate business reasons for modifications to Plaintiff's start time an the occasional changes to type of loads pulled.  There is no evidence that any such modifications to Plaintiff's job were pretext for disability discrimination.  Plaintiff testified that UPS changed Plaintiff's start time from 6:30 a.m. to 5:45 a.m.  Changes to start times or type of load pulled are made by the Feeder Scheduler as necessary to transport customer packages in a timely efficient manner in conjunction with other feeder schedulers in the context of the entire operation. Moreover, there is no evidence that Reeves had any knowledge that the changes he was making to the particular routes were even assigned to Plaintiff, let alone any evidence that any changes to Plaintiff's job were motivated by his alleged disability.  As such, Plaintiff cannot establish that

any alleged adverse action was made with intent to discriminate against Plaintiff because of any alleged disability.   Therefore, UPS is entitled to summary judgment on Plaintiff's disability discrimination claim.

## III.   PLAINTIFF CANNOT ESTABLISH A CLAIM OF HARASSMENT IN VIOLATION OF THE ADA

As set out above, Plaintiff cannot establish that he is disabled.  Plaintiff's harassment claim further fails because he cannot establish any of the other elements of a disability based harassment claim.  To establish a prima facie case of hostile work environment under the ADA, Plaintiff must establish: 1) membership in a protected group; 2) unwelcome harassment; 3) harassment based on his disability; 4) that the harassment affected a term, condition, or privilege of employment; and 5) that UPS knew or should have known of the harassment and failed to take proper remedial action. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005).  "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998)).  To evaluate whether a working environment is sufficiently hostile or abusive, a court examines all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993)). In addition, the environment must be both subjectively and objectively hostile or abusive. *Id.*

Much in the same way as Plaintiff's discrimination claim, as set out in Sections I and II above and incorporated by reference herein, Plaintiff's harassment claim fails.  Plaintiff cannot establish that he has a disability nor that any alleged harassing conduct was directed towards him because of any alleged disabilities.  None of the conduct Plaintiff alleges was harassing rises to the level of actionable harassment.  Plaintiff spent almost all of his work time on the road, alone and rarely interacted with his alleged harassers.  Requiring that Plaintiff undergo periodic safety training during various years of employment, in accordance with UPS' policies and procedures, and being assigned older tractor-trailers does or a change in shift or isolated change to loads pulled do not constitute severe and pervasive conduct sufficient to establish a harassment claim. Plaintiff was  not harassed - Plaintiff worked for UPS for 40 years and upon attaining exactly 40 years of service, utilizing his vacation time, Plaintiff voluntarily retired.  Plaintiff's claim also fails because Plaintiff cannot establish that he complained of harassment but that UPS failed to take remedial action.[18]  As such, Plaintiff's claim of harassment fails.

## IV.     PLAINTIFF CANNOT ESTABLISH THAT UPS FAILED TO PROVIDE HIM WITH A REASONABLE ACCOMMODATION IN VIOLATION OF THE ADA

As a preliminary matter, as explained in Section II above, Plaintiff testified that he could perform all of the duties of his job and did not need an accommodation to perform his job. Plaintiff also testified that he never sought an accommodation and does not believe that he ever needed an accommodation in order to perform his feeder driver job with UPS.  Plaintiff must be precluded from maintaining a claim for failure to accommodate given Plaintiff testified that he was able to perform the essential functions of his job and did not need an accommodation to perform his job.  *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)

---

[18] Plaintiff was fully aware of UPS' open door policy as well as the grievance procedures available to him.  Plaintiff filed several grievances during his employment, including pertaining to his request for retirement.

(failure to accommodate claim fails where plaintiff testified in her deposition that she was capable of performing the duties of her job and did not need an accommodation in order to perform those duties); *Umble v. Arrowhead Community Hospital and Medical Center*, 8 Fed. Appx. 756, 2001 WL 427276 at *1 (9th Cir. 2001) (plaintiff's repeated assertions that she could perform her job and that she did not require an accommodation defeat an ADA claim); *Insalaco v. Anne Arundel Co. Pub. Schs.*, 2012 WL 253405 at *3 (D. Md. 2012) (plaintiff's clear statement that she did not need an accommodation bars her from alleging later that defendant should have provided her with an accommodation and refused to do so).

While UPS submits that Plaintiff's claim fails on those grounds alone, Plaintiff's claim also fails because he cannot establish a prima facie case of failure to accommodate.   To establish a prima facie case that UPS failed to reasonably accommodate his disability under the ADA, Plaintiff must show that: (1) he has a disability within the meaning of the ADA, (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of his job, (3) UPS had notice of Plaintiff's disability and the need for a reasonable accommodation to perform the essential functions of his job, (4) a causal relationship existed between the disability and the request for accommodation, and (5) UPS refused to provide such a reasonable accommodation.  *Obermeyer v. Vilsack*, 760 F.Supp.2d 1232, 1250-1251 (D. N. M. 2010); *DeSantis v. Napolitano*, 2010 WL 2292592 at *9, *25 (D.N.M. 2010);[19] *see also Spielman v. Blue Cross and Blue Shield of Kansas*, 33 Fed.Appx. 439, 2002 WL 524549 (10th Cir. 2002).

---

[19] *Citing, in part, Whitney v. Bd. of Educ. of Grand County*, 292 F.3d 1280, 1285 (10th Cir.2002)("If a mental limitation is not 'known' to the employer, then any failure to accommodate that limitation is not discrimination within the meaning of the ADA"); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109-11 (10th Cir. 1999); *Massari v. Potter*, No. 04-CV-02306-EWN-MJW, 2006 WL 318658, at *14 (D. Colo. 2006).

The employee must initially inform the employer not only that he or she is disabled, but that he or she desires an accommodation for that disability.  *Id*.[20]

Plaintiff testified that he is not disabled.  Plaintiff testified that he did not need an accommodation in order to perform the essential functions of his job.  Plaintiff testified that he never informed UPS or his Union that he was disabled.  Plaintiff also testified that he never informed UPS management that he was unable to perform any of the duties of his job and that he never requested an accommodation from UPS.

While UPS does not dispute that Plaintiff may have some medical conditions, it is undisputed that none of those conditions interfered with Plaintiff's ability to perform his job as a feeder driver with UPS.  *See Felix v. New York City Transit Authority*, 324 F.3d 102, 106-107 (2nd Cir. 2003) (the fact that an individual has some unrelated disability does not require the employee to accommodate a mere impairment unrelated to and not stemming from the disability at issue).

Even if this Court accepts as true that Plaintiff sought that UPS provides him with better tractors and that Plaintiff complained about the rough-riding tractors, there is no evidence that Plaintiff's requests put UPS on notice that Plaintiff needed a reasonable accommodation because of a disability.  Neither Stuke nor Dooley or any member of management had any knowledge

---

[20] *Citing E.E.O.C. v. Convergys Customer Mgmt. Group. Inc.*, 491 F.3d 790, 795 (8th Cir. 2007) ("[T]he employee must provide relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation"); *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906 (10th Cir.2004)("[T]he interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job"); *Conneen v. MBNA Am. Bank. N.A.*, 334 F.3d 318, 332 (3rd Cir. 2003) ("[E]ither by direct communication or other appropriate means, the employee 'must make clear that the [he/she] wants assistance for his or her disability'"); *Hall v. Claussen*, 6 Fed. Appx. 655, 666 (10th Cir. 2001) ("[A]n employee must ordinarily initiate an interactive process with the employer by providing notice of his disability and any resulting limitations and expressing a desire for reassignment")

that Plaintiff was in need of or requested an accommodation.  See footnote 3; *Smith v. Salt Lake City Corp.*, 2007 WL 582969 at *5 (D. Utah 2007) (even if knowledge that plaintiff took short-term disability should have placed the employer on notice that plaintiff had some sort of a disability, it provided the employer with no notice concerning the severity of the disability or whether the disability interfered with plaintiff's ability to perform her job- if at all). *see also Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1171–72 (10th Cir.1999) (must inform the employer of an individual's disability and resulting need for accommodation); *see also Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir.2007) (if the employee was not required to indicate a need for an accommodation, he could "keep his disability a secret and sue later for failure to accommodate"). Once more, Plaintiff never had any permanent medical restrictions, none of his doctors indicated he needed an accommodation for any of his medical conditions, and he testified that he never brought in any sort of medical documentation indicating he needed a better tractor because of a disability.[21] Again, Plaintiff testified that he was capable of performing his job without any accommodation. (Sifuentes Dep. 213-214).

As such Plaintiff cannot establish that he had a disability, that he required or requested an accommodation because of a disability, nor that UPS was placed on notice that Plaintiff needed an accommodation and refused to provide that accommodation.  Plaintiff can also not establish a causal connection between a request for better tractors and an actual disability.

Finally, the first time UPS became aware that Plaintiff was seeking an accommodation was when Plaintiff filed a Charge of Discrimination in April 2009.  Yet, when upon becoming aware of Plaintiff's request UPS sent Plaintiff a request for medical information in order to evaluate Plaintiff's request, Plaintiff refused to complete the paperwork at the advice of

---

[21] Plaintiff did ask for and obtain a smoother seat which he requested due to a prostate problem.

Plaintiff's attorney.  UPS may not be held liable for a failure to accommodate where Plaintiff refused to participate in the interactive process.  *Williams v. Prison Health Services, Inc.*, 159 F.Supp.2d 1301, 1311 (D. Kan. 2001) (granting summary judgment to employer on employee's failure to accommodate claim on grounds that plaintiff refused to provide medical information requested by employer) (*citing Templeton v. Neodata Services, Inc.*, 162 F.3d 617, 619 (10th Cir.1998) ("the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation")).  As such, UPS is entitled to summary judgment with respect to Plaintiff's failure to accommodate claim.

## V.  PLAINTIFF CANNOT ESTABLISH THAT UPS RETALIATED AGAINST HIM OR ENGAGED IN INTERFERENCE IN VIOLATION OF THE ADA

The Tenth Circuit analyzes ADA claims of retaliation (under 42 U.S.C. § 12203(a)) and claims of interference, coercion, and intimidation (under 42 U.S.C § 12203(b)) in the same manner.  *Coleman v. Blue Cross Blue Shield of Kansas*, 487 F.Supp.2d 1225, 1253 (D. Kan. 2007); *Reed*, 244 F. Supp.3d at 1215; *Martin v. AT&T Corp.*, 331 F.Supp.2d 1274, 1301 (D. Col. 2004).

In order to establish a prima facie claim of retaliation or interference under the ADA, Plaintiff has the burden of proving that:  1) he engaged in a protected activity as defined under the ADA, 2) he was subjected to a materially adverse employment action subsequent to or contemporaneous with the protected activity, and 3) a causal connection exists between the protected activity and the adverse action.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1265 (10th Cir. 2001); *Reed*, 244 F. Supp.3d at 1214; *Coleman*, 487 F.Supp.2d at 1252 (*citing Haynes v. Level 3 Commc'ns, L.L.C.*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

53

If Plaintiff establishes a prima facie case, UPS bears the burden of articulating a legitimate, non-retaliatory reason for the adverse action. *Reed*, 244 F. Supp.3d at 1215. Plaintiff must then demonstrate that UPS's reason for the adverse action was a pretext for interference or retaliation. *Id*.

Plaintiff's ADA retaliation and interference claims fail because he cannot establish a prima facie case or demonstrate that UPS' legitimate, non-discriminatory reasons for its employment decisions were a pretext for unlawful retaliation or interference.

### A.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATION/INTERFERENCE UNDER THE ADA

Plaintiff cannot establish that he was subjected to an adverse employment action subsequent or contemporaneous with his protected activity, or that a causal connection exists between the alleged adverse action and his protected activity.

Plaintiff testified that 1) he does not believe that he is disabled, 2) that he did not request an accommodation, and 3) that he does not think that UPS retaliated against him for requesting an accommodation. Plaintiff should not be permitted to maintain a claim of retaliation/interference under the ADA where Plaintiff himself does not believe his rights were interfered with. (*See* Section IV above). As such, Plaintiff's claim fails as a matter of law.

It is undisputed that the first time UPS became aware that Plaintiff may be seeking an accommodation was when Plaintiff filed his Charge of Discrimination in April 2009. As explained in detail in Section I above, Plaintiff's claim that he was constructively discharged is time-barred as a matter of law. Plaintiff cannot establish a prima facie case of interference or retaliation under the ADA because none of the alleged conduct he complains of constitutes an adverse action sufficient to state a claim. Moreover, Plaintiff cannot establish that he was constructively discharged. As also explained in detail in Section II A., neither the alleged

assignment of old tractors nor changes to work schedule or loads, constitute adverse actions for purposes of a retaliation/interference claim.

Finally, Plaintiff's prima facie case also fails at causation. Plaintiff cannot establish a causal connection between his request for accommodation in his charge of discrimination and any alleged adverse action. Plaintiff filed a charge of discrimination in April 2009 and did not retire until February 2011- almost two years later. That long of a time period between protected activity and adverse action defeats any claim of causal connection. *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007) (four months gap is too long to establish a causal connection); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four-month time lag between Plaintiff's protected activity and his termination, without more, is insufficient to justify an inference of causation). Finally, unfavorable tractor assignments and any changes to Plaintiff's job schedule occurred before Plaintiff filed a Charge of Discrimination. An act cannot be caused by an event that has yet to occur. Accordingly, Plaintiff cannot establish that he suffered an adverse action contemporaneous with or subsequent to protected activity. *Hill v. Steven Motors, Inc.*, 97 Fed. Appx. 267 (10th Cir. 2004) (summary judgment for employer where decision not to return Plaintiff to former position occurred before her first protected activity); *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1234-35 (10th Cir. 2000) (employer's decision to discharge truck driver was not retaliatory because it pre-dated driver's grievance); *Selenke*, 248 F.3d at 1265; *See also Hill v. White*, 32 Fed.Appx. 513, 515-16 (10th Cir. 2002) (no retaliation claim where alleged adverse action preceded protected activity); *Torre v. Federated Mut. Ins. Co.*, 854 F.Supp. 790 (D. Kan. 1994) (*overruled on other grounds by Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 826 (10th Cir. 1996); ("[a]n act cannot be retaliatory unless preceded by protected opposition to discrimination"); *Burden v. Isonics Corp.*, 2009 WL

3367071, at *6 (D. Colo. 2009) ("[l]ogic dictates that the defendant could not have been motivated to take an adverse action as a result of something that happened after the alleged adverse action was taken.").

There is no other evidence that establishes a causal connection between Plaintiff's protected activity and any alleged adverse action.  As Plaintiff himself testified, he does not believe that UPS retaliated against him for engaging in protected activity under the ADA.  Moreover, majority of the conduct of which Plaintiff complains of as part of his constructive discharge claim- such as over-supervision by Dooley and Stuke – occurred years before Plaintiff filed a Charge of Discrimination/placed UPS on notice of a potential need for an accommodation defeating any claim of retaliation.  Moreover, there is no evidence that Reeves even had knowledge of Plaintiff's filing of a charge of discrimination.  Further, as explained in detail above, tractor assignments and changes to routes are made on the basis of business needs with Reeves having no knowledge as to which route is driven by which driver.  *See Hinson v. U.S.D. No*. 500, 187 F.Supp.2d 1297, 1311 (D.Kan. 2002) (granting summary judgment for the employer finding that "[e]vidence of the acting party's knowledge is essential to establishing a causal connection between the adverse action and the protected activity" – "[a]bsent a showing of such knowledge, no inference of causation is possible"); *see Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (holding that in order to establish causation in a retaliation claim, plaintiff must show that the individual who took the adverse action against plaintiff knew of plaintiff's protected activity).  As such, Plaintiff cannot establish a prima facie case of retaliation/interference in violation of the ADA.[22]

---

[22] UPS's rationale for its actions taken with respect to Plaintiff's employment concerning the constructive discharge, trailer assignments and changes to work schedule and lack of pretext is explained in detail above.  Given Plaintiff's failure to exhaust his claims pertaining to his

VI.     **PLAINTIFF CANNOT ESTABLISH A CLAIM OF RACE OR AGE DISCRIMINATION**

Plaintiff alleges that UPS discriminated against him because of race, specifically his Mexican background,[23] and because of his age.  Plaintiff was born on December 25, 1948 and was 62 years of age at the time of his retirement in February 2011.

Where a plaintiff does not present "direct" evidence of discrimination, as in the present case, race discrimination claims under Title VII and the KAAD are analyzed using the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Adamson v. Multi Community Diversified Services, Inc.,* 514 F.3d 1136, 1145 (10th Cir. 2008); *Lewis v. Standard Motor Products, Inc.*, 203 F.Supp.2d 1228, 1233 (D. Kan. 2002).  Under the *McDonnell Douglas* analysis, Plaintiff must first establish a *prima facie* case of race discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Adamson,* 514 F.3d at 1145.  If Plaintiff establishes a *prima facie* case, the burden shifts to UPS to articulate a legitimate, non-discriminatory reason for the employment action.  *Adamson*, 514 F.3d at 1145.  Once UPS does so, the burden shifts back to Plaintiff who must show that UPS' proffered reason is merely a pretext for unlawful discrimination.  *Id.*; *Bittel v. Pfizer, Inc.*, 2009 WL 52064 at *5 (10th Cir. Jan. 9, 2009) (unpublished opinion); *Jaramillo v. Colorado Judicial Dept.,* 427 F.3d 1303, 1307 (10th Cir. 2005).

To prevail on a disparate treatment claim under Title VII or the KAAD a plaintiff must show that his employer intentionally discriminated against him because of his race.  *Hernandez*

---

constructive discharge, failure to establish actionable adverse action, and lack of any causal connection between Plaintiff's protected activity and each alleged adverse action, Plaintiff's claims fall at the prima facie stage.  Nonetheless, UPS reserved the right to further address those claims in its reply.  *See also Conrad v. Board of Johnson County Com'rs*, 237 F.Supp.2d 1204, 1250 (D. Kan. 2002) (allegations of pretext negated where alleged adverse action began prior to protected activity); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (no finding of pretext where plaintiff was disciplined for attendance both before and after protected activity).
[23] Plaintiff was born in the United States. (Sifuentes Dep. p. 367)

*v. McDonald's Corp.*, 975 F.Supp. 1418, 1423 (D. Kansas 1997); *Jaramillo,* 427 F.3d at 1306; *Adamson,* 514 F.3d at 1145.

Age discrimination claims under the ADEA and KADEA[24] are analyzed using the same *McDonnell Douglas* burden-shifting framework utilized in Title VII cases set forth above.  *See Simmons v. Security Ben. Group, Inc.*, 1991 WL 17681 at *1, 10 (D.Kan. Jan. 31, 1991); *Adamson*, 514 F.3d at 1145-1146.  However, Plaintiff's burden under the ADEA is higher than under Title VII – plaintiff must establish that his age was a "determining" factor in the employer's decision.  *Bittel*, 2009 WL 52064 at *4; *Simmons*, 1991 WL 17681 at *10.

The ultimate burden of proving discrimination remains at all times with Plaintiff. *Adamson*, 514 F.3d at 1145; *Blong v. Secretary of Army*, 877 F.Supp. 1494, 1501 (D. Kan., 1995).  In order to prevail on his claims, Plaintiff must show that UPS intentionally discriminated against him on the basis of his race and/or age.  *See Id.*; *Hernandez,* 975 F.Supp. at 1423.

### A.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF RACE OR AGE DISCRIMINATION

To establish a prima facie case of race or age discrimination, plaintiff must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Cole v. Hawker Beechcraft Corp.,* 2011 WL 4809815 at *9 (D. Kan. 2011).  Plaintiff cannot establish a claim of race or age discrimination because he cannot establish that he suffered an adverse action nor can he establish that any such adverse action was motivated by his race or age.

---

[24] KADEA claims are analyzed in the same manner as ADEA claims.  *Schartz v. Unified School Dist. No. 512*, 953 F.Supp. 1208, 1214 (D. Kan. 1997)

### 1.     Plaintiff Cannot Establish That He Suffered an Adverse Action

Plaintiff alleges that UPS constructively discharged him, assigned him rough-riding

tractors and made changes to his job.  As set out above, Plaintiff's claim that he was

constructively discharged is barred because Plaintiff failed to exhaust administrative remedies as

to said claim.  Even if Plaintiff's claim was not barred, Plaintiff cannot establish that he was

constructively discharged.  As also set out in detail in section II above, Plaintiff can also not

establish that being assigned rough-riding tractors or changes being made to his job are adverse

actions.

### 2.     Plaintiff Cannot Establish a Causal Connection Between Any Adverse Action and His Race or His Age

### a)     There Is No Evidence of Race Discrimination

There is no evidence that Dooley, Stuke, or Reeves made any decisions with respect to

Plaintiff's employment because of his race.  Plaintiff testified that Stuke, Dooley, or Reeves

never made any race-based comments.  (Sifuentes Dep. 249)  There is no evidence that Stuke or

Dooley's reasons for requiring that Plaintiff undergo safety training were false (see Section II B

above) and no evidence that they were motivated by racial animus.  Moreover, as set out in detail

above, tractors are assigned by route, and not by driver.  At the time of tractor assignment,

Reeves had no idea which feeder driver was to drive which route and thus had no idea which

driver would be driving which tractor.  Plaintiff has no evidence that Reeves intentionally

assigned rough riding tractors to Plaintiff because of his race.  Plaintiff acknowledges he rarely

saw Reeves given Reeves worked out of a different facility than Plaintiff.  Moreover, numerous

Caucasian drivers complained of being assigned rough-riding tractors.  Finally, Plaintiff admits

that he does not really have reason to believe that anyone discriminated against him because of

his Mexican heritage.  (Sifuentes Dep. 275-276)  Plaintiff testified that he has no accent, that he

59

does not look like he is of Mexican heritage and that he was born in the United States.  (Sifuentes

Dep. 367)  Accordingly, Plaintiff cannot establish a prima facie case of race discrimination.

      **b)**       **There Is No Evidence of Age Discrimination**

There is also no evidence that any decision made with respect to Plaintiff's employment

was made because of Plaintiff's age.  Plaintiff testified that no one in management made any

derogatory comments concerning his age.  (Sifuentes Dep. p. 341)  As evidence of age

discrimination, Plaintiff alleges that Dooley and Stuke asked him on a number of occasions when

he planned to retire.  In the context of the present case such comments are not evidence of age

discrimination.  First, Dooley and Stuke are very close in age to Plaintiff.   Stuke, Plaintiff's

direct supervisor during his employment, is the same age as Plaintiff – in fact, Stuke was born in

the same month and same year as Plaintiff – December 1948.  Moreover, Plaintiff testified that

during a discussion with Stuke regarding his retirement, they discussed retirement and after

asking Plaintiff about his retirement plans, Stuke indicated to Plaintiff that he Stuke intended to

retire shortly.  (Sifuentes Dep. 168-169)  In fact, Stuke retired two months after Plaintiff.  (Stuke

Decl. ¶ 2)

UPS management at James Street discusses employees' retirement plans for workforce

planning purposes.  Feeder drivers have to be licensed and complete driver training schools.  In

order to know how many drivers to train and when to schedule driving school, UPS has to know

how many openings there are.  Between 2008 and 2011, a substantial number of feeder drivers at

James Street were eligible for retirement and could retire at any time.  Moreover, several drivers

had previously retired without providing advance notice to management which caused staffing

issues for UPS.  Finally, Plaintiff had previously indicated that he was retiring in late 2008/early

2009 but subsequently changed his mind and returned to work.

Questions regarding plans for the future in the context of workplace chit chat or for the purpose of workforce planning are not evidence of discrimination. "[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *see also Ziegler v. Beverly Enters. – Minn., Inc.*, 133 F.3d 671, 676 n. 3 (8th Cir. 1998) (holding an employer's questions about an employee's age and retirement plans insufficient to demonstrate age discrimination); and *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (same). As such, Plaintiff cannot establish a prima facie case of age discrimination.

## B.   PLAINTIFF CANNOT ESTABLISH PRETEXT

To establish pretext, a plaintiff must show either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994); *Luse v. Henderson*, 68 F.Supp.2d 1217, 1224-25 (D.Kan. 1999). Under the second method, a plaintiff may demonstrate pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that a jury could infer the employer actually acted out of a discriminatory motive. *Bittel*, 2009 WL 52064 at *5. "The fact-finder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions-simply disbelieving the employer is insufficient." *Montes v. Vail Clinic, Inc.,* 497 F.3d 1160, 1174 n.18 (10th Cir. 2007). Plaintiff "must undermine the employer's credibility to the point that a reasonable jury could not find in its favor." *Jaramillo*, 427 F.3d at 1310. A plaintiff's "mere conjecture that [her] employer's

explanation is a pretext for intentional discrimination is…insufficient" to avoid summary judgment." *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1198 n.6 (10th Cir. 2008).

There is absolutely no evidence that UPS' reasoning pertaining to any alleged adverse action was pretextual.  Any unsupported speculation and conjecture as to potential discrimination are insufficient to show pretext.  *See Panis v. Mission Hills Bank*, N.A., 60 F.3d 1486, 1491 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (plaintiff's mere conjecture that employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment) (citations omitted).

Plaintiff testified that the requirement that he receive additional training after suffering an injury were part of UPS' policies and procedures.  (Sifuentes Dep.  pp. 31, 41)  There is also no evidence that UPS' manner of assigning tractors or justifications for modifying routes are pretextual.  Majority of the other drivers complained of rough-riding tractors including numerous Caucasian and younger drivers.  Caucasian and younger drivers also had changes made to their routes.  There is simply no evidence that any of UPS' conduct was pretext for race or age discrimination.  Moreover, with respect to Plaintiff's age claim, an overwhelming majority of the feeder drivers at James Street are not only over 40 but close in age to Plaintiff and some are even older than Plaintiff.  In fact, of the approximately 81 drivers in the James Street Feeder Department, only 5 of these drivers were under age 40, 59 drivers were over age 50 and 13 drivers were over age 60. Finally, all of the alleged discriminators – Dooley, Stuke and Reeves  - are very close to age to Plaintiff.  As such, Plaintiff simply cannot establish pretext and thus fails to establish a claim of race or age discrimination.

**VII.   PLAINTIFF'S WORKERS' COMPENSATION RETALIATION CLAIM FAILS AS A MATTER OF LAW**

Kansas uses the familiar burden-shifting analysis in workers' compensation retaliatory discharge cases. *Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 553, 35 P.3d 892, 898 (2001). "[T]he burden of proof is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of terminating the employee for filing the claim." *Id.* To establish a *prima facie* case of retaliatory discharge, a plaintiff must demonstrate that: 1) he filed a claim for workers' compensation benefits or sustained a work-related injury for which he could assert a future claim for benefits; 2) the employer had knowledge of the compensation claim or injury; 3) the employer terminated the plaintiff's employment; and 4) a causal connection existed between the protected activity or injury and the termination. *Gonzalez-Centeno v. North Central Kan. Reg. Juvenile Detention Facility*, 278 Kan. 427, 437, 101 P.3d 1170, 1177 (2004); *Bracken v. Dixon Indus., Inc.*, 272 Kan. 1272, 1275, 38 P.3d 679, 682 (2002).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to establish a legitimate non-discriminatory reason for the discharge. *Id.* In proffering a legitimate reason for the discharge, the employer is not required to litigate the merits of its reason, prove its reason was bona fide, or prove its reason was applied in a nondiscriminatory fashion. *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992). Once the employer articulates a legitimate, non-discriminatory reason for its actions, the employee must assert specific facts establishing a triable issue as to whether the employer's stated reason for the discharge is a mere cover-up or pretext for retaliatory discharge. *Id.*

UPS is entitled to summary judgment on Plaintiff's retaliatory discharge claim because Plaintiff cannot establish a prima facie case nor can he establish pretext.

A.    **PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF WORKERS' COMPENSATION RETALIATION OR PRETEXT**

Plaintiff cannot establish a prima facie case because he cannot establish that he was discharged.  Even *assuming arguendo* that this Court finds that constructive discharge is actionable in a workers' compensation retaliation claim under Kansas law, UPS adamantly denies that Plaintiff's February 2011 voluntary retirement, upon attainment of exactly 40 years of service with UPS, constitutes constructive discharge.  Finally, even if this Court finds Plaintiff's February 2011 retirement somehow constituted constructive discharge, Plaintiff cannot establish a causal connection between his workers' compensation claims and/or injury reports and his alleged constructive discharge nor can he establish pretext

Plaintiff alleges that he was harassed and ultimately constructively discharged in February 2011 for filing injury reports and workers' compensation claims.  Recovery for workers' compensation retaliation under Kansas law is limited to claims of termination of employment, indefinite suspension without pay, and demotion.  *Brigham v. Dillon Companies, Inc.*, 935 P.2d 1054, 1059-1060 (Kan. 1997); *Patton v. AFG Industries*, 92 F.Supp.2d 1200, 1207 (D. Kan. 2000).  Accordingly, Plaintiff cannot maintain a cause of action for workers' compensation retaliation because UPS did not discharge Plaintiff.  Further, even if this Court found that a workers' compensation retaliation constructive discharge claim is actionable, as explained in detail above, Plaintiff's voluntary resignation in February 2011, upon attainment of exactly 40 years of service with UPS, does not constitute constructive discharge under any reasonable construction of the law.

Moreover, Plaintiff cannot establish a causal connection between his departure from UPS in February 2011 and his filing of injury reports and/or workers' compensation claims.  During his employment, Plaintiff filed nearly 30 injury reports and 19 workers' compensation claims.

(Exs. YY, ZZ)  After being off work in order to receive treatment, and being released to work, Plaintiff took vacation, requested to retire in December 2010, and retired in February 2011. Even if Plaintiff's retirement could be viewed as constructive discharge, despite Plaintiff not even being physically present at work at any time after June 2010, Plaintiff did not request to retire until more than six months after his last injury and did not actually retire until eight months after his last injury- and was not at work during any of that time.

Six and/or eight months between the injury and alleged constructive discharge do not establish a causal connection for purpose of a workers' compensation retaliatory discharge. *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007) (four months gap is too long to establish a causal connection); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (four-month time lag between Plaintiff's protected activity and his termination, without more, is insufficient to justify an inference of causation).

UPS anticipates that Plaintiff will argue that UPS' ongoing harassment of Plaintiff for filing workers' compensation claims spanned years and is what ultimately led Plaintiff to retire. However, Plaintiff cannot establish a causal connection between any such alleged harassment and his discharge.  Practically speaking Plaintiff could not have been harassed for filing his June 2010 workers' compensation claim because Plaintiff did not return to work after suffering the June 2010 injury before retiring in 2011.[25]  To say that Plaintiff was "forced" to resign some eight months after any last alleged act of harassment fails to establish causation.  *Id.*

Accordingly, any claim that alleged harassment got progressively worse with each new injury report and/or workers' compensation claim ultimately pushing Plaintiff "over the edge" is bellied by the fact that Plaintiff suffered no harassment between June 2010 and February 2011.

---

[25] Plaintiff does not claim that UPS personnel harassed him outside of work at any time or during the time he was off work for from June 2010 until his February 2011 retirement.

Moreover, prior to his leave in June 2010, Plaintiff spent almost all of his day on the road and rarely saw Stuke or Dooley – in fact, Dooley worked a different schedule than Plaintiff. Moreover, it is unclear why UPS would have waited until Plaintiff attained 40 years of service and full pension benefits amounting to $4,128.00 per month and full health insurance coverage to finally get rid of Plaintiff by forcing him to retire at that time where Plaintiff had filed almost 30 injury reports and 18 workers' compensation claims before June 2010, including five workers' compensation claims in calendar years 2003 and 2004 alone- years prior.[26]

In support of his workers' compensation claim, Plaintiff alleges that in 2006 Dooley notified him that he was in the "Top 50" of employees in the District of Kansas for filing injury reports and that Plaintiff should work safer.  Plaintiff alleges Dooley required him to take daily computer quizzes for a couple of weeks in 2006 so that Dooley could ensure that he is following the methods and working safely and that if he failed to work safely there would be consequences. Plaintiff also alleges that his supervisor, Stuke, required him to undergo additional training and observed him perform a pre-trip inspection after he came back to work after suffering an injury, presumably in 2007 and 2010.  (*See* Section I above)  Plaintiff's allegations do not establish a causal connection or pretext for purposes of Plaintiff's workers' compensation claim.  First, comments and conduct too remote in time from the adverse employment action – in this case conduct that occurred years prior and a comment by Dooley made five years prior to Plaintiff's retirement - are not probative.  *Mondaine v. American Drug Stores, Inc.*, 408 F.Supp.2d 1169,

---

[26] To the extent that Plaintiff is claiming constructive discharge for workers' compensation claims filed more than two years prior to Plaintiff's filing of his Complaint with this Court on April 5, 2010 any such claims are time-barred. K.S.A. 60-513; *Burnett v. Southwestern Bell Tele.*, 283 Kan. 134, 144, 151 P.3d 837, 844 (2007). Moreover, UPS submits that Plaintiff's attempt to fashion a claim of harassment for filing workers' compensation claims is unsupported by the law and Plaintiff's evidence of any such harassment should not be considered by this Court.

1197 (supervisor's comment that plaintiff would regret filing a workers' compensation claim did not establish inference of discrimination where comment was remote in time from adverse employment action); *Palmer v. Leawood S. Country Club, Inc.*, 1998 WL 724050 at *6 (D. Kan. 1998) (remarks by decision-maker with "no demonstrated temporal proximity" with plaintiff's termination insufficient to establish inference of discrimination).

Moreover, neither the conduct of Dooley or Stuke is evidence of retaliation.  "Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from 'stray remarks in the workplace, statements by nondecisionmakers, or statements by decision makers unrelated to the decisional process.'" *Mitchell v. City of Wichita*, 140 Fed.Appx. 767, 779 (10th Cir. 2005) (*quoting Clearwater v. Indep. School Dist. No.* 166, 231 F.3d 1122, 1126 (8th Cir. 2000); *Cuenca v. University of Kansas*, 101 Fed.Appx. 782, 788 (10th Cir. 2004).  As explained in detail in Section II above, due to the nature of UPS' business and applicable government regulations, UPS stresses the importance of safety and invests substantial resources to ensure the safety of its employees and the public by minimizing the risk of injuries and accidents.  UPS' commitment to safety, among myriad of things, includes joint UPS –Union safety committees, and extensive training provided to its employees, including management.  All of its policies and procedures are designed such that if a driver follows them the driver minimizes the risk of injury and accidents from occurring.  (*See* discussion in Section II B above)  Plaintiff testified in his deposition that requiring that he undergo additional training after suffering an injury was part of UPS's operations.  (Sifuentes Dep. p  41)  Accordingly, Plaintiff fails to establish a causal connection between his workers' compensation claim and his retirement.   For the same reasons, Plaintiff cannot establish that any of UPS' actions were pretext for workers' compensation retaliation.

## CONCLUSION

For the foregoing reasons, UPS respectfully requests that its Motion for Summary

Judgment be granted in its entirety.

Respectfully submitted,

By:  */s/ Jennifer Arendes*
    Jennifer L. Arendes, #77944
    Narcisa P. Symank, #78179
    ARMSTRONG TEASDALE LLP
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri  63105
    T: (314) 621-5070
    F: (314) 612-2224
    jarendes@armstrongteasdale.com
    nsymank@armstrongteasdale.com

    ATTORNEYS FOR DEFENDANT
    UNITED PARCEL SERVICE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2012, I filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Dennis E. Egan
The Popham Law Firm, P.C.
712 Broadway, Suite 100
Kansas City, MO  64105
T: (816) 221-2288 ext. 628
degan@pophamlaw.com

Fredrick D. Deay, II
Law Office of Fredrick D. Deay, II
7575 W. 106th Street, No. 14
Overland Park, KS 66212
T: (913) 649-0687
fddpai2@hotmail.com

_/s/ Jennifer Arendes_