**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

WILLIAM SIFUENTES,                )
                                  )
                Plaintiff,        )
                                  )
 vs.                              )        Case No. 10-CV-2178 RDR
                                  )
UNITED PARCEL SERVICE, INC.,      )        **ORAL ARGUMENT REQUESTED**
                                  )
                Defendant.        )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

POPHAM LAW FIRM

By: s/ Dennis E. Egan
Dennis E. Egan    KS Bar No. 70672
712 Broadway, Suite 100
Kansas City, MO 64105
(816) 399-5202
degan@pophamlaw.com  *email*

LAW OFFICES OF FREDRICK D. DEAY, II
Fredrick D. Deay, II    KS Bar No. 15035
7575 W. 106th Street, No. 14
Overland Park, KS 66212
(913) 649-0687
fddpai2@hotmail.com  *email*

*Attorneys for Plaintiff*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................4

II.  STATEMENT OF MATERIAL FACTS .............................................7

   A.  PLAINTIFF'S RESPONSE TO DEFENDANT'S
       STATEMENT OF UNCONTROVERTED FACTS ..........................7

   B.  PLAINTIFF'S STATEMENT OF ADDITIONAL
       MATERIAL FACTS ("AMF").......................................................31

III. ARGUMENT ...................................................................................47

Summary Judgment Standard ................................................................47

Plaintiff-favorable Evidence Allows A Jury to Infer That UPS Has a
Longstanding Policy or Practice of Discrimination and Retaliation ............49

Sifuentes Has Been Subjected to Severe and Pervasive
Discrimination and Retaliation ...............................................................52

A Reasonable Jury Can Conclude That A Reasonable Person in
Sifuentes' Situation Would Feel Compelled to Resign .............................53

Plaintiff's Claims Have Been Properly Plead and Are Timely –
Pursuant to the Supreme Court *Morgan* Decision ......................................56

Plaintiff Has Been Discriminated Against Because of His Disability
or Impairments .....................................................................................57

Plaintiff's Impairments Easily Meet the Definition of Disability................59

Plaintiff Was Subjected to Multiple and Ongoing Adverse
Employment Actions ............................................................................63

A Jury Can Infer A Clear Causal Connection Between Plaintiff's Impairments
and His Unlawful Treatment..................................................................65

The Conduct of UPS – Fraught with Contradictions, Inconsistencies,
and Cover-up – Is Pretextual.................................................................66

The UPS Summary Judgment Practice of Submitting Post-Hoc, Unsubstantiated,
Attorney Drafted, "Sworn" Statements – With Identical Language – From Managers
Who Have Already Given Deposition Testimony is Strong Evidence of Pretext .........68

Pursuant To What a Jury Could Conclude Is Wide-Spread Company Policy,
UPS Refused to Provide Sifuentes with a Reasonable Accommodation.....................................70

Overtly Contradicting the Company's Assertion That an Individualized
Inquiry Is Required, UPS Does Not Take Part in a Good Faith Interactive Process...................71

A Reasonable Person in Plaintiff's Situation Would Be Dissuaded from
Seeking Accommodation or Pursuing a Charge of Discrimination............................................73

UPS Practice is to Interfere with and Prevent Employees Seeking or
In Need of Accommodation......................................................................................................75

Sifuentes Was Subjected to an Adverse Action Which Occurred
Under Circumstances That Gives Rise to an Inference of Discrimination –
the Unfavorable Terms, Conditions, or Privileges of His Employment
Were Motivated By His Age and/or Race ................................................................................76

UPS Brazenly (and Foolishly) Asserting or Admitting It Treats
All or Other  Employees Unlawfully or Unfavorably is Not a
Legitimate, Non-Discriminatory Reason for Its Unlawful Conduct.........................................79

Sifuentes Was Forced to Resign In Part Because of His Injuries
and Workers' Compensation Claims; He Is Not Required to Show
This Was the Exclusive Reason for His Unlawful Treatment ...................................................80

UPS Has a Policy or Practice of Interfering With, Intimidating,
Harassing, and Retaliating Against Employees Who Contemplate
Filing an Injury Report or Pursue Their Lawful Workers'
Compensation Rights..............................................................................................................84

The So-Called Safety Methods and Training of UPS Are Pretextual;
This is a Transparent Ploy of Retaliation Under the Guise of a Legitimate Concern .................85

UPS is Not Absolved From Liability or Complying with the Law by
Proclaiming Its Conduct is "Business Judgment" Based on Purported
Good Faith Beliefs; The Jury or Finder of Fact – Not a Judge – Must
Be Allowed to Assess this Unproven, Biased, and Controverted Assertion ..............................87

IV. CONCLUSION..................................................................................................................88

PLAINTIFF'S EXHIBIT LIST................................................................................................91

## <u>INTRODUCTION</u>

### *"YOU NEED TO STOP FILING INJURY REPORTS!!"*
### *"WE'RE GOING TO BE WATCHING EVERYTHING YOU DO!!"*
### *"WHY DON'T YOU JUST RETIRE!!?"*

These hostile and intimidating threats and admonishments were persistently thrown at Plaintiff – William Sifuentes – by his managers during his employment at UPS. The company and his managers got their wish. After four decades of devoted service at UPS as a feeder (tractor) driver and being subjected to ongoing physical, verbal, and emotional abuse, Sifuentes retired upon reaching his pension benefit eligibility. Make no mistake, though, his resignation or retirement was forced – brought about due to his being subjected to a hostile environment steeped in ongoing severe and pervasive discrimination and retaliation.

Sifuentes, age 63 when he retired, is of Mexican descent and was one of very few minorities at the UPS facility he worked out of, known as the James Street (or Kansas City, Kansas) location. He finally had enough of his employer assigning him dangerous, unsafe, and improperly maintained vehicles ("tractors") – worsening his already severe disabilities – and, repeatedly tormenting him, based on his impairments, age, ethnicity, and workplace injuries. This abuse and the adverse actions accompanying such would have compelled a reasonable person in his situation to retire. The events occurred under circumstances that give rise to a reasonable inference of discrimination. Likewise, before his retirement, a reasonable person in Sifuentes' situation would have been dissuaded from seeking an accommodation or pursuing a charge of discrimination. All of this is exactly what UPS wanted and is part of the company's well-recognized, longstanding unlawful employment practices – particularly, discriminating and retaliating against those with disabilities seeking accommodation and who file injury reports or workers' compensation claims – just like Sifuentes.

4

Indeed, a very effective way for an employer to force an individual with an impairment out of a job is by refusing to acknowledge the disability or request for accommodation and making their job more difficult in a manner that exacerbates their disability – just as UPS did with Sifuentes. This is well recognized as constructive discharge. Yet, UPS actually has the temerity to criticize Sifuentes because he kept working, although the ADA expressly provides coverage to an individual with a disability who does or can perform the essential functions of their current job *without* accommodation – just as Sifuentes was unlawfully forced to do. Still, UPS questions Sifuentes because he kept working *without* accommodation and illogically asserts he has no claim because he performed his job without accommodation. This insulting and outrageous argument clearly has no merit in the law.

As UPS did at the pretrial conference, it continues its practice of misrepresenting to the court Sifuentes' claims and theories. To begin with, contrary to Defendant's assertions, there are numerous instances within Plaintiff's Complaint, Charge, and in the Pretrial Order where he expressly pleads constructive discharge – and, the facts fully support the claim. UPS also puts forth the meritless argument Sifuentes has no claim and should stop complaining, given the pension he is receiving. Consistent with his legal rights, Sifuentes very reasonably and prudently waited to resign until eligible for his pension – which he had worked long and hard for. Truly, had Sifuentes left earlier, giving up his pension (but, tellingly, which would have gone to UPS), no doubt UPS would argue he should have tried to work things out. Yet, to the consternation of UPS – and, consistent with the law – Sifuentes did not prematurely succumb to the ongoing harassment and just walk away before his pension eligibility. He defied UPS, where it's all about money and where the company openly targets and tries to remove those employees – called injury "repeaters" like Sifuentes – whom management feels are "stealing our money."

UPS also asserts another familiar defense: "Yes, we admit, we don't comply with our policies – so what?  Sure we treated Sifuentes unfairly and poorly; why not, other people were mistreated as well?  Did he expect something special!?" UPS astoundingly tries to label this unlawful conduct – i.e., forcing it drivers to use and subjecting the public to unsafe and improperly maintained trucks – as "good faith business judgment."  As such, in addition to brazenly admitting it is breaking the law, UPS openly admits it treated Sifuentes adversely and argues that, because it also does so with _other_ employees, then he cannot show he was discriminated or retaliated against.  Yet, again, this posture has no merit and has long been rejected in case law.

In short, UPS is one of the nation's largest private employers and government contractors (with 400,000 plus employees, $50 billion plus in annual revenues, and one of the nation's top ten corporate PACs), and has a provable longstanding corporate-wide policy of discrimination and retaliation.  This systemic, unlawful conduct is carried out at the UPS facility Plaintiff worked at that forced him into retirement.  Sifuentes has put forth admissible evidence establishing all the elements of all of his claims, and pretext.  There are clearly disputed issues of material fact.  UPS has not met its burden – as required of the moving party – to demonstrate the absence of such, **_and_** that it is entitled to judgment as a matter of law; thus, mandated standards require that its motion be denied.  A jury – not a court at summary judgment – must be allowed to weigh and evaluate the credibility of the post-hoc, self-serving, unsubstantiated management affidavits UPS purports to offer in support of its motion.  This court cannot grant UPS's motion without impermissibly giving credence to this biased, controverted, unproven testimony – while ignoring the evidence and inferences favorable to Sifuentes – and, adopting UPS's pretextual

version of events.  Supreme Court and Tenth Circuit precedent mandate that UPS's motion be

denied.

## II.   STATEMENT OF MATERIAL FACTS

Pursuant to D.Kan.Rule 56.1(b), Plaintiff sets forth below his responses to Defendant's

Statement of Uncontroverted Facts and the Additional Material Facts on which this

response memorandum in opposition relies.

### A.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

1.      Undisputed

2.      Undisputed

3.      Undisputed

4.      Undisputed

5.      Objection. Plaintiff objects to Defendant's testimony by footnote as improper under the F.R.C.P.  Without waiving said objection this assertion is undisputed.

6.      Objection. Plaintiff objects to Defendant's testimony by footnote as improper under the F.R.C.P.  Without waiving said objection this assertion is undisputed.

7.      **Disputed**.  Objection.   The citations provided by UPS do not state or support what UPS asserts.  Plaintiff was hired by and first started working with UPS in 1970.   Additionally, he did not voluntarily retire , rather, he was forced to retire because of his impairments, his age, and UPS's endless hostile environment in retaliation for Sifuentes asserting his rights against disability, age, worker's comp, and race discrimination.  (See Plaintiff's Statement of Additional fact #  and Ex. 1, Plaintiff's 3rd Amended Answers to Defendant's 1st Interrogatories 3,4,5 and14)

8.      **Disputed**.  Dooley was On-road Dispatcher Manager from 2006-2007, not the

Feeder Manager (Pl. Ex. 2, Dooley Dep. pp. 8-9).

       9.    **Disputed**. Others, such as dispatchers, were responsible for training,

supervising and disciplining drivers, and making decisions about the terms and conditions of

their employment .

> (Pl. Ex. 3, R. Daniels Dep. p. 45 ) *"We were responsible for reviewing that job or changes with the driver.  And that wasn't necessarily annual bid time.  If the district scheduler made changes to a schedule, a bid   job, those changes would come down on a weekly basis and we would have to obviously review and re-train the driver what those changes were so they performed accordingly.  A.  I would go over the bid sheets **and train -- re-train the driver and discuss what had changed or what their duties were** for that particular job."*

> (Pl. Ex. 4, Sifuentes Dep.pp. 76, 80-82).*"Was Mr. Isabell ever your direct supervisor? Yes.   When was he your supervisor? This week. When Stuke's not there, he's the supervisor.   Okay.  If Mr. Stuke's not there, can Jason Isabell give you discipline?  Yes. Has Mr. Isabell ever given you any discipline?Yes. When was that? Tuesday morning.*

      10.    Undisputed.

      11.    Undisputed.

      12.    Objection, Plaintiff objects to Defendant's testimony by footnote as being

improper under the FRCP.  In Addition, plaintiff objects to this footnoted information as being

irrelevant and immaterial to the issues in this case.  Without waiving said objections, this fact is

undisputed.

      13.    Objection, Plaintiff objects to Defendant's testimony by footnote, as being

improper under the FRCP. In Addition, plaintiff objects to this footnoted information as

being irrelevant and immaterial to the issues in this case.  Without waiving said objections, this

fact is undisputed.

      14.    Undisputed.

      15.    Objection. Contrary to FRCP 56, UPS does not provide any citation or

authority in support of this allegation.  As such, Plaintiff is not obligated to respond as to

whether this assertion is or is not disputed.  This paragraph and all assertions therein and any

other alleged facts asserted by UPS, relying in whole or part upon such, should be stricken in

their entirety and disregarded by the court.

16.      Objection.  Contrary to FRCP 56, UPS does not provide any citation or

authority in support of this allegation.  As such, Plaintiff is not obligated to respond as to

whether this assertion is or is not disputed.  This paragraph and all assertions therein and any

other alleged facts asserted by UPS, relying in whole or part upon such, should be stricken in

their entirety and disregarded by the court.

17.   Undisputed.

18.   **Disputed**.  Plaintiff was hired in 1970 hired as a temporary worker.

(Pl. Ex. 4, Sifuentes Dep. p. 11).

19.      **Disputed**. Plaintiff worked at UPS James' Street facility from 2001-2011.

(Pl. Ex. 4, Sifuentes Dep. p. 27).

20.   **Disputed**. Plaintiff did not work through 2011, he retired as of February 1,

2011. (Pl. Ex. 4, Sifuentes Dep. p.10).

21.   Undisputed.

22.   Undisputed.

23.   **Disputed**.   This selectively extracted passage of deposition is in response to a

general question.  It doesn't detail Sifuentes's many years suffering discrimination, retaliation

and hostile work environment.  Without waiving said objection, Plaintiff doesn't dispute that he

testified that he performed well and enjoyed his job.  Plaintiff did not enjoy the discrimination,

harassment, retaliation, and intense scrutiny he experienced over the years, nor did he enjoy

breathing diesel fumes, or being shaken "to death" by his truck, and felt he was discriminated against in the assignment of his tractor, among other things (Pl. Ex. 1, Plaintiff's 3rd Amended Answers to Defendant's 1st Interrogatories # 3 (pp 18-23, 4, 5 and 14)

24.    **Disputed**.  Plaintiff was constructively discharged (Pl. Ex. 1, Plaintiff's 3rd Amended Answers to Defendant's 1st Interrogatories #3,4 5 and 14.)

25.    **Disputed**.    Plaintiff was sent a "Letter of Concern", which was form of punishment, in 2009 (Pl. Ex 5, Letter of Concern).  Plaintiff was disciplined in many other ways including threats, verbal warnings, and punishment which he considered discipline because he was told he was going to be watched, etc. (Pl. Ex. 4, Sifuentes Dep. p. 43-44; Pl. Ex. 3, R. Daniels Dep. p. 120).  Plaintiff was yelled at by Yard Supervisor Jason Isabell who telling him to retire (P. Ex. 4, Sifuentes Dep. p.76 ).  Surely being denied time off available to others, being threatened, yelled, having your job bid while you were on vacation, are forms of discipline.

> (Pl. Ex. 6, Sifuentes  deposition in ***Daniels v. UPS***; Dep. p. 48)  "*Have you ever been disciplined or discharged by UPS since 2000? -- I have never been fired, disciplined,* **I'd say more like punished.**"

> (Pl. Ex. 3, R.Daniels Dep. p. 120) *"If  Jason Isabell tells William Sifuentes he needs to quit filing injury reports, is that a form of discipline? Most certainly"*

> (Pl. Ex, 4, Sifuentes Dep. pp. 49-50, 226, 564-565) **"Did you get any other discipline since 2000? Warnings, suspension, any kind of discipline. Yes. Joe Dooley warned me last night… he says, "Unless you're getting an emergency phone  call from home, you are not to talk.  He said, "I'm not paying you for time you spent on the telephone."… Has Mr. Isabell ever given you any discipline? Yes.  When was that?  Tuesday morning.**  *What was the discipline? He was disciplining me for wanting to write an injury report… Asked Yank for roving holiday on Wednesday, and   he said okay.  Went upstairs and asked Joe Dooley and he said no."   "But I had also asked him -- because about the same time, I asked him  -- because I needed some therapy and he said No.* **Stucky told me that if I took   another day off, they were going to write me a warning letter because I had off twice to see a doctor within 90 days."**

26.    Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     **<u>Disputed</u>**.   Only selected terms and conditions of employment are governed by the Labor Agreement. (Defendant's Ex.Q Collective Bargaining Agreement).

30.     **<u>Disputed</u>**.  When drivers bid the job, they see the tractors assigned on the bid sheet. (Pl. Ex. 4, Sifuentes p. 49).

31.     **<u>Disputed</u>**. Drivers see tractor numbers when they bid jobs (Pl. Ex. 4, Sifuentes Dep. p.49). Objection .  Pages cited by defendant for Mr. Sifuentes do not stand for what UPS represents.

32.     Undisputed.

33.     **<u>Disputed</u>**. See Response to Defendant's Assertion No. 31.

34.     Undisputed.

35.     Undisputed.

36.     Undisputed.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed.

40.     Undisputed.

41.     Undisputed.

42.     Undisputed.

43.     **<u>Disputed</u>**.  Plaintiff testified that he worked an average of 8-9 hours per day (Pl. Ex. 4, Sifuentes Dep. p. 29-30).

44.     Undisputed.

45. Undisputed.

46. **Disputed**. This footnote is totally unsupported by any citations. Objection to defendant testifying by footnote without supplying any authority for the alleged facts. In fact there is testimony in this case indicates that the lack of spares was a problem.

> (Pl. Ex. 3, R. Daniels Dep. p. 48), *"And was that usually a spare tractor that the driver would be given?_ If spares were available and not already out on the road due to lack of equipment."* (Pl. Ex. 7, Graham, p. 67). *"I know that Mr. Epperson didn't want people smoking in his tractor in the event it had to be used because we didn't have spares*

47. Tractors are assigned to jobs but jobs are granted by seniority but UPS Managers can affect the assignment. Reeves chose NOT to give good tractor to another employee who tended to have accidents. Sifuentes bid jobs that had tractors assigned to them, only to have the tractor's pulled after he got the job.

> (Pl. Ex. 2, Dooley Dep. p. 18, 63-64) (*"Was there one person who decided in all instances? 99 percent of the time it was assigned by the scheduler." "I do recall telling Bill I would try to keep him in newer tractors, jus*t *like I do with other drivers. Lot of the tractors we use we try to dual utilize to get more use of them. Working with drivers, if there was -- Wes Epperson's a nonsmoker and at the time he was sharing a tractor with a smoker, a Steve Macey. They were assigned by the scheduler the tractors and try to work with them to where I'd match the nonsmokers with nonsmokers and the smokers with smokers the best I could. It's just -- just trying to work with employees."*)

> (Pl. Ex. 8, Brown Dep. p.*44 )"A job will go out for bid, the senior employee gets it. Oftentimes there's a tractor or -- the equipment is assigned to that job and they can change the equipment"* )

> (Pl. Ex. 7, Graham Dep. p. 67 ) *"In 2011, they changed Mr. Reno's tractor to a newer tractor, and then the supervisor, Scott Wetschensky, said he didn't want Reno driving one of those tractors because he had wrecked too man- he wanted him to drive the oldest tractor in the fleet."*

> (Pl. Ex. 4, Sifuentes Dep. p. ) *" I bid that O'Fallon job in 2009 specifically to get a new tractor for a change. It wasn't new. It had 200,000 miles on it, but that to me was new. So I complained about the seat in that new tractor. It's a new*

*tractor. I hated to complain about it. I was finally getting a new tractor. What did they do? They took it from me. What year was this? 2009. And they gave me another piece of junk to drive."*

48.     **Disputed**.  Both Dooley and Plaintiff testified that feeder jobs are bid by

seniority, see  (Pl. Ex. 2, Dooley, pp 48-49; Ex. 4, Sifuentes p. 28).

49.     **Disputed**.  None of Defendant's cited deposition pages Reeves Dep. pp 28-37 or

57, 101-103, or 122-123, stand for what UPS represents.   What Reeves does say about changing

a bid job start time is that knowing the names is too hard:

> (Pl. Ex. 9, Reeves, p. 21). *" Okay.  I don't know it was Bill or not, KLW-2 did change to 5:45 at a request from St. Paul. That is true, but I don't know the names. **Again, I don't  follow the names.  It's too hard for me."***

Reeves admits that he spoke with managers and drivers (Pl. Ex. 9, Reeves p. 120) about

particular issues with trucks, that they observed while driving OR riding in them (as

managers ride in them too) and he would refer them to automotive to see if the problem

can be fixed.  In fact, he doesn't deny that Bill Sifuentes called him about one of the

problems, having fumes in his cab (Pl. Ex. 9, Reeves, Dep. 97).  Obviously if he spoke to

them they identified what trucks they were discussing.  He admits it's possible Joe

Dooley called him about problems with tractors assigned to plaintiff.

> (Pl. Ex. 9, Reeves Dep p. 121-122*) "Is it possible that Joe Dooley could have spoken with you about the tractors assigned to one of the jobs that Mr. Sifuentes had?  Is that possible? I mean, it's possible. He probably wouldn't use the name 'cause he knows how I feel about drivers." So, it's possible that Mr. Dooley talked to you about a driver who was complaining about a rough riding tractor, but he might not have told you that it was Mr. Sifuentes, right?  I mean, it's possible he could have actually said that, but I don't, don't say I recall it"*

50.     Undisputed.

51.     **Disputed** that those are the only factors considered in assigning tractors. UPS

considers other factors in assigning tractors, such as   mileage of the tractors such as whether

drivers smoke (Pl. Ex. 2, Dooley, p.64), who is driving the tractor (Pl. Ex. 10, Haynes Dep. p.

26) *"Mileage could affect the tractor assigned to the job? It could"*.

52.     Undisputed.

53.     Undisputed.

54.     Undisputed.

55.     **Disputed**. See response to Defendant's Response No. 49

56.     **Disputed**.   Supervisors and managers discuss possible repairs, timing etc., and

make decisions about whether tractors should be driving before repairs.  Supervisors also refuse

to repair tractors:

> (Pl. Ex.11, Foth Dep. p. 29  *) Who is responsible for reviewing
> the daily inspection reports and deciding what
> repairs are to be made? The mechanics and management team.*

> (Pl. Ex. 4, Sifuentes Dep. pp. 524-525; 536-537)*, **"Are you claiming that you
> were forced to drive a tractor that had some kind of safety issue that was not
> repaired?  Yes.   And what is that?   That's the stop on the seat belt.** That was
> in 2010?   '9 or '10".)*

> (Pl. Ex.3,  R. Daniels Dep.p. 67) "*Or they'd say, "Well, they've  been written up
> and they can't do anything" or **"They're not doing anything about it**." So,   I
> mean, it was out of my hands to do anything for them.*

57.     **Disputed**.  The Scheduler also changes tractors based on driver's accident history,

drivers' smoking habits, and other factors.  See response to Defendant's Assertion No. 49

58.     Objection, This alleged fact is vague and ambiguous as it doesn't assert what

"this" is.

59.     **Disputed**.   Many times spares were not available.

> (Pl. Ex.3, Daniels Dep. pp. 47-48, 63)  *"And I think you started to answer this,
> but if a driver found some kind of a   safety issue and the tractor went to the shop*

14

*for repair, who would assign another tractor for that person to drive that day? The dispatcher on duty. Okay. And was that usually a spare tractor that the driver would be given?* **If spares were available and not already out on the road due to lack of equipment.** **"** *I know that Mr. Epperson didn't want people smoking in his tractor in the event it had to be used because we didn't have spares."*

60.     Objection. Vague and unclear. What defendant means by "slightly larger."

61.     Undisputed, but incomplete.  Some other drivers have rough riding tractors, but incomplete in that the driver's cited by Defendant are ***near the same age as Plaintiff***.  Feeder drivers Shockley and Epperson both were hired in 1970, the same year as Plaintiff (Pl. Ex. 23, Shockley, p. 10; Ex. 13, Epperson p. 10) . Shockley testified that the drivers that complained about their tractors to him were Sheplar, Hill and Partain.  Sheplar and Hill were hired in 1971, (Pl. Ex. 12, Hill p. 17) are both over 60.

62.     Objection, Neither Shockley nor Hill's testimony cited stand for the proposition made by Defendant.

63.     Undisputed.

64.     **<u>Disputed</u>**. Although there is testimony that start times and other factors about the jobs changed regularly, there is no testimony that it happened to younger drivers.  Despite Plaintiff's requests to Defendant for documents evidencing the need for changing start times, and evidence that such documentation exists, Defendant has not produced any documentation of such change involving Plaintiff, despite testimony that requests for change in start time and schedules are made in the form of a written request.

> (Pl. Ex. 3, Daniels Dep, pp. 75-76*) "**Basically that -- we were required to send in the schedule change requests,** so that Would happen on a weekly basis. And then they were reviewed. And yes, it could involve their start times"*.

65.     Undisputed.

66.   **Disputed**.  There is no testimony in this case, or documented evidence that this (load/trailer changes) ever happened to younger drivers.  If there was such evidence UPS should have produced it.

67.   Objection. Contrary to FRCP 56 , UPS does not provide any citation or authority in support of this allegation.  As such, Plaintiff is not obligated to respond as to whether this assertion is or is not disputed.  This paragraph and all assertions therein and any other alleged facts asserted by UPS, relying in whole or part upon such, should be stricken in their entirety and disregarded by the court.

68.   **Disputed**.  UPS ignores safety and has a "coordinated" blame-the-worker-approach to safety, which is the subject of many union and worker disputes at UPS.  (Pl. Ex. 4, Sifuentes, Dep. pp. ; Ex.7,  Graham Dep. p.63; and Ex.13,  Epperson Dep. p.136 Ex. 14, *New York Times* article).  In addition the ongoing employee training cited by defendant is actually used in a punitive fashion, or as a deterrent, as described by Plaintiff and other witnesses in this case.

> (Pl. Ex.4,  Sifuentes Dep. pp. 349, 361).   *"Anything else that Mr. Dooley said or did that you think  was retaliation for  filing a workers' comp claim?  Well, him asking me to come up to his officer after work every day and taking these  tests after I have driven 552 miles a day.  I am tired, ready to go home.  And he wants me to come up to his office, log into his computer and take these tests, which were silly."  Well, I came into his office.  And I said, "Hello."  And he (Dooley) says, "Sit down."  He says,  "This is you", holding up this binder.  He says, "You're in the top 50."  I said, "Oh, what did I do to deserve that honor?"  He said, **"No, this is not good."  He said, "Since 1992, you have written 19 injury reports."  He said, "You're going to have to come up to my office, log into my computer and take these tests every day until you're done."  And it took me, oh, I don't know, two, three weeks to do that.  And he says, "We're going to be watching you. We're going to be watching everything you do".***

> (Pl. Ex.7.  Graham Dep. p. 63), *"There's also a comment in this magazine, and it's under a portion of the document called "A Union Approach." **And it says, UPS has a coordinated national  strategy to blame workers for safety problems, save comp costs by reducing the reporting  of injuries, and divide the membership through company-dominated safety committees.** Those are three things…They have to have a   third party that comes in and  certifies them because they had so*

16

> *much dangerous   equipment on the highway after they  fired a mechanic who would not go along with the   program of looking the other way and writing their -- their equipment off. In St. Louis last year, a friend of mine, they fired him because he refused to drive an unsafe pickup trailer back to   the building with no lights, no taillights, no turn signals.   He refused because it was unsafe.  They wound up firing him.  He filed a lawsuit under the Surface Transportation Act. And OSHA has ordered backpay and that notices be posted in all workplaces that the driver's right to know about their rights under the law to refuse to drive unsafe equipment."*

69.   **Disputed**.  See Response to Defendant's Assertion #68.

70.   Undisputed.

71.   **Disputed**.  Although there are joint safety committees, the purpose or effect of these were used to divide the membership.  See response to Defendant's Assertion #70.

> (Pl. Ex. 13, Epperson Dep. p. 93),  *"We've complained about our safety committee, off and on, From time to time.  It's good at cooking hot dogs and handing out T-shirts.  But when it comes to safety, why, very little gets done."*

72.   Undisputed.

73.   **Disputed** and incomplete.  Many of these observations are for punitive reasons and done only after work injuries or accidents  (Pl. Ex.4,  Sifuentes Dep. p. 361- Dooley ***"we'll be watching you"***).

74.   **Disputed**. Many of these activities were punitive in nature and retaliatory for being injured on the job and filing injury reports.  See Response to Defendant's Assertion # 68. In the same breath as "***You are in the Top 50"***, Dooley screamed at Sifuentes ***"we will be watching you".  Id***

75.   Undisputed.

76.   **Disputed**.  Although employees are "told" to report unsafe equipment or conditions, in fact, those reports are ignored at the discretion of management.  Employees have been forced to drive on roads closed by state DOT agencies and in storms, resulting in accidents

and even deaths .   UPS Is under an OSHA order in Missouri not to force drivers to drive in unsafe conditions or with unsafe equipment, after they fired someone for following orders to do so.  (Pl. Ex.13, Epperson, p.137).

78.   **Disputed** that the purpose of the "training" is to keep the employees safe.  They feel it is punitive to be given tests with nonsensical questions that require them to stay another hour after a ten hour day for two or three weeks, such as Mr. Sifuentes was after he was disciplined for being in the "Top 50 (Pl. Ex.4, Sifuentes, pp. 349, 361-362, Pl.Ex.35- Top 50).

79.   **Disputed** that the purpose of observations and drivers' rides are to ensure they are following safe methods and training, the worker's compensation injury handling process is considered part of employee terminations.  (Pl. Ex. 4, Sifuentes Dep. pp. 341, 361-362; Pl. Ex. 26,  UPS Focus on Abilities).

80.   Undisputed.

81.   Objection, repetitive and duplicative.   This assertion is duplicative of 78 and 79.

82.   **Disputed**. Many employees did not report injuries that they sustained at work because of retaliation and management's response,(Pl. Ex. 14, *New York Times* article).

83.   Objection, irrelevant and immaterial.  Plaintiff reported safety violations concerning the fumes in his cabs and other safety issues to UPS and his union.  Plaintiff should not be required to report to OSHA or DOT.  He believed (and his employer represents) that they promote a safe workplace.  He thought they would "do the right thing".   Plaintiff also testified, that he did not report DOT violations because he was afraid:

> (Pl. Ex.4,  Sifuentes Dep. p. 226). "*Did you report that to the Department of Transportation?  No.  Okay.  And why not?  You're talking to report it to -- The DOT.  No.  I never reported it to them.  Why not? I tried to keep a low profile at work.  I came to work and just tried to do my job.*"

84.   Undisputed.

85.     Objection.  Contrary to FRCP 56, UPS does not provide any citation or authority in support of this allegation.  As such, Plaintiff is not obligated to respond as to whether this assertion is or is not disputed.  This paragraph and all assertions therein and any other alleged facts asserted by UPS, relying in whole or part upon such, should be stricken in their entirety and disregarded by the court.

86.     Objection. Defendant's Exhibit GG, which is the UPS Policy on inspections does not even mention the US Department of Transportation or DOT.

87.     Objection, again Defendant's Exhibit GG, which is the UPS Policy on inspections does not even mention the US Department of Transportation or DOT.

88.     **Disputed**.  Repairs are not always done, despite being requested. See Response to Defendant's Assertion #56 and:

> (Pl. Ex.  10, Haynes  Dep. p. 42) *If it wasn't  something that was un -- to make the vehicle unroadworthy or an unsafe condition, we would sometimes, if we had plenty of tractors, we'd say, well, let's set it down and we'd talk with the driver.  If the driver felt very strongly, he felt like it was a safety issue, then sometimes we would, ...So we would have to really look at good, but if he found something as far as steering, wheel tread, lights, horn not working, defroster not working, air conditioning  not work, all those things required by DOT.  ...if the driver noted a safety issue and wrote it up on the DVIR, then a mechanic or a mechanic supervisor would have to sign off that it had been addressed and taken care of before the tractor could be driven; is that right? That is correct.  And that's at the end of the day when they bring that in if they – after they do their post-trip because, first of all, they shouldn't go out and start the day if they find something then, we make a decision then.*

89.     Objection. There is no Exhibit KK  filed with this motion.

90.     Undisputed.

91.     **Disputed**.  There is no documentary evidence as to what UPS considers safety

issues, or whether the safety issue is as to the safety of the driver or the public.  Plaintiff has

testified that UPS tells him what they consider to be safety or non-safety related issues, or they

use common sense to determine what is a safety issue

> (Pl. Ex. 4, Sifuentes Dep. p.65*).  "Is an uncomfortable seat in a tractor considered a safety issue by UPS? Well, that's where you come into the vehicle nonsafety related service.  If the seat is uncomfortable, that's not a nonsafety -- That is a nonsafety -- are you saying that is a nonsafety issue? **That's not something that they would consider a safety issue**."*

92.     Undisputed.

93.     Undisputed.

94.     Undisputed.

95.     Undisputed.

95.     Undisputed.

96.     Undisputed.

97.     **Disputed**.  Drivers are forced to drive unsafe tractors that cannot keep a safe

speed due to lack of power, leak diesel fumes in to the cabs, unsafe mirrors, faulty seat belts, and

bald tires.  In fact employees that refuse to drive unsafe equipment are told to go home and even

fired. (Pl. Ex. 4, Sifuentes Dep. p.35;  Pl.Ex. 8, Brown Dep. p. 49). (See Response to

Defendant's Assertion No. 56 ; Pl. Ex. 16, EEOC Charge; Pl. Ex. 14, *New York Times* article).

> (Pl. Ex. 8, Brown Dep. p. 49)*"A a diesel fume issue, is that a safety issue or a mechanical issue? If there are diesel fumes in the cab it would be a safety issue."*

98.     **Disputed**, that drivers are instructed not to drive any unsafe tractors or equipment.

Plaintiff and others, repeatedly testified that they were forced to drive unsafe equipment. ( See

Response to Defendant's Assertion No. 56 ).

99.     **Disputed**.  Plaintiff testified that he violated DOT rules/regulations when he

drove in a snowstorm.

> (Pl. Ex. 4, Sifuentes Dep. pp. 37-38) *"Did you ever violate the DOT rules and regulations as far as you know? Well, I'm sure I did. What did you do that violated the DOT regulations?  Well, back again, when I was running Omaha at night, we ran into this snowstorm."*

100.   **Disputed**. Plaintiff's testimony on p. 61 of his a deposition was in answer to a

hypothetical description of what the procedure was that he followed, not what actually happened

at any given point in time.  After that line of questioning, he cited examples of repairs that were

not made, or were not timely.

> (Pl. Ex. 4, Sifuentes Dep. pp. 59-61, pp. 92-93) *" Okay.  But **if you did your inspection** and you saw that there was a safety issue, you would check that on the DVIR.  Can you show me where you would sign when you would pretrip the vehicle in the morning?  I mean, would you sign in the middle or would you sign at the bottom? Well, in the morning I would write it at the bottom, "I have reviewed the above report."   Okay.  And you were required to fill out and sign the DVIR before you leave to drive your route? Yes. Okay. You have to -- when you inspect your vehicle and you look at the DVIR report, you look at who drove it last, and if they wrote down any safety issues or nonsafety issues with the vehicle.  And then you would write at the bottom, "I have reviewed the above report."  And I'd write it and sign it.   Okay.  then at the end of the day, as you see on the following page, I would report at the end of the day whether there were any safety related items or nonsafety related items.  And I would again sign the book.  Would you sign in the middle of the page after your route?  Excuse me. Yes, in the middle.   Okay.  And was the driver required to note any safety issue he found on the DVIR?  Yes…did you write the problems that you noted with your tractors in the  DVIRs?  Yes.   Okay.  And if you found a problem with your tractor, what would you do with the*
> *DVIR?  **Well, I would go to the shop and have it repaired.**  Okay.  In 2007, are you claiming that there should have been repairs made to your  tractors that were not made?  Well, somewhere along there in 2007 or 2008, I had this tractor that had a bad seat.  And the mechanic finally found the problem.  I don't remember what it was.  But the shocks were bad in the seat. And there was another tractor that had a broken valve that didn't -- I was riding on the frame. The cab was sitting on the frame because the air ride system was broke, and the tractor was just bouncing on this frame.  And I'd -- they finally found it.  But it took a few days to find it.  But in 2007, and I asked you this in your deposition in the Regina Daniels case, if  they repaired the things that you asked to be repaired.  Yes, they did, but not necessarily immediately.  Okay.  Sometimes it would take a few days? The seat belt was not ever fixed until I came back from the hospital with this pancreatitis deal. Then they fixed that seat -- oh, it was amazing how quick they*

*got a new seat belt. Well, this bad tractor that caused my pancreatitis, I told Joe Dooley and the shop that This tractor has a bad seat belt. And Mr. Stucky went up and said, "Why don't you take the seat belt off that seat over there" -- it was the stop. You put the seat belt on. And in the tractor, you adjust the seat belt and put the stop on it because you have to have a little play in there. Because if the seat belt is holding you tight against the seat, when you hit a bump, you're going to get jarred. So what the stop does is it gives you a little play. He said, "Take the stop off of this seat belt and put it on this side." It was riveted to the tractor. I couldn't do that. So I drove the vehicle. They said -- they gave me a paper clip like this one right here except it was twice this size, about that big. And they said, "Put that on there and you can drive." I said, "Okay." **It's amazing I didn't have an accident. I was picking that thing up off the floor every three or four miles."***

101.   **Disputed**. Repairs were not always made, and when they were not always made in a timely manner. (See Response to Defendant's Assertion No. 100).

102.   Objection, relevance. Where are the DVIR's for the tractors Plaintiff drove in the years before 2010, and before he filed his EEOC claim in early 2009 unfortunately they were not maintained or not produced in this litigation as requested.

103.   Objection. Contrary to FRCP 56 , UPS does not provide any citation or authority in support of this allegation. As such, Plaintiff is not obligated to respond as to whether this assertion is or is not disputed. This paragraph and all assertions therein and any other alleged facts asserted by UPS, relying in whole or part upon such, should be stricken in their entirety and disregarded by the court.

104.   **Disputed**. Sifuentes has testified and it has been confirmed by his union steward that employees have to discuss a possible grievance with management before they are allowed to file one. Despite this deterrent, Sifuentes filed two grievances in 2008 which concerned safety issues and injuries related to his tractor assignments. When asked to explain his grievance he began explaining and they cut him off and said they only wanted to hear what had happened in the past 30 days. (Pl. Ex. 4, Sifuentes Dep. pp. 142-143, 148-149, 245-246; Pl. Ex. 17and 18 Grievances of 6/23/2008 and 9/16/2008).

22

(Pl. Ex. 4, Sifuentes Dep. p. 142-143); *"Did you write a grievance, though, about problems with these tractors?  Because we don't have any grievance about that. The grievance was about discrimination --discrimination.  Right.  But was there any grievance about problems with your tractors? Well, that was all part of it, I'm sure. But I do not remember writing a grievance just  on tractors, no.*

(Pl. Ex. 4, Sifuentes Dep. pp. 148-149) *"Well, I told them what -- they wanted to know what the meeting was about.  Well, you're making this discrimination claim. So I started to tell them everything.* **Margrave shuts me off right away.  He said, "That's a long time ago."  He said, "All them people are gone."  He said, "This statute of limitations  has run out.  You don't have a case."** *Well, what did you tell him the discrimination from a long time ago was?  Well, I wanted to tell them everything.  So I started back in '92 with the diesel poisonings, and they didn't want to hear it.  Is that where he stopped you? Yeah.  He said, "What's happened in the last 30 days?"  I said, "I want to tell you  everything." He said, "We don't want to hear it."  Well, did you tell them anything that happened in the last 30 days? They didn't want to hear anything.  Well, you said he asked you what happened in the last 30 days. Yeah.  They were very fussy.  They wanted to end the conversation right there.  "You don't have a case."  So I said "okay", and I left."*

(Pl. Ex. 4, Sifuentes Dep. pp. 149-150), *" Did you tell him anything about discrimination in that meeting? Well, he didn't let me go on and – Well, I'm asking did you tell him anything else?  I don't recall.  I remember a short time later filing a second discrimination, because in the meantime, I get a letter from workmen's comp out of Topeka wanting to know why that claim should not be dismissed.  So I took it to work and showed it to them and wrote another discrimination grievance because he told me it was long ago, the statute of limitations has  run out.  And I told him "No, it hasn't.   Right.  On the workers' comp claim; right? And here was the proof.  They wanted to know why it should not be dismissed.  And you're talking about the workers' comp claim as to the diesel – Yes."*

(Pl. Ex. 4, Sifuentes Dep. pp. 245 & 246),   *"Well, they -- I would want to write a grievance discrimination (sic), and Dennis  Brown and other business agents or union stewards that I had, Bill -- they'd say* **"Bill, you know you can't just write a discrimination grievance.  It has to be discussed first."**… *Well, I told you I tried to write discrimination grievances several times, and they would not allow me to do that."*

105.    Objection, whether Plaintiff used the hotline is irrelevant and immaterial.

Plaintiff used the UPS and Union procedures concerning tractor issues including the DVIR and

grievance procedures, as cited in Plaintiff's response to Defendant's assertions 104 and 88.

106.   **Disputed**.  Plaintiff drove tractors, not trailers (Pl. Ex. 4, Sifuentes Dep. P. 145)

107.   **Disputed**.  Plaintiff wrote up tractor #270818 because the air ride system was

broken as did other drivers, who considered seat issues a safety issue, whether UPS did or not

(Pl. Ex. 12, Hill pp. 83-84).

> (Pl. Ex. 4, Sifuentes Dep. p. 145-146,) *"On the DVIR, is that what you're
> pointing at?  Yeah.  Right.  If you look at June 5th and June 6th of 2008 – Yeah.
> -- is there anything about a problem with trac -- I mean, a problem with the seat
> in your tractor? Yes.  On Friday, June 6th, there was a breakdown on property
> with the air ride.  That's the tractor... I think that's when I told you I was riding
> on the rail.  The air ride system was broke.*"

> (Pl. Ex. 12, Hill Dep p. 83-84), "*Do you remember Eppy, Wes Epperson, driving
> Tractor 270818, does that ring a bell? Something that had a broken -- had a bad
> seat in it, that particular tractor?  I know you may not remember numbers, but I'm
> asking a specific number.  270818.   Yeah. That was -- that was one of the newer
> trucks, I think.  I think it was. Do you remember anything about Eppy talking
> about it having a bad seat in it?  .....the way they were bolted in and everything,
> the seat would go too high and before it would catch.  You know, a taller person
> would -- if you really hit a big --***You would hit your head on the ceiling of the
> tractor***.  He wrote a lot of those up for that reason ...he thought that was very
> unsafe".*

> (Pl. Ex.13, Epperson Dep. pp. 83-84), "*I had a write-up one time on a tractor that
> was these  Internationals that they bought...They were like a city cab type
> International. They were little -- they didn't have very much height to them.  We
> got into it because I refused to drive the truck because the upward travel of the
> seat would put your head right up into the -- the ...Ceiling of the tractor.  So I
> refused to drive  the truck.  And we got in a big kind of  showdown over that.
> And as it wound up, they   told me I didn't have to drive the tractor. But they never
> informed anybody else that was over 5-foot-5, that this thing ma break your neck
> if you ever get in a --  because -- and -- and there was a warning right  on the
> seat.  I mean right on the seat,   it talked about the upward travel and having the
> head clearance. And as far as I know, they've still got some of those trucks on the
> street.  And they know ***that that tractor could break somebody's neck.  They've
> still got two or  three of them out there that they're – that they use every day.***"*

108.   Objection.  Relevance as to the "uncomfortable" seat. The seat issues complained

of by plaintiff and others involved more than comfort.   A seat without a proper suspension

would allow a driver to hit his head on the ceiling of the tractor, which drivers considered unsafe,

and could break someone's neck. See response to Defendant's assertion 107.

109.   **Disputed**.  UPS didn't repair the seat immediately, it took a few days, days that

Sifuentes still had to drive this truck.

> (Pl. Ex. 4, Sifuentes Dep. p. 92) *"Well, somewhere along there in 2007 or 2008, I had this tractor that had a bad seat. And the mechanic finally found the problem. I don't remember what it was. But the shocks were bad in the seat. And there was another tractor that had a broken valve that didn't—I was riding on the frame. The cab was sitting on the frame because the air ride system was broke, and the tractor was just bouncing on this frame.  And I'd --they finally found it. But it took a few day to find it."*

110.   **Disputed**.  Plaintiff was not allowed to perform his feeder job when he requested

an accommodation to return to work with a weight restriction in November 2008.  Again in 2010

he was denied time off to attend physical therapy and was threatened that if he did, they would

write him up because he had gone to the doctor twice already in 90 days (Pl. Ex. 4, Sifuentes

Dep. pp. 564-565).

> (Pl. Ex. 4, Sifuentes Dep. pp. 160-162) *"All right.  Let me show you what's been marked as Exhibit 5.  This is a note from Dr. Strickland dated December 12th, 2008.  Uh-huh. Okay.  Is this when he released you to return to work with these restrictions saying you can't lift anything more than 25 pounds?  Yes.  Okay. Before this, had he given you a release to return to work?  I don't recall. Evidently not.  Okay.  And did you give this release to somebody at UPS?  Yes. Who did you give it to?  I gave it to evidently the dispatcher when I come in and told them to give it to Dooley when he comes in.  Okay.  Well, did you talk to anybody in management about this release?  What did Stucky say? He said, "Well, you have to get a physical from the company doctor."  Okay.  And did you go to see the company doctor?  ... And did that person give you a release?  No.  He said I'm on -- he said I couldn't go back to work with anything less than 100 percent.  Who said that?  Both Stucky and this doc -- I don't know. I don't recall if the doctor said that.  But Stucky told me, "**You cannot return to work unless you're 100 percent.**"*

> (Pl. Ex. 4, Sifuentes Dep. pp. 200-201)  "*Let me hand you what's been marked as Exhibit 6.  Is this a note from Dr. Strickland in 2008 that says, "Please get a better, smoother seat for Mr. Sifuentes"....Did you give this to somebody at UPS? Well, it was either Dooley or Stucky.  Or I could have given it to the dispatch person to give to Stucky or Dooley if they were not there.     What did the doctor say about the tractor seat?   Well, he asks you questions, you know, when you have these prostate problems, you know, "What's going on?"  I said, "Well, this seat at work, I'm bouncing up and down."  He said, "That will do it."  He said, "Jumping up and down on your prostate all day will cause irritation."   He suggested if they would give me a smoother-riding tractor or smoother seat, he said here that would help.*"

111.   Objection.  Whether Plaintiff had permanent medical restrictions is irrelevant and immaterial as to whether he had disabilities or limitations.

112.   Objection.  Whether or not Plaintiff passed his DOT examinations done by UPS's own doctors is irrelevant and immaterial to the issue of whether he had disabilities or limitations.

113.   Objection, this assertion is misleading, Plaintiff testified that he was not allowed to work as a feeder driver when his doctor said he could return with a weight restriction, and the company doctor would not release him because he was not 100% released.  See response to Defendant's assertion 110.

114.   **Disputed**.  Plaintiff's complaint and his testimony states he could perform his job with or without accommodation.

> (Pl. Ex. 4, Sifuentes Dep. p. 224) *"Your complaint in this lawsuit states that you could perform your job with or without  accommodation.  Is that a true statement?  I can perform the job, yes.   Okay.  Either with or without accommodation?  Right.  That rough-riding tractor has caused me a lot of pain, but yes, I could do it."*

115.   Undisputed.

116.   Undisputed.

117.   Undisputed.

118.   **Disputed**. Plaintiff returned to work only when he was allowed to return to work

by Defendant.  See response to Defendant's assertion 110.

119.   **Disputed**. Plaintiff told UPS via a doctor's notes that he had a weight restriction to do his job, and that he needed a better riding seat to do his job.  See response to Defendant's assertion 110.

120.   Undisputed.

121.   **Disputed**.  Sifuentes was given Doctor's notes requesting accommodation to perform his job.   (See response to Defendant's assertion No. 110).  UPS was clearly aware of Sifuentes' medical issues and limitations, as his managers questioned him about his use of a disabled parking tag, and why he had it.

> (Pl. Ex. 4, Sifuentes Dep. pp. 218-219)  *"Well, I think somebody asked me why I was always parking in the handicapped zone, and I told them I was handicapped. I don't -- Who did you tell that to?   Well, I don't remember who asked me. Was it a person in management or human resources, or was it a driver?  I hardly ever talked to anyone in human resources.  It had to be a manager or supervisor.  Do you know who it was?  **It was either Stucky or Dooley**.  Well, do you recall as you sit here?  No.  I don't know who asked me that.  **Well, when they asked you, you told them you're handicapped?  No.  I said I -- handicapped, yeah, not disabled; handicapped.  And did you tell them what your handicap was? Yeah. I said I have a handicap sticker that I put on my window because Dr. Stechschulte gave it to me because the pain in my knees.  This was even before I had the knee surgery.  Okay.  Because they seen me hobbling in there and hobbling out of work."***

122.   **Disputed**.  Sifuentes doctor requested that he return to work with weight restrictions, which UPS denied.  UPS own policy provides that UPS will find temporary alternative work for the employee.  (Defendant's Ex. AA- Injured Employee Reference Guide).

123.   **Disputed**.  UPS knew of plaintiff's doctor's notes requesting accommodations for a better riding truck, and light duty, these are requests for accommodations.   (See response to Defendant's assertion No. 110).

124.   **Disputed**.  Plaintiff requested an accommodation in 2009 for time off to attend

physical therapy  which resulted in Rosner's  letter (Pl. Ex. 4, Sifuentes Dep. p 171 ).

125.    **Disputed**.  Plaintiff's deposition testimony cited is does not stand for that which is represented by Defendant.

126.    Undisputed.  Plaintiff attended the physical therapy on a different date that did not require time away from work because his employer threatened to write him up. (Pl. Ex. 4, Sifuentes Dep. pp. 564-565).

127.    Undisputed.

128.    Undisputed but incomplete.  Plaintiff's claim is that he was NOT allowed to return to work when he had a restriction.  (Pl. Ex.16, EEOC Charge)

129.    Undisputed.  Plaintiff's claim is that he was NOT allowed to return to work when he had a restriction (Pl. Ex.16, EEOC Charge)

130.    **Disputed**.  Plaintiff's 2008 grievance was about discrimination and Plaintiff clearly testified that it was about discrimination.  (Pl. Ex. 17 & Ex. 18- 2008 Grievances) and:

> (Pl. Ex. 4 Sifuentes Dep pp. 142-143*)  **"Did you write a grievance, though, about problems with these tractors?  Because we don't have any grievance about that. The grievance was about discrimination – discrimination."**

131.    **Disputed**.  Defendant's footnote makes an assertion unsupported by any evidence, in addition,   Exh. CCC to Ferguson Declaration does not exist; the exhibits to Gayle Ferguson's affidavit are numbered 1-9.

132.    Undisputed.

133.    **Disputed**.  This assertion is vague and ambiguous, what is a "substantial number"?

134.    Undisputed.

135.    Undisputed.

28

136. **Disputed**.  Asking an employee "why don't you just retire" is not proper way to poll the drivers.

> (Pl. Ex. 10, Haynes pp. 118-119)  "*It -- there was -- I call it coaching and counseling or mentoring.  What we were told to do, whether we were polling people on retiring or whether we were polling people on, you know, trying to find out where the company stood according -- with the contract coming up or whatever, you really had to have your choice of words and watch what you say.  I did not want the drivers to feel like we were forcing them out to retire, but I would explain, we were told to explain it in such a way that we would like to know if -- you know, do you have any ideas on your retirement, you know, you're due next March, you think you'll be going at that time?  We'd like -- we're trying to find out from everybody who might be going at that time so that we can know how to plan, how to get some people ready to fill the seats.  Okay.  And I understand that.  So then when you're talking about choice of words, from your training were you coached or mentored to understand that the language you use can go too far?  For instance, that there would be a difference between asking as you were giving us an example about what their plans might be -- Uh-huh. -- as opposed to saying why don't you just retire?  Yeah, that would not be appropriate.*"

137.   Undisputed

138.   Undisputed.

139.   Undisputed.

140.   Undisputed.

141. **Disputed**.  Objection.  Sifuentes deposition pages cited do not stand for the assertions made, and in fact have nothing to do with the subject of his retirement.  Without waiving said objection, Sifuentes made UPS aware of his plans for retirement before the end of 2010, and also signed up for vacation.  Only after not hearing anything for six weeks and not getting vacation pay, did he contact Gayle Ferguson in early 2011:

> (Sifuentes Dep pp. 462-463)  "*On November 1st of 2010, we're supposed to sign up our vacations.  I went down to UPS, and there it is posted, "William J. Sifuentes, 6 plus one weeks".  So I signed up for the first seven weeks of 2011 because I had informed them that I am planning to retire.  So come -- I'm supposed to get my pay two weeks before the first week starts.  I didn't get it.  I didn't get it the following week.  It wasn't until the middle of January that I got ahold of these people and asked them -- Gayle Ferguson and Bridgette to look*

29

> *into my situation.  They said they would. They got back to me and said that since it wasn't a workmen's comp. claim, they wasn't going to pay me seven weeks.  So here comes the UPS man with an express package in the middle of January with my vacation pay for three weeks."*

142.   Undisputed.

143.   Undisputed.  Plaintiff was told he could not return to work because the Doctor had given him a 25 pound weight restriction. (See Response to Defendant's assertion No.110).

144.   Undisputed that UPS has written policies, however these are empty and meaningless as  the unwritten policy and the practice of UPS is clearly not an "open door" policy regarding complaints, as described in response to Defendant's assertion 104.  Employees were not allowed to  make a grievance, unless discussed with management first, and there were *occasions when supervisor refused to discuss his complaints and refused to accept his grievance.*

> *(Pl. Ex. 6, Sifuentes Dep. in **Daniels v. UPS**, pp.100-101,103-104) "Okay.  When is it that you believe Greg Mispagel retaliated against you?  When I came in and wanted to write an injury report.   Okay.  Do you know what year?  Yes.  2004. Was he the feeder manager at James Street?  Yes.  All right.  And what did he do that you think is retaliation?  He threw a fit.  All right.  Did he do anything else? Yes.  He refused to answer my question…He started cursing and swept everything off his desk and started throwing things." (**Regarding Supervisor Cantrell**) There were many things he done.  He was going to have me handcuffed and escorted off the property.  Well, did he do that?  No.  Our conversation was broken by a telephone call.  Well, do you know why he was going to have you handcuffed and escorted off the property?   Yes, because I complained about the vehicle that he reassigned to my new job."*

145.   **Disputed**.  (See response to Defendant's assertion No.144).  The unofficial policy and the practice of UPS is quite the opposite of their written policy in the UPS Conduct Code and Anti-Harassment policy.

146.   Undisputed

147.   Undisputed.

148.    Undisputed.

149.    Undisputed.

150.    Undisputed.  However, no record of this call has been produced in this case, if such record exists, it would clearly be covered by the discovery requests and disclosure responsibilities of Defendant.

151.    Undisputed.

152.    Undisputed, however plaintiff experienced increased scrutiny and retaliation after filing this complaint such as having his job bid while he was out on vacation, being denied repairs to his seat belt, denied time off for his wife's surgery or physical therapy, having his vacation pay withheld, having his retirement paperwork lost and delayed.  (Pl. Ex. 1, Plaintiff's Third Amended Answers to Defendant's  First Interrogatories).

153.    Undisputed

## B.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ("AMF")

1.    Plaintiff has a substantial impairment of one or more major life activities – both knees (severe arthritis and sclerosis); his shoulder (arthritis); his neck (deterioration of 3rd, 4th, and 5th vertebrae); respiratory ailments (asthma, lung poisoning, prolonged diesel exposure); as well as hypertension.  Pl. Ex. 4, (Sifuentes Dep.) at 73-78, 83-86, 89, 91, 109-11, 129, 218-19, 461, 465, 476, 478; Pl. Ex. 19, (Stuckmeyer Ltr. - Nov. 9, 2010); Pl. Ex. 1, (Pltf. Interrog. Ans. – 3rd Am.) at ¶¶ 3, 6, 15; Pl. Ex.16,  (EEOC Charge) at 1, 2; Pl. Ex. 20, (Complaint) at 10, 13, 19, 20, 21; Pl. Ex. 21, (Pretrial Order) at 4; Pl. Ex. 3, (Daniels Dep.) at 126-27; Pl. Ex. 22, (Stuke Dep.) at 40, 48, 74; Pl. Ex. 13, (Epperson Dep.) at 57-59; Pl. Ex. 12, (Hill Dep.) at 78, 89; Pl. Ex. 23, (Shockley Dep.) at 61.

2.      These impairments result in, among other things: ongoing symptoms of pain and swelling, difficulty with prolonged standing, prolong walking, traversing steps, bending, kneeling, squatting, and arising from a chair. Pl. Ex. 4, (Sifuentes Dep.) at 73-78, 83-86, 89, 91, 109-11, 129, 218-19, 461, 465, 476, 478; Pl. Ex. 19, (Stuckmeyer Ltr. - Nov. 9, 2010); Pl. Ex. 1, (Pltf. Interrog. Ans. – 3rd Am.) at ¶¶ 3, 6, 15; Pl. Ex. (EEOC Charge) at 1, 2; Pl. Ex. 20, (Complaint) at 10, 13; Pl. Ex. 21, (Pretrial Order) at 4; Pl. Ex. 13, (Epperson Dep.) at 57-59; Pl. Ex. 12, (Hill Dep.) at 78, 89.

3.      Plaintiff is substantially limited in engaging in or performing a number of major life activities, including: performing certain manual tasks, sleeping, walking, standing, lifting, bending, concentrating, and working. Pl. Ex. 4, (Sifuentes Dep.) at 73-78, 83-86, 89, 91, 109-11, 129, 218-19, 461, 465, 476, 478; Pl. Ex. 19, (Stuckmeyer Ltr. - Nov. 9, 2010); Pl. Ex. (Pltf. Interrog. Ans. – 3rd Am.) at ¶¶ 3, 6, 15; Pl. Ex. (EEOC Charge) at 1, 2; Pl. Ex. 20, (Complaint) at 10, 13; Pl. Ex. 21, (Pretrial Order) at 4; Pl. Ex. 13, (Epperson Dep.) at 57-59; Pl. Ex. 12, (Hill Dep.) at 78, 89.

4.      Plaintiff repeatedly requested an accommodation from UPS – that he be provided with a safe and properly maintained vehicle _and_ light duty work consistent with his restrictions. Pl. Ex. 4, (Sifuentes Dep.) at 124, 160, 434; Pl. Ex.1,  (Pltf. Interrog. Ans. – 3rd Am.) at ¶¶ 3, 5, 6, 7; Pl. Ex. 16, (EEOC Charge) at 1, 2, 3; Pl. Ex. 20, (Complaint) at 10, 11, 12, 16; Pl. Ex. 21, (Pretrial Order) at 5; Pl. Ex. 2, (Dooley Dep.) at 86, 87, 89, 90, 98, 99, 100, 101; Pl. Ex.8, (Brown Dep.) at 84-85.

5.      UPS repeatedly ignored and failed to respond to Plaintiff's accommodation requests. Pl. Ex. 4, (Sifuentes Dep). at 124, 160-61, 228-29, 258, 290, 434, 438; Pl. Ex. 2, (Dooley Dep.) at 86, 87, 89, 90, 98, 99, 100, 101; Pl. Ex. 7, (Graham Dep.) at 58-59; Pl Ex. 8,

Brown Dep.) at 84-85 ("***Bill had a problem with diesel poisoning and also he had some problems, a problem with his shoulder and arms. UPS was not paying attention to what he believed was diesel poisoning***.").

6.     Plaintiff was repeatedly forced to drive older, unsafe, dangerous, and improperly maintained tractors – e.g., rough riding, broken shocks and suspension, unsafe tires, defective seating, dangerous fuming and smoking, etc. Pl. Ex. 4, (Sifuentes Dep.) at 89, 92, 104-06, 124, 177, 181-84, 193, 240, 242, 243, 258, 261-63, 350, 357, 436, 451, 522; Pl. Ex. 2, (Dooley Dep.) at 9, 11, 14-17, 82; Pl. Ex. 3, (Daniels Dep.) at 66, 106-07, 121-22, 125 ("***It was habitual. It was ongoing. The fumes were just overpowering***."); Pl. Ex. 22, (Stuke Dep.) at 40, 47, 70, 79, 83, 102, 134; Pl. Ex. 12, (Hill Dep.) at 37; Pl. Ex. 22, (Shockley Dep.) at 45; Pl. Ex. 7, (Graham Dep.) at 33, 71 ("***The newer tractors would have less – less breakdowns than the older tractors. I don't know of Mr. Sifuentes ever having a newer tractor***."); Pl. Ex.13, (Epperson Dep.) at 28, 29, 30, 37, 39, 40, 41, 43, 44, 57, 58 ("***UPS has still got us out there bouncing around on these highways with the leaf spring tractors, beating the hell out of everybody.  But, you know, they say, 'Well, there's nothing we can do about it.  That's what corporate orders.'***"); Pl. Ex. 8, (Brown Dep.) at 73, 77, 84-85.

7.     Plaintiff repeatedly requested that he be provided with properly maintained and safe vehicles. Pl. Ex. (Sifuentes Dep.) at 124, 184, 193, 197, 204, 205, 434, 454; Pl. Ex. 2, (Dooley Dep.) at 9, 11, 14-17, 82, 83, 85, 89, 90, 94, 95, 103, 104; Pl. Ex. 22, (Stuke Dep.) at 29, 47, 83; Pl. Ex. 8, (Brown Dep.) at 84-85.

8.     UPS did not respond to ⸺ and ignored ⸺ Plaintiff's reports of tractors that required repairs and maintenance and were unsafe and dangerous. Pl. Ex. (Sifuentes Dep.) at 124, 184, 193, 195, 197, 229, 290, 454, 522; Pl. Ex. 2, (Dooley Dep.) at 103, 104; Pl. Ex. 3,

(Daniels Dep.) at 67, 122 ("***Management was certainly aware that there were tractors that were in need of repair that were not in the shop where they should have been – that were driven by the drivers and were out on the street***."); Pl. Ex. 13, (Epperson Dep.) at 28, 29, 30, 37 ("*nothing gets done about it*"), 39, 40, 41, 43, 44 ("***they know that tractor could break somebody's neck***"), 46 ("***they'll just say, "Okay to drive" or "no defect found"***"), 81, 82, 100, 101, 136; Pl. Ex. 7, (Graham Dep.) at 33; Pl. Ex.8, (Brown Dep.) at 84-85.

9.     UPS retaliated against and harassed Plaintiff for filing injury reports and workers' compensation claims. Pl. Ex. (Sifuentes Dep.) at 43-45, 118, 272, 349, 350, 361-62, 544, 552; Pl. Ex. 2, (Dooley Dep.) at 36, 37, 38, 39; Pl. Ex. 13,  (Epperson Dep.) at 9, 10, 18, 19 ("***they were on him about his filing injury claims***") 20, 58; Pl Ex. 8, (Brown Dep.) at 98; Pl. Ex. 7, (Graham Dep.) at 58-59.

10.     Plaintiff's manager and supervisors directing him to quit filing injury reports is "***most certainly***" a form of discipline *and* harassment.  ; Pl. Ex. 3, (Daniels Dep.) at 120; Pl. Ex. 6, (Sifuentes Dep. – ***Daniels v. UPS***) at 76-77.

11.     Plaintiff and his feeder managers and supervisors repeatedly discussed the condition of Plaintiff's tractors (rough riding, older, fumes, etc.), and they discussed Plaintiff's tractor assignments with the UPS feeder tractor scheduler, Gerald Reeves.  Pl. Ex. 2,(Dooley Dep.) at 63, 65, 66, 67, 68, 152, 153, 154; Pl. Ex. 22, (Stuke Dep.) at 75; Pl. Ex. 4, (Sifuentes Dep.) at 263, 455; Pl. Ex. 9, (Reeves Dep.) at 56, 57, 59, 60, 97, 121, 122; Pl. Ex. 7, (Graham Dep.) at 73-74.

12.     Reeves, though, gives contradictory testimony: Claiming he "alone" is responsible for assigning tractors to employees and supposedly gives no consideration to which employee drives a particular tractor, but, also supposedly stating that management called him to

complain about tractors – including "rough rides."  Reeves can't "tell you what we said."  Pl. Ex. 9, (Reeves Dep.) at 8, 56, 58; Pl. Ex. 22, (Stuke Dep.) at 22; Pl. Ex. 7, (Graham Dep.) at 73-74 ("***Joe's [Dooley's] response was, "We'll see who bids the job and we'll see about changing the start time then***.").

13.    Yet, Reeves also testified Plaintiff's managers and supervisors and drivers talked to him about the condition of the tractors.  *Id*. at 59, 60, 120 ("*I've heard drivers complain about tractors.*"), 121.

14.    Plaintiff's former manager testified he repeatedly spoke with and made recommendations to Gerald Reeves about the tractors that were to be assigned to Plaintiff.  Pl. Ex. 2, (Dooley Dep.) at 65, 66, 67, 68, 152, 153.

15.    Feeder managers and the scheduler were involved with "junk tractors" or "ADA" tractors taken out of service and putting these tractors back into service.  Pl. Ex. 3,  (Daniels Dep.) at 104-06, 143 ("***They always seemed to manage to, regardless, put it back on the road.***").

16.    Plaintiff's former manager testified (inconsistently with Reeves) that he directed the feeder dispatcher to give Plaintiff certain tractors. Pl. Ex. 2,  (Dooley Dep.) at 73.

17.    Plaintiff filed multiple injury reports and workers' compensation claims. Pl. Ex. 4, (Sifuentes Dep.) at 207, 226; Def. Ex. YY (Sifuentes Injury History); Def. Ex. ZZ (Sifuentes Work. Comp. Claims).

18.    Plaintiff was repeatedly harassed, threatened, and retaliated against for filing injury reports and workers' compensation claims. Pl. Ex. 4, (Sifuentes Dep.) at 43-45, 118-19, 239, 346, 347-49, 350, 357, 361-62; Pl. Ex. 2, (Dooley Dep.) at 36, 37, 38, 39.

19.     Plaintiff's former manager became angry with Plaintiff, threatened Plaintiff, and admitted he told Plaintiff "***we're going to be watching you – we're going to be watching everything you do***" in a meeting he had with Plaintiff regarding Plaintiff's injury reports. Pl. Ex. 4, (Sifuentes Dep.) at 43, 44, 118, 120, 361-62; Pl. Ex. 2, (Dooley Dep.) at 36, 37.

20.     Plaintiff's former manager, Joe Dooley, told Plaintiff he was in "***the top 50***" and he was writing to many injury reports; and, then, he forced Plaintiff to repeatedly take safety tests at the end of his 8-hour work days, because of Plaintiff's injury reports.  Pl. Ex. 4, (Sifuentes Dep.) at 43, 44, 361-62; Pl. Ex. 2, (Dooley Dep.) at 36, 37.

21.     Although forced to take these tests, management testified Plaintiff had a proven history of safely performing his job.  In fact Sifuentes was awarded for 25 years of safe driving as a member of the "Circle of Honor." Pl. Ex. 4, (Sifuentes Depo.) at 41; Pl. Ex. 22, (Stuke Dep.) at 38, 39.

22.     Plaintiff was repeatedly harassed and retaliated against for seeking an accommodation. Pl. Ex. 4, (Sifuentes Dep.) at 124, 350.

23.     Plaintiff was repeatedly harassed and questioned by his manager and supervisors about "when are you going to retire," and "why don't you just retire or quit." Pl. Ex. 4, (Sifuentes Dep.) at 153, 272, 329, 383; Pl. Ex. 2, (Dooley Dep.) at 84, 93, 95, 113, 131-33; Pl. Ex. 3, (Daniels Dep.) at 82, 83; Pl. Ex. 22, (Stuke Dep.) at 81, 93, 96; Pl. Ex. 12, (Hill Dep.) at 74, 92, 93 ("*it was throwed around **a lot**, <u>especially to us older guys</u> ...**"When you going"** ... **"How much longer you going to be here"**... **When are you going to retire**"*); Pl. Ex. 7, (Graham Dep.) at 36-40 ("*Jason Isabell was covering the dispatch window and he started raising his voice to Bill saying, "**Why don't you retire**," you know.  And Bill spoke up and he said, "**I'm tired of you guys trying to force me out the door**.*").

24.     Plaintiff's manager, Joe Dooley admitted there was no valid business reason for this repeated questioning about Sifuentes' retirement and it was improper.  Pl. Ex. 2, (Dooley Dep.) at 116, 117, 127, 131-33.

25.     Plaintiff has repeatedly been told by management that UPS will not allow an employee to work at UPS with restrictions. Pl. Ex. 4, (Sifuentes Dep.) at 68, 159, 160-61; Pl. Ex. 2, (Dooley Dep.) at 168, 169.

26.     Plaintiff and other drivers over the age of 40 were regularly assigned, or forced to drive, older tractors or trucks.  Pl. Ex. 4, (Sifuentes Dep.) at 242, 243.

27.     Plaintiff and other Hispanic drivers were regularly assigned or forced to drive tractors that were older, in need of repair, and dangerous.  Pl. Ex. 4, (Sifuentes Dep.) at 185, 265, 364, 366, 452.

28.     The racial makeup of feeder drivers at the UPS James Street facility from 2006 to 2009 was mostly Caucasian; _all_ of the feeder managers and supervisor at James Street facility were male and Caucasian; and, there was one (1) female driver. Pl. Ex. 3, (Daniels Dep.) at 147, 148-49.

29.     Drivers who were _not_ Hispanic were assigned or provided with vehicles in better condition than those Plaintiff was assigned (i.e., newer and in better condition and not in need of repairs and maintenance). Pl. Ex. 4, (Sifuentes Dep.) at 185, 265, 364, 366, 452.

30.     Plaintiff repeatedly was subjected to having his start times or schedule changed. He alone was assigned unfavorable start times and schedules which resulted in him being improperly denied and losing pay.  Pl. Ex. 4, (Sifuentes Dep.) at 51, 268, 358-60; Pl. Ex. 2, (Dooley Dep.) at 109, 110, 111, 113, 114, 115; Pl. Ex. 22,  (Stuke Dep.) at 108, 110-12; Pl. Ex. 13, (Epperson Dep.) at 17; Pl. Ex. 7, (Graham Dep.) at 43-47, 73-74 ("***that job had been in***

*existence for approximately 10 years at 6:30 a.m.  And as soon as Bill Sifuentes bid it, they moved to 5:45*."); Pl. Ex. 8, (Brown Dep.) at 67-68.

31.     Plaintiff's manager, Joe Dooley, testified that it was not proper for Plaintiff to be denied pay in this fashion.  Pl. Ex. 2, (Dooley Dep.) at 114, 115.

32.     Plaintiff repeatedly had his schedule changed to prevent him from bidding on or being eligible for more favorable jobs or routes and better tractors.  Pl. Ex. __ (Sifuentes Dep.) at 51, 268, 358-60; Pl. Ex. 13, (Epperson Dep.) at 17; Pl. Ex. 7,  (Graham Dep.) at 46, 73-74; Pl. Ex. 8, (Brown Dep.) at 44, 46; Pl. Ex. 22, (Stuke Dep.) at 108.

33.     UPS has been found to have a corporate-wide policy or practice of disability discrimination and workers' compensation retaliation that is carried out by management at the facility where Plaintiff worked.  Pl. Ex. 24, (EEOC Determinations); Pl. Ex. 25, (EEOC Consent Decree); Pl. Ex. 26,(UPS Training Mat. – Focus on Abilities) at 2,3; Pl. Ex. 27, (***Jones v. UPS*** Verdict); Pl. Ex. 7, (Graham Dep.) at 61-63, 76-77, 78-79; Pl. Ex. 13, (Epperson Dep.) at 84-87, 93.

34.     Plaintiff was constructively discharged or (forced to retire) because of the repeated and ongoing discrimination, retaliation, interference, and harassment he was subjected to and the adverse effects it had upon his impairments. Pl. Ex. 4, (Sifuentes Dep.) at 116, 129, 290, 357.

35.     Plaintiff repeatedly and expressly asserted, and has plead, that he has been constructively discharged.  Pl. Ex.1, (Pltf. Interrog. Ans. – 3rd Am.) at ¶¶ 3, 4, 21 ; Pl. Ex. 16, (EEOC Charge) at 3 ("***It is clear UPS is trying to unlawfully force me to quit or resign for exercising my related rights***."); Pl. Ex. 20, (Complaint) at 8 (¶ 17), 12 (¶ 49), 13 (¶¶ 50, 51), 15 (¶ 67), 17 (¶¶ 77, 80); Pl. Ex. 21, (Pretrial Order) at 4, 5, 6, 8.

36.     Plaintiff performed the essential functions of his job *without* accommodation. Pl. Ex. 12, (Hill Dep.) at 24, 78; Pl. Ex. 7, (Graham Dep.) at 35.

37.     UPS management was fully aware Plaintiff had a substantial impairment of one or more major life activities, was in need of and requested accommodation, and performed the essential functions of his job *without* accommodation.  Pl. Ex. 2, (Dooley Dep.) at 79-81, 98, 99, 134; Pl. Ex. 28,(UPS ADA Manual & Proced.) at 6-11, 35-36 ("***What constitutes a Request*** *–* *"any notification that a job modification is needed because of a physical or mental impairment will be sufficient to trigger this inquiry; no "magic" words or explicit use of the terms "accommodation" or "ADA" is required*."); Pl. Ex. 3, (Daniels Dep.) at 126-27 (management would have been aware of his health issues – "about his neck in particular and his shoulder an knees.").

38.     UPS never offered to provide (or even considered providing) an accommodation for Plaintiff. Pl. Ex. 4, (Sifuentes Dep.) at 160-61.

39.     UPS refused to provide Plaintiff with light duty or temporary alternative work. Pl. Ex. 4, (Sifuentes Dep.) at 160-61.

40.     UPS was fully aware that Plaintiff attempted to return, and wanted to return to work consistent with his minor restrictions.  Pl. Ex. 4, (Sifuentes Dep.) at 68, 160-61; Pl. Ex. 2, (Dooley Dep.) at 79-81.

41.     UPS could have provided and was required to provide Plaintiff with a safe and properly maintained vehicle. Pl. Ex. 29, (UPS Code of Bus. Conduct) at 8 (Workplace Health & Safety).

42.     UPS providing Plaintiff with a safe and properly maintained vehicle would have been a reasonable accommodation for Plaintiff.  *Id.*

43.     UPS asserts it has provided two other employees – with _temporary_ restrictions after surgery – with _temporary_ job modifications to their existing positions or light duty or alternate work at the same facility, and within the feeder department, at which Plaintiff worked. Pl. Ex. 30, (**_Chapell v. UPS_** Sum. Judg. Mem.) at ¶¶ 63-72; Pl. Ex. 4, (Sifuentes Dep.) at 166, 255.

44.     UPS management would not allow Plaintiff to do the same ─ even going so far as to tell Sifuentes he could not work at his last _or any job_ at UPS with restrictions. Pl. Ex. 4, (Sifuentes Dep.) at 68, 159, 160-61.

45.     UPS as a corporate practice utilizes its purported safety training and concerns to discriminate and retaliate against, interfere with, threaten, and harass employees – and, their families – who contemplate filing or do file injury reports or workers' compensation claims. Pl. Ex. 4, (Sifuentes Dep.) at 42-45; Pl. Ex. 13, (Epperson Dep.) at 18-20, 21-23 **("I confronted Allen about this letter of concern I had got in the mail and why he'd be sending this letter to my family")** , 24 ("**_He said, "Oh, it's corporate"_**), 93; Pl. Ex. 5, (Letter of Concern); Pl. Ex. 3, (Daniels Dep.) at 109-11, 129-30; Pl. Ex. 7, (Graham Dep.) at 49, 61-63 (Agreeing "**_UPS has a coordinated national strategy to blame workers for safety problems, save comp costs by reducing the reporting of injuries, and divide the membership through company-dominated safety committees_**"); Pl. Ex. 31, (Samborski Dep.) at 12, 201-05, 216-20, 221-24, 225-27, 231-32, 237-40; Pl. Ex. 32, (Bleish Dep.) at 58-59, 74-79; Pl. Ex. 14, ("UPS Workers Demand New Approach to Safety" _New York Times_ article); Pl. Ex. 33, (Robidoux, et al. v. UPS) at 2-6 ("**_the safety program is a facade_**").

46.     UPS, Plaintiff's managers and supervisors – and, the feeder tractor scheduler – are all fully aware Plaintiff has reported and sustained workplace injuries, he has an impairment or

disability, he has requested safe and properly maintained vehicles, and he has filed workers' compensation claims.  Pl. Ex. 2,  (Dooley Dep.) at 9, 11, 17, 63, 65, 66, 67, 68; Pl. Ex. 22, (Stuke Dep.) at 29, 83, 84.

47.    The UPS facility Plaintiff worked at recently failed to pass a safety audit and has repeatedly been recognized as among the most unsafe work sites in the United States.  Pl. Ex. 2, (Dooley Dep.) at 167; Pl. Ex. 34, (OSHA Worst Best List).

48.    UPS managers' reviews or QPRs are scored or evaluated based on safety issues and workers' compensation claims, and they are offered financial rewards and incentives to keep employees from filing injury reports and workers' compensation claims.  Pl. Ex.3, (Daniels Dep.) at 130-31, 135-36; Pl. Ex. 7,  (Graham Dep.) at 76-77; Pl. Pl. Ex. 32, (Bleish Dep.) at 58-59, 74-79; Pl. Ex. 31, (Samborski Dep.) at 231-32.

49.    UPS employees are offered rewards and inducements – thrown parties – for not filing injury reports and workers' compensation claims. Pl. Ex.3. (Daniels Dep.) at 137-38; Pl. Ex. 13, (Epperson Dep.) at 93; Pl. Ex. 31, (Samborski Dep.) at 12, 201-05, 216-20, 221-24, 225-27, 231-32, 237-40.

50.    UPS management disparagingly refers to employees who have filed multiple injury reports or workers' compensation claims as "*repeaters*," and has "*targeted*" these employees. Pl. Ex. 3, (Daniels Dep.) at 109 ("*They targeted the repeaters*."), 129-30; Pl. Ex. 36, (UPS email re "repeaters").

51.    UPS instructs its managers to carry out purported safety training and concerns in a manner that either forces an employee not to file any injury reports or resign. Pl. Ex. 36, (UPS email re "repeaters"); Pl. Ex. 2, (Dooley Dep.) at 36-39; Pl. Ex. 7, (Graham Dep.) at 61-63, 76-77.

52.     UPS retaliates against and harasses employees under the guise of safety training and concerns. Pl. Ex. 4, (Sifuentes Dep.) at 42-45; Pl. Ex. 22, (Stuke Dep.) at 34, 85, 104; Pl. Ex. 3, (Daniels Dep.) at 110-11, 129-30; Pl. Ex. 31, (Samborski Dep.) at 12, 201-05, 216-20, 221-24, 225-27, 231-32, 237-40; Pl. Ex. 36, (UPS email re "repeaters"); Pl. Ex. 2, (Dooley Dep.) at 36, 37; Pl. Ex. 7, (Graham Dep.) at 61-63, 76-77; Pl. Ex. 14, ("UPS Workers Demand New Approach to Safety" *New York Times* article); Pl. Ex. 33, (Robidoux, et al. v. UPS) at 2-6 ("***the safety program is a facade***"); Pl. Ex. 13, (Epperson Dep.) at 18-20, 21-23, 24, 83, 93.

> Q. So we've -- I've seen some documents and heard answers to questions about safety being a top concern of UPS.  Your experience would show that it's kind of cherry picking.  They decide when they want to make safety their issue.  And other times, they really don't care.  Would that be accurate?
>
> A. Yeah.

*Id*. at 83.

> Q. "UPS has a coordinated national strategy to blame workers for safety problems, save comp costs by reducing the reporting of injuries, and divide the membership through company-dominated safety committees."
>
> A. Yeah, I agree with that.  We've complained about our safety committee, off and on, from time to time.  It's good at cooking hot dogs and handing out T-shirts.  But when it comes to safety, why, very little gets done.

*Id*. at  93.

53.     UPS James Street feeder department and Kansas District HR managers have a practice of harassing and trying to force employees over the age of 40, who are at or nearing

pension benefit eligibility to retire. Pl. Ex. 4,  (Sifuentes Dep.) at 153, 272, 329, 383; Pl. Ex. 12. (Hill Dep.) at 60, 61, 74; Pl. Ex. 38, (Carpenter Declar.) at ¶¶ 3-4.

54.     The  workforce make-up at the UPS facility Plaintiff worked at is predominantly white with very few hispanics  Pl. Ex. 4, (Sifuentes Dep.) at 185, 265.

55.     The EEOC has repeatedly found that UPS has an unlawful no restrictions or 100% full-release policy or practice in violation of the ADA. Pl. Ex. 24, (EEOC Determinations); Pl. Ex. 25, (EEOC Consent Decree).

56.     The former UPS Kansas District Human Resources manager (Gary Liberti) has been found guilty of disability discrimination in violation of the ADA and New York State Human Rights Law. Pl. Ex. 39, (Picinich Order).

57.     In August 2008, a Kansas District Court jury found UPS guilty of workers' compensation retaliation.  Pl. Ex. 27, (***Jones v. UPS*** Verdict).

58.     UPS has a corporate-wide practice of retaliating against employees reporting unsafe or dangerous equipment or working conditions. Pl. Ex. 13, (Epperson Dep.) at 136, 137.

59.     UPS written policies claim to prohibit discrimination, retaliation, and harassment. Pl. Ex. 29, (UPS Code of Bus. Conduct) at 8; Def. Ex. GG, (UPS Policy Book) at 16.

60.     UPS written policy claims that:

The health and safety of our people are of utmost importance to UPS, which is committed to protecting the health and well-being of each UPS employee.

Employees are required to advise the company of any vehicle accident, workplace injury, instance of non-compliance, or any situation presenting a danger of injury. This information will assist in preventing injuries, and will ensure that appropriate medical attention is provided. Through investigation of such reports, we can identify contributing factors and determine if our policies and processes are effective and adequately communicated. When an unsafe condition, practice, or non-compliant action is identified, prompt and appropriate action must be taken to correct the condition and prevent it from happening again.

Pl. Ex. 29, (UPS Code of Bus. Conduct) at 8 (Workplace Health & Safety).

61.     UPS policies claim employees should report discrimination, retaliation, and/or harassment and this will be promptly and thoroughly investigated and responded to without retaliation. Pl. Ex. 29, (UPS Code of Bus. Conduct) at 8; Def. Ex. GG, (UPS Policy Book) at 20.

62.     UPS policies claim an employee may report any good faith concern – including discrimination, retaliation, harassment, or safety issues – to any manager or supervisor. Pl. Ex. 29, (UPS Code of Bus. Conduct) at 8; Def. Ex. GG, (UPS Policy Book) at 20.

63.     Plaintiff made repeated reports or complaints to UPS regarding discrimination, retaliation, and harassment that were ignored or not responded to. Pl. Ex. 4, (Sifuentes Dep.) at 46, 124-28, 132,142, 147-50, 340, 413, 415, 418-20, 430, 435.

64.     Plaintiff was repeatedly harassed and discriminated and retaliated against because of his reports of discrimination, retaliation, and harassment. Pl. Ex. 4, (Sifuentes Dep.) at 116, 273, 350; Pl. Ex. 7, (Graham Dep.) at 58-59; Pl. Ex.8,  (Brown Dep.) at 98.

65.     Plaintiff was repeatedly discriminated and retaliated against, harassed, threatened, and interfered with because of his requests for accommodation. Pl. Ex. 4, (Sifuentes Dep.) at 116, 273, 350; Pl. Ex. 7, (Graham Dep.) at 58-59; Pl. Ex. 8, (Brown Dep.) at 98.

66.     Plaintiff was repeatedly discriminated and retaliated against, harassed, threatened, and interfered with because of his requests for a properly maintained and safe vehicle. Pl. Ex. 4, (Sifuentes Dep.) at 116, 258, 261, 262, 273, 350, 357; Pl. Ex. 7,  (Graham Dep.) at 58-59; Pl. Ex. 8, (Brown Dep.) at 98.

67.     UPS's written ADA procedural and compliance manual is required to be followed by the company and its management and states UPS will promptly respond to requests for accommodation.  Pl. Ex. 28, (UPS ADA Proced. & Compl. Man.) at 42, 43, 57, 58.

68.     At the time of Plaintiff's accommodation requests, UPS had all necessary medical information regarding Plaintiff's medical condition and treatment in order to make a determination of whether Plaintiff had a disability and a reasonable accommodation could be provided for him. Pl. Ex. 40, (Emails); Def. Ex. YY (Sifuentes Injury History); Def. Ex. ZZ (Sifuentes Work. Comp. Claims); Pl. Ex. 26, (UPS Training Mat. – Focus on Abilities) at 6, 7, 13; Pl. Ex. 41, (Bleish Declar.) at ¶¶ 4, 5.

69.     UPS never acknowledged Plaintiff made an accommodation request until *after* he filed a lawsuit against the company.  Pl. Ex. 42,  (Rosner Letter)

70.     UPS then refused to make a determination regarding whether Plaintiff had a disability by falsely claiming it needed medical information from Plaintiff.  Pl. Ex. 42, (Rosner Letter).

71.     At the time of Plaintiff's accommodation requests, UPS management was fully aware Plaintiff had a history of injuries, health issues, and a substantial impairment of one or more major life activities.  Pl. Ex. 2, (Dooley Dep.) at 79-81, 98, 99, 134; Pl. Ex. 22,(Stuke Dep.) at 40, 48, 74, 115; Pl. Ex. 40, (Emails); Pl. Ex. 3, (Daniels Dep.) at 126-27;  Def. Ex. YY (Sifuentes Injury History); Def. Ex. ZZ (Sifuentes Work. Comp. Claims); Pl. Ex. 41, (Bleish Declar.) at ¶¶ 4, 5.

72.     The collective bargaining agreement ("CBA") between UPS and Plaintiff's former union expressly recognizes the legal rights of Plaintiff and other employees to be free of discrimination, retaliation, and harassment, to pursue those rights under that law, and that such exists separate and independent of or from the CBA.  Def. Ex. Q, (CBA) at Art. 36.

73.     UPS would not allow Plaintiff to pursue and told Plaintiff that he could not pursue any complaint of discrimination, retaliation, or harassment unless he first discussed his concerns

with management.  Pl. Ex. 4, (Sifuentes Dep.) at 246, 290, 416; Pl. Ex. 2, (Dooley Dep.) at 88; Pl. Ex. 8, (Brown Dep.) at 33-34.

74.     Although Plaintiff repeatedly tried to meet with management to discuss his concerns and complaints of discrimination, retaliation, and harassment – including, his impairments, being forced to drive unsafe tractors, how this was worsening his impairments and health, and being retaliated against and harassed because of his injury reports – UPS management would not discuss his concerns and told him he should get a lawyer.  Pl. Ex. 4, (Sifuentes Dep.) at 246, 290, 416, 418, 419, 420, 421, 422, 430, 434, 437, 438; Pl. Ex. 2, (Dooley Dep.) at 83, 84, 86, 89, 90, 100, 101; Pl. Ex. 8, (Brown Dep.) at 84-84.

75.     UPS written training materials admit the company has an unlawful no-restrictions or 100% release policy and this is a violation of the ADA and other law.  Pl. Ex. 26, (UPS Training Mat. – Focus on Abilities) at 2,3.

76.     UPS written training materials admit the company unlawfully discriminates and retaliates against employees' filing workers' compensation claims. Pl. Ex. 26, (UPS Training Mat. – Focus on Abilities) at 2,3.

77.     UPS written training materials admit that workers' compensation is sometimes seen as part of the termination process. Pl. Ex. 26, (UPS Training Mat. – Focus on Abilities) at 2, 3.

78.     UPS instructs its managers to discriminate and retaliate against and harass, intimidate, threaten, and interfere with employees who may file or have filed injury reports and workers' compensation claims. Pl. Ex. 2, (Dooley Dep.) at 36-39; Pl. Ex. 36,   (Email re "repeaters"); Pl. Ex. 13, (Epperson Dep.) at 23, 24, 93; Pl. Ex. 7, (Graham Dep.) at 76-77, 78-79.

79.   Although earlier in this case Plaintiff's manager and supervisor and the feeder scheduler gave purportedly "sworn" deposition testimony, UPS supplemented this with lengthy declarations addressing the same issues, containing numerous assertions having no citations to supporting documentation, parroting each other, and reciting language and argument in UPS's summary judgment motion.  Pl. Ex. 2, (Dooley Dep.); Def. Ex. E (Dooley Declar.); Pl. Ex. 9, (Reeves Dep.); Def. Ex. G (Reeves Declar.); Pl. Ex. 22, (Stuke Dep.); Def. Ex. L (Stuke Declar.).

## III.   ARGUMENT

**Summary Judgment Standard.**

In reviewing Defendant UPS's motion, this Court must view the facts in the light most favorable to the non-movant – Sifuentes – draw all reasonable inferences in his favor, make no credibility determinations, and weigh no evidence.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (*quoting Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).  The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Company*, 120 S.Ct. 2097, 2111 (2000).  Credence may be given to evidence favoring or supporting UPS *only* to extent it comes from *disinterested* witnesses **_and_** is *uncontradicted* **_and_** *unimpeached*. *Id.* at 2110.

Summary judgment may only be granted where there is no genuine dispute as to **_any_** material fact; the evidence must be such that no reasonable jury could find in favor of Sifuentes. Fed.R.Civ.Pro. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Sifuentes is to be given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas*, 147 F.3d 1220, 1228 (10th Cir.1998) (*quoting Ulissey v. Shvartsman*,

61 F.3d 805, 808 (10th Cir.1995)).   At the summary judgment stage, all doubts concerning

pretext must be resolved in Sifuentes' favor.   *Doebele v. Sprint/United Mgm't Co.*, 342 F.3d

1117, 1135-39 (10th Cir. 2003).

> "It is not the purpose of a motion for summary judgment to force the judge to
> conduct a "mini trial" to determine the defendant's true state of mind. So long as
> the plaintiff has presented evidence of pretext (by demonstrating that the
> defendant's proffered non-discriminatory reason is unworthy of belief) upon
> which a jury could infer discriminatory motive, the case should go to trial.
> Judgments about intent are best left for trial and are within the province of the
> jury."

> *Randle v. City of Aurora*, 69 F. 3d 441, 453 (10th Cir. 1995).

UPS's motion simply cannot meet the rigid standards for granting summary judgment.

Under the above standards, a rational juror could more than reasonably infer that: Sifuentes was

subjected to severe and pervasive discrimination; the terms, privileges, and conditions of his

employment were adversely impacted because of his impairments, age, and race; and, one in

Sifuentes' situation would reasonably be dissuaded from exercising his protected rights and feel

compelled to resign.   The record evidence also shows that, after Sifuentes reported his unlawful

treatment to UPS, he was subjected to further retaliation, interference, and harassment.   When

combined with the abundant pretext evidence in this case – including UPS's open admissions it

failed to comply with its written policies, as well as its legal obligations, and brazenly asserting it

treats many of its employees unlawfully – a rational juror could more than reasonably conclude

UPS's conduct towards Sifuentes was based on discriminatory bias, retaliatory animus, and that

Defendant's asserted reasons for its conduct are simply unbelievable and a cover-up.[1]   That is,

---

[1] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the
judge's function is not to weigh the evidence and determine the truth of the matter, but to determine
whether there is a genuine issue for trial"); *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th
Cir.1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties,
the case is not one for summary judgment.").

UPS's conduct and treatment of Sifuentes occurred under circumstances which give rise to a reasonable inference of discrimination.

A jury is not required to believe UPS management's biased, contradictory, unsubstantiated, post-hoc explanations for its behavior.  At the very least, evaluated properly and in its totality, the record evidence shows there to be numerous disputed issues of material fact. In short, UPS – as the movant – has failed to show the absence of a genuine issue as to any material fact **_and_** that it is entitled to judgment as a matter of law.  Thus, pursuant to Supreme Court and Tenth Circuit mandate, UPS's motion should be denied.

**Plaintiff-favorable Evidence Allows A Jury to Infer That UPS Has a Longstanding Policy or Practice of Discrimination and Retaliation.**

The EEOC has repeatedly found that UPS has an unlawful no restrictions or 100%-full release policy or practice in violation of the ADA.  To wit: the EEOC has repeatedly issued determination letters – throughout the country – finding evidence that UPS has engaged in disability discrimination in violation of the ADA, including that it has an unlawful no restrictions or 100% release policy in violation of the ADA, as alleged in this lawsuit. AMF 55. In fact, albeit to no avail, the EEOC has entered into a consent decree with UPS, based on UPS having an unlawful no restrictions or 100% release policy in violation of the ADA.  AMF 55.

Consistent with this, in *Hohider v. United Parcel Service, Inc.*, 243 F.R.D. 147 (W.D.Pa.2007), a nationwide class action initially was certified on behalf of current and former UPS employees who were absent from work for medical reasons and were prevented from returning to work by companywide policies, including an unwritten rule that employees cannot return to work unless they are "100 percent healed" and have no medical restrictions.  The district court authorized the workers to proceed with claims that: 1) UPS discriminates against employees with disabilities and refuses to accommodate them by following a 100 percent healed

policy; 2) applying its written ADA compliance policy to delay and avoid providing accommodations; and, 3) using general job descriptions that fail to describe the essential functions of specific jobs.  *Id.*

To be clear, this unlawful practice takes place locally – at the very James Street or Kansas City, Kansas UPS facility at which Plaintiff worked.  In August 2008, a Kansas Federal District Court jury found UPS guilty of workers' compensation retaliation. *Jones v. United Parcel Service, Inc.*, 658 F. Supp. 2d 1308, 1327-32 (D.Kan.  2009); *aff'd in pt., rev'd in pt., rem.* 2012 WL 689269 (10th Cir. 2012). AMF 57.  That case involved an outrageous – but, quite common – scenario in which UPS management sabotaged the plaintiff's attempt to return to work by "asking" the UPS doctor (who had just examined and given the plaintiff a full release without restrictions) to change his opinion and place restrictions on the plaintiff (which, according to UPS's unlawful policy, rendered him incapable of performing any job at UPS).[2] *Id. See, e.g., also Turrentine v. United Parcel Service, Inc.*, 645 F. Supp. 2d 976 (D.Kan. 2009) (denying summary judgment on plaintiff's retaliation claim that UPS changed her start times because of her complaint of discrimination).  In fact, former UPS Kansas District HR Manager Jim Grover has been found guilty in Federal Court of violating the ADA. *Picinich v. United Parcel Service*, 318 Fed.Appx. 34 (2nd Cir. 2009). AMF 56.  However, he still remains employed with UPS.

Knowingly admitting its unlawful conduct, UPS training materials expressly state: the company has at times viewed workers' compensation as an extension of the termination process

---

[2] UPS Kansas District Occupational Health Manager Monica Sloan admittedly carried out this practice in *Jones*. UPS's and Ms. Sloan's true sentiments and overt discriminatory and retaliatory animus had been noted previously by this court and the Tenth Circuit. See *Proctor v. United Parcel Service*, 2006 WL 980741, at *4 (D.Kan. 2006) **("[W]e're going to pay him a work comp settlement and as far as I'm concerned he can go eat shit and die.**") (emphasis added); *Proctor v. United Parcel Service*, 502 F. 3d 1200, 1204 (10th Cir. 2007) (same).

and not allowed employees with restrictions to return to work; and, also, this conduct is discrimination in violation of the ADA and could subject the company to punitive damages, in addition to workers' compensation liability.  AMF 75, 76, 77.

In *Jones v. UPS, Inc.*, 502 F. 3d 1176, 1188 (10th Cir. 2007), the Tenth Circuit stated:

> [Plaintiff] attempts to prove his claim of individualized disability discrimination by proving that UPS routinely applies a 100%-healed policy that discriminates against disabled individuals.  Evidence of such a policy is potentially relevant not only to the allegedly unlawful motivation behind UPS's refusal to return Mr. Jones to work, but also to a determination of whether UPS regarded him as disabled.

Viewed in the light most favorable to Sifuentes, UPS has a longstanding practice of discriminating against employees seeking accommodation in violation of the ADA (as well as workers' compensation retaliation); and, Plaintiff is clearly allowed to utilize this evidence in support of his claims and theories.  This substantial policy evidence – in and of itself – would easily allow a rational jury to infer Plaintiff was discriminated against because of his disability and that UPS regards him as disabled.  All of this is entirely consistent with Sifuentes' claims and allegations.  Although well established, Plaintiff has produced compelling evidence amply supporting this and demonstrating he has been discriminated and retaliated against pursuant to this same unlawful corporate policy.[3]  As such, Defendant's motion should be denied.

**Sifuentes Has Been Subjected to Severe and Pervasive Discrimination and Retaliation.**

---

[3] UPS's unlawful employment practices are not limited to its flagrant and ongoing disregard of the ADA. It is well-known that UPS just as brazenly ignores its other legal employment obligations.  *See Federal Contractor Misconduct Database*, http://www.contractormisconduct.org , Ranking: 91 – United Parcel Service, Inc. (noting: 1.  Carter v. UPS (Racial Discrimination); 2.  Unsafe Delivery Trucks (New York Investigation); 3.  Bates v. UPS (Disability Discrimination); 4.  EEOC v. UPS (Failing to Accommodate an Employee with Diabetes); 5.  Fischer v. UPS (Retaliation); 6.  Hoskins v. UPS (Racial/Sexual Preference Discrimination); 7.  Meza v. UPS (Unpaid Overtime); 8.  EEOC v. UPS (Religious Discrimination – Harrisburg, PA); 9.  Runner v. UPS (Unfair Shipping Rate Policy); 10.  Sobocinski v. UPS (Sexual Harassment); 11.  Anderson v. UPS (Disability Discrimination); 12.  EEOC v. UPS (Religious Discrimination – Bartlett, TN); and, 13.  LaBrie v. UPS Supply Chain Solutions (Misclassifying Workers)).  Yet, as UPS is one of the largest private contractors to the United States, this is even more outlandish.  That is, the American taxpayer effectively subsidizes UPS's unlawful employment practices.

In *Lanman v. Johnson County, Kansas*, 393 F.3d 1151 (10th Cir. 2004), the Tenth Circuit ruled that a claim for disability harassment or hostile work environment can be brought under the Americans with Disabilities Act (ADA).[4]   In order for harassment to approach the level of a hostile work environment, it must be "so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.2005) (*quoting Harris v. Forklift Systems, Inc.*, 510 US 17, 23, 114 S. Ct. 367 (1993). "**The severity and pervasiveness evaluation is particularly unsuited for summary judgment because <u>it is quintessentially a question of fact</u>.**" *Tademy v. Union Pacific Corp.*, 520 F. 3d 1149, 1162 (10th Cir. 2008) (internal quotation omitted)(emphasis added).

Here, the continuous, repeated, and ongoing actions taken against Sifuentes, including, continually and repeatedly refusing to provide him with a properly maintained vehicle, assigning him dangerous vehicles, demanding to know when he is going to retire and why he won't retire, and chastising and threatening him about his injuries and injury reports and workers' compensation claims, were unquestionably severe and pervasive and quite accurately

---

[4] The ADA expressly states, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).   Further, the regulatory language implementing the ADA states that "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by" the employment provisions of the ADA. 29 C.F.R. § 1630.12(b).

characterized as "abusive." Particularly, given Sifuentes' ongoing impairments, directly related to and exacerbated by the unsafe and dangerous vehicles he was assigned and forced to drive, it can easily be said that because of or due to Sifuentes' disabilities or impairments and engaging in protected conduct the terms and conditions of his work environment were adversely altered and he was subjected to an abusive environment.

Plaintiff's allegations are more than sufficient to create a "genuine issue" requiring sending the case to a jury; therefore, summary judgment should not be granted.  The company's management had sufficient notice of the conduct, and there is no evidence of any response of any kind – let alone one that is lawfully adequate – to the ongoing, abusive conduct to justify summary resolution.  Indeed, management claims it was not even aware Sifuentes made any requests or complaints; thus, UPS admits it did not respond to Plaintiff.  Based on Sifuentes' version of events – which must be believed at summary judgment – he told management repeatedly about his need for a safe and properly maintained tractor and that he felt he was being discriminated and retaliated against and he wanted this to stop.  Management brushed this off.  Thus, there are clearly disputed issues of material fact requiring the case go to a jury and summary judgment cannot be granted.

**A Reasonable Jury Can Conclude That A Reasonable Person in Sifuentes' Situation Would Feel Compelled to Resign.**

Plaintiff's ADA claims and his impairments are inextricably intertwined with his workplace injuries and workers' compensation claims.  Indeed, it is well recognized that disability discrimination and workers' compensation claims frequently overlap. *See, e.g., EEOC Enforcement Guidance: Workers' Compensation and the ADA*, EEOC NOTICE Number 915.002.  In fact, one of the considerations to evaluate and which supports a "regarded as" disability discrimination claim is whether the employer's conduct was motivated in part by

workers' compensation concerns and costs.[5] Courts must recognize the overlapping nature of these claims. They cannot be isolated, but, rather, must be integrated with the whole record.

Plaintiff was forced to retire or constructively discharged because of his impairments and injury claims. Constructive discharge occurs "when `the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir.1998) (*quoting Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)).

It is simply irrefutable that Sifuentes was subjected to repeated and ongoing acts of overt discrimination, retaliation, interference, and harassment because of his impairments, accommodation requests, injury reports, and workers' compensation claims. An employee, like Sifuentes, whose requests for accommodation are repeatedly ignored and, instead, is forced to work *without* accommodation and, thereby, subjected to working conditions exacerbating his impairments is placed in a truly untenable situation. Numerous courts have recognized this is constructive discharge – and adverse employment action – and would easily compel a reasonable employee in Sifuentes' situation to resign. See, e.g., *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F. 3d 1099 (6th Cir. 2008) (reversing grant of summary judgment in favor of employer on plaintiff's ADA claim); *Smith v. Henderson*, 376 F. 3d 529, 537-38 (6th Cir. 2004) (reversing summary judgment on disability, sex, and age claims); *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F. 3d 707, 717-18 (8th Cir. 2003)(reversing grant of summary judgment on

---

[5] Under the prior version of the ADA, a plaintiff asserting he is disabled under subsection (C) meets his burden by offering evidence that his employer regarded him as having an impairment substantially limiting his ability to perform a broad range of jobs, rather than a single position, and that the employer's misperception was based on "myth, fear, or stereotype." This includes "concerns regarding productivity, safety, insurance, liability, attendance, cost of accommodation and accessibility, workers' compensation costs, and acceptance by coworkers and customers." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1133 (10th Cir. 2003)(quoting 29 C.F.R. § 1630.2(l)); *McKenzie v. Dovala*, 242 F.3d 967, 970-72 (10th Cir. 2001).

plaintiff's ADA claims); Chavez v. Waterford School Dist., 720 F. Supp. 2d 845, 859 (ED Mich.

2010) (denying summary judgment of plaintiff's ADA discrimination claims).

As the Sixth Circuit stated in *Smith, supra*:

Assuming that Smith was denied a reasonable accommodation that forced her to work well in excess of her medical restrictions, *a jury reasonably could infer that the USPS (through Mullin) knew that Smith's working conditions would become intolerable to a reasonable person suffering from her particular disability…* a reasonable jury could conclude that the USPS knowingly and deliberately "turned its back" on Smith and, therefore, the USPS could foresee that Smith would be compelled to quit her job in order to preserve her health…*The district court erred in ruling, as a matter of law, that Smith had not suffered a constructive discharge*.

*Id*. at 537-38 (emphasis added).

Also particularly on point are the holdings in *Talley*, *supra*:

[T]here is a genuine issue of material fact regarding whether the plaintiff proposed a reasonable accommodation that would have allowed her to be "otherwise qualified" for the cashier position despite her disability. Further, *if a jury were to find that Talley's requests, both written and oral, for a stool constituted a request for a reasonable accommodation, there is a remaining dispute of whether that accommodation would cause an undue hardship for the employer. The defendants have not set forth specific facts indisputably demonstrating that the use of a stool would have presented an undue hardship for the company.*

*While the defendants allege that other co-workers had complained about unfair treatment*, given Talley's and other workers' testimony that she was able to perform her job adequately when using the stool, *there is a genuine issue of material fact as to whether this accommodation would have imposed an "undue hardship" on Family Dollar and the other defendants. Assuming that Talley was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, a reasonable jury could infer that the defendants knew that Talley's working conditions would become intolerable to a reasonable person suffering from her particular disability.*

**[W]hen an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable.**

*Id*. at 1108-09 (emphasis added).

The evidence of UPS's unlawful policy and its treatment of Sifuentes in this case make it abundantly clear that Sifuentes' resignation is exactly what UPS wanted.

In yet another discrimination and retaliation case involving Defendant, *Strickland v. UPS, Inc* ., 555 F.3d 1224, 1229-31 (10th Cir. 2009), the Tenth Circuit reversed a district court's grant of a judgment as a matter of law to UPS on the plaintiff's FMLA retaliation-constructive discharge and sex discrimination claims. The Court found that that whether the conditions at UPS were objectively intolerable – *whether a reasonable employee would have felt compelled to leave* – is a question of fact for the jury; and, although UPS presented contrary evidence regarding the alleged discrimination, the plaintiff presented sufficient evidence for a reasonable jury to find in her favor. *Id.* Accordingly, this court cannot grant UPS's motion with regard to the issue of Sifuentes' constructive discharge – this is required to be evaluated and resolved by a jury.

**Plaintiff's Claims Have Been Properly Plead and Are Timely – Pursuant to the Supreme Court *Morgan* Decision.**

Defendant's assertions that Sifuentes has not properly plead, asserted, or alleged constructive discharge is an outright fabrication. Plaintiff repeatedly and expressly alleged this within his Complaint, Charge of Discrimination, and the Pretrial Order. AMF 35. Indeed, when UPS raised this frivolous argument at the Pretrial Conference, it was readily dismissed by Magistrate Judge O'Hara.[6]

Also contrary to UPS's unfounded argument, Plaintiff's claims and the conduct he relies on are clearly timely and properly considered. As recognized by the Supreme Court: **a hostile work environment claim is a continuing violation; if a single event which contributes to the hostile work environment occurs within the limitations period the entire claim is timely**.

---

[6] Magistrate Judge O'Hara also found UPS complaining about the number of claims raised by Plaintiff to be disingenuous, given the excessive and unsubstantiated affirmative defenses alleged by UPS.

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability").[7] The evidence clearly demonstrates the adverse actions Plaintiff was subjected to continued up until the time he was forced to resign.   Plaintiff's version controls. As such, Defendant's arguments have no merit and its motion should be denied on this issue.

**Plaintiff Has Been Discriminated Against Because of His Disability or Impairments.**

The ADA expressly states, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added).  Further, the regulatory language implementing the ADA states that "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by" the employment provisions of the ADA. 29 C.F.R. § 1630.12(b).

Under the ADA, a reasonable accommodation "may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, **acquisition or modification of equipment or devices**, appropriate adjustment or modifications of examinations, training

---

[7] Just so, in *Tademy v. Union Pacific Corp.*, 520 F. 3d 1149 (10th Cir. 2008), the Tenth Circuit held **a plaintiff may point to and utilize all past acts of and contributing to a hostile environment in support of such a claim**, recognizing *Morgan* specifically provides for this. *See also Tademy v. Union Pacific Corp.*, 614 F. 3d 1132 (10th Cir. 2008). Further, in *Plotke v. White*, 405 F. 3d 1092, 1106-07 (10th Cir. 2005), the Court held that, "[p]laintiffs are not precluded from introducing "quite probative evidence of earlier acts of discrimination to support a claim of current discriminatory intent," even if prior events are beyond the limitations period." *Id.* at 1106-07 (*citing Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1012-13 (10th Cir. 2002); *Bazemore v. Friday*, 478 U.S. 385, 402 n. 13, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ("evidence of pre-act discrimination is quite probative"); *Noland v. McAdoo*, 39 F.3d 269, 271-72 (10th Cir.1994) (**prior events not actionable may provide relevant circumstantial evidence to explain later, actionable events**).

materials or policies, the provision of qualified readers or interpreters, <u>and other similar accommodations</u>." 42 U.S.C. § 12111(9) (emphasis added). In addition, if the employee is unable to perform his job, with or without accommodation, an employer must consider reassignment to an available position as one form of accommodation. 42 U.S.C. § 12111(9)(B).

Sifuentes has come forth with evidence demonstrating: UPS assigned him dangerous, unsafe, and improperly maintained tractors; he complained about this; he asked for an accommodation that involved nothing more than providing him with a safe and properly maintained vehicle; and, UPS failed to respond.  The unlawful conduct of UPS is expressly prohibited by the straightforward language of the ADA.  UPS's motion must be denied.

Yet, UPS argues its conduct is not discriminatory, because other drivers had unsafe and improperly maintained tractors.  This is not a valid, legitimate, non-discriminatory explanation for this conduct.  Also, as discussed further herein, the law is clear such an argument is both legally and logically unsound.  Defendant's argument further fails because it has not shown these other employees were similarly situated to Sifuentes – that is: all these other employees had substantial impairments or disabilities; they all requested and were in need of accommodation; and, UPS did not provide any of them a reasonable accommodation or evaluate whether this was possible. UPS altogether fails to address any of this – because it can't.

Likewise, UPS is not exonerated from engaging in this outrageous conduct by labeling its actions as "business judgment."  In fact, UPS offers no documentation or any hard evidence that would merit its burden to conclusively show its decisions were made on sound, prudent business judgment or were non-discriminatory. Rather, it relies solely on post-hoc, attorney-drafted assertions, and asks the court to ignore mandated standards by giving wholesale credence to UPS

managements' biased, self-serving, "sworn" declarations.[8]   The Supreme Court in *Reeves v.*

*Sanderson Plumbing Company*, 120 S.Ct. 2097, 2110-11 (2000), holds such evidence unavailing.

Quite simply, UPS asserting that it treats other employees adversely or unfavorably – like

it did Sifuentes – is not a valid defense; its motion should be denied. A rational jury could

reasonable find UPS's "explanations" unbelievable and a cover-up and that Sifuentes being

forced to drive dangerous vehicles – which only worsened his impairments – was based on his

impairments, age, and race.  As such, UPS's motion should be denied.

**Plaintiff's Impairments Easily Meet the Definition of Disability.**

In order to establish a prima facie case under the ADA, a plaintiff must demonstrate that:

(1) he is a disabled person within the meaning of the ADA; (2) he is qualified, that is, he is able

to perform the essential functions of the job or jobs in question – with or *without* reasonable

accommodation;[9] and, (3) his employer discriminated against him under circumstances which

give rise to an inference that the action was based on his disability.  *See Praseuth v. Rubbermaid,*

*Inc.*, 406 F. 3d 1245, 1250 (10th Cir. 2005); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th

Cir.1997).  Plaintiff's burden is "not onerous." *Carter v. Pathfinder Energy Services, Inc.*, 662 F.

3d 1134, 1142 (10th Cir. 2011) (reversing grant of summary judgment on plaintiff's ADA claim;

rejecting defendant's argument plaintiff was not substantially limited because he could perform

---

[8] Contrary to UPS management's testimony, Plaintiff has introduced evidence from other employees that UPS unlawfully retaliates and discriminates against its employees. The Tenth Circuit has repeatedly recognized the testimony of other employees regarding how defendant treated them is relevant to the defendant's discriminatory intent where "testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motive." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir.1999).  *See, e.g., also Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir.1990); *Greene v. Safeway Stores, Inc.*, 98 F.3d 554 (10th Cir.1996); *Bingman v. Natkin & Company*, 937 F.2d 553 (10th Cir.1991).

[9] As mentioned, UPS makes the frivolous argument that Sifuentes claim must fail because he continued to work without accommodation. Defendant's posture ignores the express language of the ADA and allows it to make an end-run around the law.  It also maliciously exploits the precarious situation of a disabled employee with financial and family obligations and his or her fear of losing their pension and benefits.

the essential functions of his job; recognizing simply because employer may have a valid reason for its conduct, a jury could still find plaintiff was discriminated against because of his disability).

The evidence fully supports the finding that Sifuentes was "disabled" – as defined under the past and, most certainly, the current ADA definition.  Sifuentes suffered from a "disability" while he was employed by UPS.  He had a history or record of impairments which substantially limited one or more major life activities.  Further, UPS "regarded" him as disabled; that is, UPS told him – as it does all employees – he could not work at any job at UPS with his impairments and would not allow him to work with any impairments.  AMF 25, 44.

A "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of such impairment; or being regarded as having such an impairment."  42 U.S.C. § 12102.  Among other things, working, standing, and lifting are all recognized as a "major life activity". *See, e.g., Praseuth v. Rubbermaid*, 406 F.3d 1245, 1251 (10th Cir. 2005) (working a major life activity); 29 C.F.R. Pt. 1630.

Those major life activities are "substantially limited" when an individual is:

> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or

> (ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2.

A reasonable juror could find Mr. Sifuentes was disabled under the ADA. AMF 1-3. Among other things, Mr. Sifuentes suffered impairments to both knees (severe arthritis and

sclerosis), his shoulder (arthritis), his neck (deterioration of 3rd, 4th, and 5th vertebrae), and he had respiratory ailments (asthma, lung poisoning, prolonged diesel exposure), as well as hypertension.  AMF 1. As recognized by one of Plaintiff's treating physicians, these impairments resulted in, among other things, "Ongoing symptoms of pain and swelling; difficulty with prolonged standing, prolong walking, traversing steps, bending, kneeling, squatting, and arising from a chair."  AMF 2 (Stuckmeyer Ltr).

The ADA "prohibits certain employers from discriminating against individuals on the basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999) *superseded in part*, ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008). The statute provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA encompasses not only such disparate treatment but also the failure to provide a reasonable accommodation for an individual's disability. The ADA provides that an employer engages in discrimination when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

The ADAAA became effective on January 1, 2009, and applies to this case because Sifuentes was discriminated against and constructively discharged after that date.  Congress amended the ADA to broaden its scope by expanding the definition of disability, which had been narrowed by Supreme Court interpretation. With the passage of the ADAAA, Congress

expanded the statute's non-exhaustive list of "major life activities" and declared that "[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), § 4(a), 122 Stat. 3553, 3555. Major life activities include "performing manual tasks, seeing, hearing, eating, sleeping, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Additionally, the ADAAA requires a "less searching analysis" of whether a plaintiff is "substantially limited." *Kravits v. Shinseki*, No. 10-861, 2012 U.S. Dist. LEXIS 24039, at *17 (W.D. Pa. Feb. 24, 2012). The EEOC has noted that under the ADAAA, "substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i) and (iii). "Rather, `the determination of whether an impairment substantially limits a major life activity requires an individualized assessment,' and should `require a degree of functional limitation that is lower than the standard for `substantially limits' applied prior to the ADAAA.'" *Cohen v. CHLN, Inc.*, No. 10-514, 2011 U.S. Dist. LEXIS 75404, at *20 (E.D. Pa. July 13, 2011).  "**Ascertaining whether [an] impairment substantially limits the [plaintiff's] major life activity is <u>a factual question for the jury</u>.**" *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (emphasis added).

Under the earlier version of the ADA, and, most certainly under the less restrictive standard of the ADAAA, Sifuentes has offered more than sufficient evidence to raise a genuine issue of fact as to whether he was disabled (if he has not already conclusively demonstrated this). In any event, this is for the jury to decide – not the court at summary judgment.  UPS's motion should be denied on this claim.

**Plaintiff Was Subjected to Multiple and Ongoing Adverse Employment Actions.**

To prove a prima facie case of age or race discrimination, Plaintiff must show: 1) he is a member of the protected class; 2) he suffered an adverse employment action; and, 3) this occurred under circumstances giving rise to an inference of discrimination.  *Ammon v. Baron Auto. Group*, 270 F. Supp.2d 1293, 1310 (D. Kan. 2003) (*citing Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002)).  Plaintiff is **not** required to show that age was the sole motivating factor in the employment decision.   *Jones v. Oklahoma City Public Schools*, 617 F. 3d 1273, 1277-78 (10th Cir. 2010).  "Adverse employment action" is liberally defined and must be examined looking at "the unique factors relevant to the situation at hand."  *Id.* at 1279.  A plaintiff has no obligation to provide additional evidence of discrimination beyond showing the reasons for his treatment to be pretextual.  *Id.* at 1281.  As the Tenth Circuit made clear in *Jones*:

> Consistent with *Reeves*, the Tenth Circuit has "definitively rejected a `pretext plus' standard." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir.2007). Consequently, "once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and **must deny summary judgment**." *Bryant*, 432 F.3d at 1125. A plaintiff produces sufficient evidence of pretext when she shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

> *Id.* at 1280. (emphasis added).

Finding the district court in *Jones* had improperly failed to view the facts in the light most favorable to the plaintiff, including discrediting evidence from the plaintiff, the Tenth Circuit reversed a grant of summary judgment to the employer therein, determining that the plaintiff had satisfied her burden with evidence that the reasons asserted by the employer for her reassignment were pretextual.  *Id.* at 1281.

Defendant overstates what Plaintiff must establish for a prima facie case of race or age discrimination.  Contrary to Defendant's assertions, Plaintiff is not required to show that he was treated differently from other similarly situated employees to survive summary judgment. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1137 (10th Cir. 2003) (finding district court so ruling erroneous).  Likewise, a plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual.  *Id.* Defendant also misrepresents the law regarding an adverse employment action which may give rise to an inference of discrimination.  In so doing, Defendant also insultingly minimizes the significance of the various ways in which it has discriminated against Sifuentes.

Plaintiff's prima facie burden is not great; it is easily met in this case.  *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Sifuentes has put forth evidence demonstrating: He continually was forced to drive dangerous, unsafe, and improperly maintained tractors; he was subjected to unfavorable schedule changes; UPS failed to accommodate him or even respond to his accommodation requests; he was repeatedly and abusively subjected to hostile criticism for exercising his rights; he was forced to take part in illusory safety training; UPS ignored and failed to respond to his reports or complaints regarding his discrimination, harassment, and retaliation; and, UPS never addressed or remedied the multiple and continuous adverse actions he reported and was subjected to.  There is simply no question that – evaluated under the proper standards – the record evidence would allow a reasonable jury to find that the unfavorable terms, conditions, and privileges of employment Sifuentes was subjected to (and, denied) amount to significant adverse employment actions.  Accordingly, UPS's motion should be denied.

**A Jury Can Infer A Clear Causal Connection Between Plaintiff's Impairments and His Unlawful Treatment.**

Sifuentes' accommodation requests and the reports of his harassment unquestionably involved legal non-compliance issues and the potential for related, serious adverse ramifications for UPS and its management.  UPS written policy expressly recognizes Sifuentes' requests for an accommodation as precisely that and they were required to be lawfully responded to.  AMF 37.  Likewise, there is simply no way that those responsible for what Sifuentes was reporting (e.g., dangerous and unsafe vehicles, discrimination, retaliation, etc.) and who were lawfully responsible for such could have found his reports to be anything but adverse; laws were being broken on their watch. UPS and its management cannot escape responsibility or liability for their conduct by claiming ignorance.[10]

Indeed, the Tenth Circuit Court of Appeals has held that it would be "eminently reasonable" to find that an employer who was or claimed to be ignorant of their obligations an employee was complaining of would engage in the very practice that the law at issue was enacted to prevent. *See DeFreitas v. Horizon Management Corp.*, 577 F.3d 1151, 1161 (10th Cir. 2009) (reversing grant of summary judgment on FMLA interference claim).  *See, e.g., also Sassaman v. Gamache*, 566 F.3d 307, 314-15 (2nd Cir. 2009) (employer's lack of efforts to verify accusations made by employee could be construed as evidence that plaintiff's forced resignation occurred under circumstances giving rise to an inference of discriminatory intent).  UPS and its management are required to know the laws they are subject to and comply with them.  UPS's motion should be denied.

---

[10] Kansas law is that an employer is bound by what it knew or "should have known." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1121-22 (10th Cir. 2001). An  employer cannot adopt a workplace policy by which the employer abdicates its duty to see, to hear, and to think. *Id.* The Kansas "knew or should have known" standard charges an employer with knowledge of those facts reasonably available to the employer at the time. *Id.* An employer is required to act upon what facts it knows or should know, not upon an unwritten practice that leads to conscious avoidance of those facts on the part of the employer. *Id.*

**The Conduct of UPS – Fraught with Contradictions, Inconsistencies, and a Cover-up – Is Pretextual.**

At the summary stage, all doubts concerning pretext must be resolved in the plaintiff's favor. *Doebele v. Sprint/United Mgm't Co.*, 342 F.3d 1117, 1135-39 (10th Cir. 2003). Pretext for an allegedly discriminatory employment decision can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *Id*. A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely [than not] motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Moreover, in analyzing the issue of pretext, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and the inferences drawn therefrom.[11] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Where a plaintiff introduces contradictory evidence from which a reasonable jury could conclude an employer's explanations were pretextual, **questions as whether an employer's reasons for its conduct are pretext for discrimination are for jury**. *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir. 1996).

There is abundant evidence of pretext and causation in this case, including the following:

- Contrary to law and its own policy, UPS refused to engage in the interactive process or even consider providing Sifuentes with an accommodation. AMF 5, 8, 25, 37, 38, 39, 40, 44, 74.

- Contrary to law and UPS policy, Sifuentes' managers repeatedly harassed him about when he was going to retire. AMF 23.

---

[11] Pretext evidence clearly can be utilized by Plaintiff in demonstrating causation. *See, e.g., Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2006).

- Contrary to law and UPS policy, UPS repeatedly threatened Sifuentes regarding his injury reports and workers' compensation claims. AMF 9, 19, 20.

- UPS falsely told Sifuentes it could not address his complaints or requests and he could not file or pursue a grievance or claim unless he first discussed his concerns and treatment with management. AMF 72, 73.

- Contrary to law, UPS told Sifuentes he could not work at UPS with his impairments or restrictions. AMF 25, 44.


- Although Sifuentes had an exemplary driving record and actually received the "Circle of Honor" award for this, Plaintiff was told by his manager he was in "**the top 50**" and he was writing to many injury reports; because of this, UPS repeatedly subjected him to humiliating and degrading harassment after his injuries under the guise of "safety training." AMF 18, 19, 20, 20, 21.

- UPS claims its conduct and treatment of Sifuentes is not discriminatory or retaliatory because it discriminates and retaliates against and harasses other employees. AMF 6, 8, 26, 27, 45, 52.

- UPS claims its conduct and treatment of Sifuentes is not discriminatory or retaliatory because other drivers are also forced to drive dangerous, unsafe, and improperly maintained vehicles. AMF 6, 8, 26, 27.

- Although UPS was fully aware of Sifuentes' impairments and medical history, UPS did not bother to even give the appearance of recognizing Sifuentes had requested or was in need of an accommodation until after he sued UPS. AMF 5, 17, 37, 68, 69, 70, 71.

- After its feigned and untimely response to Sifuentes' accommodation request, UPS falsely claimed it could not make a determination as to whether he had a disability until he provided UPS with medical information which it already had. AMF 69, 70.

- Although UPS claims Sifuentes never requested an accommodation and the company never engaged in the interactive process, the company argues it could not provide him with a reasonable accommodation, although this would require nothing more than UPS complying with its existing legal obligation to provide Sifuentes with a safe and properly maintained vehicle. AMF 4, 5, 7, 8, 41, 42, 60.

- There are significantly fewer Hispanic and minority employees than white or Caucasian employees in the Department where Plaintiff worked.[12] AMF 28, 29, 54.

While there is certainly more, this evidence alone amply demonstrates pretext and exposes the ludicrous and brazen posture of UPS.  A reasonable jury could also find this compellingly establishes causation.  This evidence fully supports a finding that UPS's conduct and Sifuentes' adverse treatment occurred under circumstances giving rise to an inference of discrimination and retaliation – based on his impairments, age, and race and exercising his protected rights.  At this stage, properly evaluated, UPS's motion must be denied.

**The UPS Summary Judgment Practice of Submitting Post-Hoc, Unsubstantiated, Attorney Drafted, "Sworn" Statements – With Identical Language – From Managers Who Have Already Given Deposition Testimony Is Strong Evidence of Pretext.**

UPS's motion places heavy reliance on declarations from managers who have already testified. Yet, there is no way this court can accept the allegations in these untimely and improper declarations unless it makes credibility determinations and gives credence to the unsubstantiated, biased assertions within these attorney-drafted statements (which contain identical language parroting one another and UPS's summary judgment arguments).  A jury must be allowed to listen to and observe those giving these "sworn" assertions and decide whether to give them any weight or credence.  *See Reeves, supra,* 120 S.Ct. at 2110-11.  "The court may not act as the jury

---

[12] The Tenth Circuit has repeatedly recognized simple statistical evidence of this kind is properly considered when evaluating pretext. *See, e.g., Garrett v. Hewlett Packard Co.*, 305 F. 3d 1210, 1217 (10th Cir. 2002). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805 (1973) ("Other evidence that may be relevant to any showing of pretext includes ... [the employer's] general policy and practice with respect to minority employment.").  Plaintiff does not assert this statistical disparity explains or resolves all issues; yet, when considered in context with all evidence, it is most certainly illuminates. As would whatever explanation UPS may – or, may not have – for this disparity and whether or not UPS has a policy of racial discrimination and whether that was carried out with Sifuentes – i.e., the motive and intent behind his many adverse terms, condition, and privileges of employment.

and determine witness credibility when it examines the record upon a summary judgment motion."[13] *Degraw v. Exide Technologies*, 744 F. Supp. 2d 1199, 1201 (D.Kan. 2010).

These declarations are also deficient, in that they contain numerous, sweeping assertions of omniscience, without any citation to supporting evidence, and are plainly inadmissible hearsay.  The court is not obligated to sift through UPS's exhibits and see if there is anything that might support what is alleged in these "sworn" assertions; nor would that be compatible with required summary judgment standards.  Further, these untimely "sworn" statements are strong evidence of pretext.[14]   In fact, one of these is an unwieldy thirty (30) page "sworn" declaration from Plaintiff's former manager, Joe Dooley, who already gave deposition testimony in this case – with his counsel present, who was free to and did question him, but, yet, has crafted this glaring pretext evidence.   Quite simply, this amounts to an improper de facto errata or a "sham affidavit."[15]

In sum, especially in light of the combination of other evidence of discrimination, a rational juror would reasonably question the veracity of a manager accused of discrimination, particularly, feeder manager Joe Dooley, who earlier testified about material facts under oath,

---

[13]  A court cannot evade this by claiming to be evaluating a movant's management affidavit only for purposes of motive; in that, in order to accept the asserted motive, the court has to weigh and give credence to that asserted – i.e., believe it is true.  That is not permitted at summary judgment.

[14] *See, e.g., Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir.2005) (holding that post-hoc reasons for an adverse employment decision constitute evidence of pretext); *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("**We are disquieted … by an employer who "fully" articulates its reasons for the first time months after the decision was made**.") (emphasis added).

[15]  In *Burns v. Board of County Commissioners of Jackson County*, 330 F.3d 1275 (10th Cir.2003), the Court noted the Tenth Circuit's conservative approach to deposition changes. "In the recent case of *Garcia v. Pueblo Country Club*, 299 F.3d 1233 (10th Cir. 2002), this court discussed the purpose of Rule 30(e). Quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D.La.1992), we noted that "[t]he Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." *Garcia*, 299 F.3d at 1242 n. 5 (quotation omitted).   Accordingly, Plaintiff submits the declarations provided by UPS management who earlier gave purportedly "sworn" deposition testimony should be ignored, as these are effectively improper erratas changes, if not a "sham affidavits." *See, e.g., Whitaker v. Trans Union Corp.*, 2004 WL 1982527 *1,2  (D.Kan. 2004).

and, then, later, submitted lengthy prepared testimony on the same issues (and which parrots other tardy "sworn" statement), but with the latter not subject to cross examination. This compelling demonstration of pretext should preclude Defendant's motion for summary judgment. In any event, pursuant to Supreme Court mandate, a jury must be allowed to hear and evaluate these UPS managers in person; their testimony is not required to be believed.

**Pursuant To What A Jury Could Conclude Is Wide-Spread Company Policy, UPS Refused to Provide Sifuentes with a Reasonable Accommodation.**

As noted, UPS has a well-recognized corporate policy of refusing to provide or even consider providing accommodations to its employees. AMF 55-57. Indeed, UPS openly admits it did not provide Sifuentes with an accommodation. Naturally, UPS's only possible face-saving response is to claim no request was made, because an accommodation as simple as providing Sifuentes with a safe and properly maintained vehicle was all that was required. The only problem for UPS, though, is this was already required by law and it was not complying with the law. Thus, to provide the accommodation, it would have to admit it was forcing its drivers – like Sifuentes – to unlawfully drive unsafe and improperly maintained tractors. What does UPS then assert? It says we give lots of drivers unsafe and improperly maintained tractors and, therefore, Sifuentes cannot show he was discriminated or retaliated against. As already noted, in addition to being utterly preposterous, this argument fails as a matter of law.

To begin with, the argument that others were being given and forced to drive tractors in like fashion as Plaintiff – i.e., unlawfully drive dangerous and improperly maintained tractors – is not a legitimate non-discriminatory reason for UPS's conduct. Defendant has thus failed to satisfy its burden of production. Furthermore, it has long been recognized that simply because an employer treats individuals other than the plaintiff in the same manner, this does not provide license for the employer to discriminate or retaliate against the plaintiff.

70

Tellingly, also, the first time UPS tried to respond to Sifuentes' accommodation request was *after* he filed a lawsuit against the company.  Yet, this, too, contradicts and is inconsistent with UPS asserting it was not aware Sifuentes requested or was in need of accommodation.  The evidence of pretext in this case combined with the overwhelming evidence of UPS's unlawful policy requires that Defendant's motion be denied.

**Overtly Contradicting the Company's Assertion That an Individualized Inquiry Is Required, UPS Does *Not* Take Part in a Good Faith Interactive Process.**

After nationwide class certification was granted in *Hohider v. UPS, Inc.*, *supra*, the Third Circuit reversed, accepting UPS's argument that ADA claims are ill-suited for class resolution, in that each plaintiff's situation required – pursuant to the ADA – an individualized assessment. *Hohider v. United Parcel Service, Inc.*, 574 F. 3d 169 (3rd Cir. 2009).  Yet, UPS's posture was utterly disingenuous and this played right into the company's unlawful practice.  That is, Defendant does everything possible to avoid and keep from engaging in an individualized assessment or participating in a good faith interactive process.  In any event, UPS openly admits it did not take part in any interactive process with Sifuentes.  Not only is this a flagrant violation of long, well-known law, it is runs counter to UPS's written ADA accommodation procedure and policy.  AMF 37, 67.

Seeking an accommodation is not difficult – yet, UPS makes it so, as a matter of corporate policy.  A request to return to work with a medical condition can be a request for an accommodation. *See, e.g., Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171-73 (10th Cir.1999).  No magic words are required for such; in fact, in certain situations, UPS is required to initiate the required interactive process in good faith. *Id*.  This is particularly true for an employee with a known medical condition and/or impairment or a history of work related injuries – such as Sifuentes.  That Defendant would feign not to be aware of such stands in stark

contrast to well-known law and what UPS professes within its own ADA policies and procedures.  AMF 37, 67.  Likewise, particularly given his workers' compensation claims, UPS is fully aware of Sifuentes' medical condition and impairments.[16]  Indeed, that's why UPS wants him gone – the company doesn't want to pay for any more care or treatment for Plaintiff.

It is well recognized that UPS's failure to engage in the interactive process, or to respond in any way to Sifuentes' accommodation requests precludes summary judgment. A number of circuits, including the Tenth Circuit, have refused to grant an employer summary judgment if there is a genuine dispute of material fact as to whether or not an employer engaged in good faith in the interactive process.  *See, e.g., Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 953 (8th Cir. 1999); *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 318 (3d Cir. 1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1173 (10th Cir. 1999); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-34 (7th Cir. 1998); *Bultemeyer v. Fort Wayne Commun. School*, 100 F.3d 1281, 1284-86 (7th Cir. 1996). "Therefore, summary judgment is available [to the employer] only where there is no genuine dispute that the employer has engaged in the interactive process in good faith."  *Barnett*, 228 F.3d at 1116.  *See, e.g.,  also Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F. 3d 1099 (6th Cir. 2008) (reversing summary judgment to employer; noting failure to engage in the interactive

---

[16] As the recent Kansas Federal District Court case *Jones v. UPS* case vividly demonstrates, UPS, Liberty Mutual (the company's workers' compensation insurer), and the UPS-approved "company" doctors have what could at best be described as "an unholy alliance." *Jones v. United Parcel Service, Inc.*, 658 F. Supp. 2d 1308 (D.Kan.  2009).  In short, UPS has an abundance of "real-time" information regarding the health and condition of its employees, such as Sifuentes, who have filed injury reports or workers' compensation claims.  AMF 68.  UPS's assertions to the contrary are an outright fabrication.  As found in the *Hohider v. UPS* class action, as Plaintiff alleges in his Complaint, and as the evidence in this case amply demonstrates, UPS avoids and manipulates compliance with the ADA by disingenuously demanding medical information from employees requesting accommodation.  This – in and of itself – is a violation of the ADA; it is done for no other reason than to interfere with and stymie employees seeking an accommodation.  In fact, as a matter of practice, in the rare instances when UPS actually carries out its ADA procedure, it perfunctorily denies an accommodation.  Tellingly, in this case, UPS never "requested" any medial information from Sifuentes until *after* he sued UPS.

process required under the EEOC's regulations to determine whether there might be a reasonable accommodation may itself create liability).

Plaintiff made an accommodation request by repeatedly requesting a safe and properly maintained vehicle and telling UPS what he was being forced to drive was exacerbating his impairments and health.[17]   UPS cannot avoid liability simply by claiming Sifuentes never made an accommodation request and pursuing a transparent strategy of deliberate ignorance or willful blindness.  If such an outlandish posture were sanctioned, an employer would never have to comply with the ADA.  There are clearly disputed issues of material fact as to whether or not Plaintiff requested an accommodation and whether UPS properly engaged in the required good faith interactive process.  Again, UPS denies this because Sifuentes' accommodation required no more than UPS providing him with a safe and properly maintained vehicle – which, of course, it is already required by law to do and, yet, which it was not doing.  Defendant's motion should be denied.

**A Reasonable Person in Plaintiff's Situation Would Be Dissuaded from Seeking Accommodation or Pursuing a Charge of Discrimination.**

To establish a prima facie case of retaliation, pursuant to 42 U.S.C. § 12203 (a), a plaintiff must show that: (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the employer's challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action."

---

[17] Defendant cannot rely on a contractual arrangement, be it through a collective bargaining agreement or otherwise, to avoid its duties under the ADA. The ADA expressly prohibits employers from "participating in a contractual or other arrangement that has the effect of subjecting a covered entity's qualified applicant or employee to … discrimination." 42 U.S.C. 12112(b)(2).  "An employer cannot use a collective bargaining agreement to accomplish what it would be prohibited from doing under [the ADA]." S. Rep. No. 116, 101st Cong., 1st Sess. 32 (1989); H.R. Rep. No. 101-485(II), reprinted in 1990 U.S.C.C.A.N. 303, 345.  If Defendant finds it is a party to a contractual procedure that does not allow it to fulfill its ADA duties, then the law commands that UPS take appropriate measures to see to it that it lives up to its legal obligations independent of the union contract and through other means.

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir.2006).  In order to show the challenged action materially adverse, a plaintiff must demonstrate a reasonable worker in his circumstances would have been dissuaded from making or supporting a charge of discrimination.[18]  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).

Plaintiff has presented more than sufficient evidence to show he engaged in protected conduct, he was subjected to multiple material adverse employment actions that would easily dissuade one from engaging in further protected conduct or pursuing a charge, there is a causal connection between such and his repeated accommodation requests, and Defendant's asserted reasons for its conduct are pretextual.  Viewed in the light most favorable to Plaintiff, the collective record evidence is sufficient for a reasonable jury to conclude there is a causal connection between Plaintiff's protected conduct and the multiple adverse employment actions he was subjected to.  At the very least, based on Plaintiff's version of events, there are clearly a number of disputed issues of material fact surrounding such.  Accordingly, Defendant's motion must be denied with regard to Plaintiff's ADA retaliation claim.[19]

**UPS Practice is to Interfere with and Prevent Employees Seeking or In Need of Accommodation.**

---

[18] While termination of employment obviously is an adverse employment action, an environment of hostility and harassment may also suffice if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (*quoting Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  *See also Billings v. Town of Grafton*, 515 F.3d 39, 54 n.13 (1st Cir. 2008) ("Of course, retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment.").

[19] UPS's argument that Plaintiff has not been retaliated against because he continued with his charge is preposterous and devoid of logic and was so recognized in being rejected by Judge Lungstrum. That is, in order to satisfy such an absurd standard one would actually have to fail to file a charge and, in so doing, thereby be precluded from bringing a retaliation claim.  *See Turrentine v. United Parcel Service, Inc.*, 645 F. Supp. 2d 976, 989 (D.Kan. 2009) ("To suggest, then, that a plaintiff's filing of a charge of discrimination precludes a finding that a reasonable person might be dissuaded from filing a charge of discrimination defies logic.").

Plaintiff did not just allege an ADA retaliation claim.   He also alleged UPS violated section 42 U.S.C. § 12203(b) of the ADA.   That section prohibits unlawful interference with an individual exercising their rights under the ADA. Congress set this out as a violation and prohibited this conduct separate and distinct from section 42 U.S.C. § 12203(a) – the ADA retaliation prohibition.   Contrary to the assertion of UPS, this is a different claim than Plaintiff's ADA retaliation claim.

Under the ADA, 42 U.S.C. § 12203(b), it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter."   This unique and separate provision focuses on coercion, interference and intimidation under the ADA, and is a separate cause of action from a retaliation or other ADA claim, and therefore does not require the burdens of proof as those in a traditional harassment claim. *See Brown v. City of Tucson*, 336 F.3d 1181 (9th Cir. 2003) (stating that "the ADA's anti-interference provision appears to protect a broader class of persons against less clearly defined wrongs, compared to the anti-discrimination provisions from which the hostile environment standard is derived."). Furthermore, patently obvious, Congress specifically recognized such a cause of action separate and independent of the retaliation prohibitions of the ADA.   Thus, the two prohibitions are distinct; therefore, an employer can be found to have not only violated the retaliation prohibitions of the ADA, but, also, the conduct prohibited by 42 U.S.C. § 12203(b) – e.g., coercion, interference, intimidation, etc.

The evidence amply shows UPS's conduct and its treatment of Sifuentes is a violation of the interference prohibition of the ADA.   A jury could reasonably find that UPS coerced, intimidated, threatened, or interfered with Sifuentes' exercise or enjoyment of his rights under

the ADA.  Indeed, again, this is exactly what UPS intended – to keep Sifuentes from exercising his rights under the ADA.  AMF 8, 25, 38, 39, 74. UPS's motion on this claim should be denied.

**Sifuentes Was Subjected to an Adverse Action Which Occurred Under Circumstances That Give Rise to an Inference of Discrimination – the Unfavorable Terms, Conditions, or Privileges of His Employment Were Motivated By His Age and/or Race.**

Plaintiff has alleged (and brought forth proof) that he was treated differently and subjected to multiple adverse employment actions because of a number of factors, including his age, disability, race, workers' compensation claims, and exercising his protected rights.  Plaintiff possesses all these characteristics; he has not stated and neither is he required to show all of these are independent acting factors.  As other courts have explained, where two or more bases of discrimination exist, the grounds cannot be neatly reduced to distinct components. *See, e.g., Gorzynski v. Jetblue Airways Corp.*, 596 F. 3d 93, 109, 110 (2nd Cir. 2010) (recognizing that plaintiff claimed she was treated differently because of her status as an older woman, rather than because of age or gender acting as independent factors); *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir.1994) (acknowledging that "the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences" including a specific set of stereotypes and assumptions not shared by all persons of that race or gender); *Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir.1980).

Powerful evidence of UPS's unlawful motive and intent are amply demonstrated by the overtly hostile discriminatory and retaliatory comments repeatedly directed at Sifuentes regarding his injury reports and retirement.  AMF 19, 20, 23.  This evidence would easily allow a reasonable jury to impute retaliatory intent to Defendant.  *See Barnes v. Foot Locker Retail, Inc.*, 476 F.Supp.2d 1210, 1214-16 (D.Kan. 2007) (the necessary causal nexus may be shown if the allegedly discriminatory comments were directed at the plaintiff; "in some circumstances, a

76

single remark may raise the necessary inference of discrimination.").[20] A rational jury could reasonable infer these threats and admonishments show UPS's adverse treatment of Sifuentes was based on his disability and age.  Further, UPS's disingenuous attempts to explain this away are compelling evidence of pretext – they are unbelievable and a cover-up – and are entirely consistent with UPS carrying out its discrimination and retaliation under the guise of legitimate business concerns.

"[N]ot all inquiries about retirement are `friendly'" and "repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination." *Franks v. Village of Bolivar*, 2011 WL 5838209, at * 5 (N.D. Ohio 2011) (*citing Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001).  "[A]n employer's statements, can amount to direct evidence of age discrimination if a plaintiff can show that the defendant used the term "retire" as a "proxy for age" to express or accomplish age discrimination." *Id.* (*citing Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (holding that evidence that employer frequently used innocuous terms to refer to an older worker in a disparaging way constitutes direct evidence of age discrimination). "`[Y]ou should retire' means `you're too old.'" *Id.*

In the context of summary judgment, the evidence must be viewed in a light most favorable to – Sifuentes – so a finding by the court on the meaning or motivation for comments about retirement is not appropriate.  A factfinder – that is, the jury – needs to resolve what was asked or discussed before it can weigh whether the discussion about retirement plans was reasonable under the circumstances of this case. It is not the place of the court to make credibility determinations of witnesses or testimony.

---

[20] *See also Minshall v. McGraw Hill Broadcasting Co., Inc.*, 323 F.3d 1273, 1281-82 (10th Cir. 2003) (**comments and communications expressly directed at or to the plaintiff and demonstrating discriminatory animus are <u>not</u> stray remarks**); *Diaz v. Jiten Hotel Mgmt.*, 2011 WL 181777 (D.Mass. 2011) (discussion of <u>*proper*</u> analysis of discriminatory managerial comments and <u>*improper disregard*</u> of such at summary judgment; addressing <u>abused and flawed reliance on so-called "stray remarks" doctrine</u>).

As stated by the Eighth Circuit, in *Cox v. Dubuque Bank & Trust Co.*, 163 F. 3d 492, 497 (8th Cir. 1998):

> While "many courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees," [s]ometimes retirement inquiries are so unnecessary and excessive – that is, unreasonable – as to constitute evidence of discriminatory harassment.

> *Id*. at 497 (*citing Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 208 (5th Cir.1986).

And, as also recognized by the Eighth Circuit, in *Guthrie*:

> However, the question here is what Penney's motive actually was, not what it could have been. In reaching this determination, the jury is entitled to weigh the credibility of witnesses and to disbelieve self-serving testimony. In this case, the jury could have believed that Penney's need to plan for vacancies motivated its first inquiry into Guthrie's retirement plans. However, the jury could also have believed that the later, repeated inquiries were unnecessary and constituted intentional harassment.

> *Id*. at 207-08 (affirming jury verdict finding constructive discharge and sufficient evidence to support conclusion defendant's stated reasons were pretextual).

Furthermore, the Tenth Circuit has long, consistently recognized that age related comments may be probative of discrimination and pretext and are properly considered by a jury – *not* the court at summary judgment. See, e.g., *Spulak v. K Mart Corp.*, 894 F. 2d 1150, 1155 (10th Cir. 1990); *Cooper v. Asplundh Tree Expert Co.*, 836 F. 2d 1544, 1548 n. 2 (10th Cir. 1988); *Smith v. Consolidated Mut. Water Co.*, 787 F. 2d 1441, 1442 (10th Cir. 1986). Yet, Defendant seeks to have the court adopt an improper blanket or per se rule of preclusion that offers UPS carte blanche protection and an unfettered right to discriminate and edge an employee out under the guise of purportedly legitimate business concerns. *See Sprint/United Management Co. v. Mendelsohn*, 128 S. Ct. 1140, 1146-47 (2008) (per se rules excluding evidence probative of discrimination are improper).

Evaluating the evidence as required, a more than reasonable inference can be drawn that the repeated comments to Sifuentes about "why don't you just quit" and "when are you going to retire" were not innocuous workforce planning questions, but, rather, were clearly intended to add to the harassment and abuse he was facing and force him out.   Further, at summary judgment, Plaintiff's version controls.   "**The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.**" *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added).  In sum, it is for a jury to decide which version of events to believe.  As such, UPS's motion should be denied.

**UPS Brazenly (and Foolishly) Asserting or Admitting It Treats All or Other Employees Unlawfully or Unfavorably is Not a Legitimate, Non-Discriminatory Reason for Its Unlawful Conduct.**

UPS's argument that it is absolved of liability because other employees besides Sifuentes were subjected to the same treatment as he has no merit. To begin with, it is a logical fallacy. That is, simply because others, whether or not they are in the plaintiff's protected class, may or may not have been subject to the same adverse treatment or conditions, that does not resolve the issue of whether the plaintiff's treatment was based on discriminatory or retaliatory motives or intent.  Indeed, the Tenth Circuit has repeatedly recognized that a discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's class.  *Strickland v. United Parcel Service, Inc.*, 555 F. 3d 1224, 1230-31 (10th Cir. 2009) (finding district court erred in granting summary judgment on the basis the employer did not treat employee's other than plaintiff differently).

Likewise, the Supreme Court holds a plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the fact that some members of a protected class were not subject to discrimination, while another subset is discriminated against

based on a protected characteristic shared by both. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971)). *See, e.g., also Amro v. Boeing Co.*, 232 F.3d 790, 796 & n. 2 (10th Cir.2000) (clarifying that the fourth prong of failure to promote claim does not require a showing that the position "was filled by someone outside the plaintiff's protected class."). As the Supreme Court has also explained: "Congress never intended to give an employer license to discriminate against some employees ... merely because he favorably treats other members of the employees' group." *Connecticut v. Teal*, 57 U.S. 440, 455, 102 S.Ct. 2525, 2535 (1982).

In short, it is for a jury to decide whether it believes UPS's fanciful and suspect story of unfavorable treatment for all. Even if true, it does not resolve the issue of whether or not the ongoing and repeated adverse actions Sifuentes was subjected to were discriminatory. UPS's motion should be denied.

### Sifuentes Was Forced to Resign In Part Because of His Injuries and Workers' Compensation Claims; He Is Not Required to Show This Was the Exclusive Reason for His Unlawful Treatment.

Kansas public policy recognizes it to be unlawful for an employer to retaliate against an employee for exercising his workers' compensation rights. *See, e.g., Murphy v. City of Topeka*, 630 P.2d 186 (1981) (recognizing cause of action for termination due to claim or related injury); *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 752 P.2d 645 (1988) (extending protection to termination for related absences); *Brigham v. Dillon Companies, Inc.*, 935 P. 2d 1054 (Kan. 1997) (extending protection to recognize wrongful demotion). To set forth a prima facie case of retaliatory discharge for filing a workers' compensation claim under Kansas law, a plaintiff must show that: (1) he filed a claim for workers compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) defendant knew of the claim or injury;

(3) defendant terminated plaintiff's employment; and (4) a causal connection connects the protected activity and the termination of plaintiff's employment.[21]  *Jones v. United Parcel Service, Inc.*, 411 F.Supp.2d 1236, 1260 (D.Kan. 2006).

The prima facie case is not an onerous burden under the *McDonnell Douglas* burden-shifting analysis. *Id*.  Further, Sifuentes may recover upon "proving that the discharge was 'based on,' 'because of,' 'motivated by' **or** 'due to' the employer's intent to retaliate," but [he] does "not need to show that retaliation was the employer's <u>sole</u> *motive* <u>or</u> <u>reason</u> for the termination." *Bausman v. Interstate Brands Corp.*, 252 F. 3d 1111, 1116 (10th Cir. 2001) (emphasis added) (*citing Sanjuan v. IBP, Inc.*, 160 F.3d at 1298 (*quoting Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146-148, 815 P.2d 72 (1991)).

A causal connection between protected activity and an adverse employment action is established where the plaintiff presents "'evidence of circumstances that justify an inference of retaliatory motive."  *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir.1999). *See also Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir. 1996)("A causal connection is established where the plaintiff presents evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.").  Further, a plaintiff need only establish a circumstantial case "that justif[ies] an inference of retaliatory motive." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).  Thus, Sifuentes is not required to disprove UPS's alleged reasons for its conduct or demonstrate that his workplace injuries or workers' compensation claims were the only factors motivating the conduct of UPS. Rather, Plaintiff is only required to show by a preponderance of the evidence that his injuries or claims played a role in his treatment by UPS.  *See, e.g., Bausman v. Interstate Brands Corp.*, 252

---

[21] Wrongful discharge claims under Kansas law are analyzed using the three-part framework established in *McDonell Douglas v. Green*, 411 U.S. 792, 824 (1973).  *See Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193-94 (10th Cir. 2002).

F.3d 1111, 1116 (10th Cir. 2001) (based on, motivated by, *or* because of showing all that is required).

UPS management openly, repeatedly, and directly threatening Sifuentes at or near the time of his injury reports and after his returning to work due to absences because of workplace injuries amply demonstrates retaliatory animus and causation. AMF 19, 20, 23.  This evidence would easily allow a reasonable jury to impute retaliatory intent to Defendant.  *See, e.g., Barnes v. Foot Locker Retail, Inc.*, 476 F.Supp.2d 1210, 1214-16 (D.Kan. 2007)(the necessary causal nexus may be shown if the allegedly discriminatory comments were directed at the plaintiff; "in some circumstances, a single remark may raise the necessary inference of discrimination."). Just so, this Court denied summary to UPS as to the plaintiff's workers' compensation retaliation claim in *Jones v. United Parcel Service, Inc.*, 411 F.Supp.2d 1236, 1261 (D.Kan. 2006), based on hostile comments directed to the plaintiff:

> After plaintiff sustained injury, his supervisor asked him whether he "knew what work comp fraud was" and whether he knew "how much this was going to cost UPS." Defendant characterizes these comments as "stray remarks" by an individual who was not a decision-maker. The Court concludes, however, that this circumstantial evidence, if believed by a jury, may be sufficient to show that defendant was motivated by retaliatory intent. Defendant's motion for summary judgment is overruled on this claim.

UPS's unfounded argument that Sifuentes has not presented clear and convincing evidence of a causal link between his workplace injuries and claims and his harassment and termination amounts to nothing more than an assertion that the evidence Plaintiff has presented is not credible – an assessment which this court cannot make in determining whether Defendant is entitled to judgment as a matter of law.  Furthermore, contrary to UPS's incredibly erroneous argument, Plaintiff need not rely solely on temporal proximity to establish causal connection. *See, e.g., Kachmar v. SunGuard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("[i]t is

important to emphasize that it is causation, not temporal proximity that is an element of plaintiff's *prima facie* case and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). And, "the passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes retaliatory motive." *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007) ("Other evidence in the record could establish an adverse employment action taken after a lengthy period of time was still in response to the earlier, protected activity").[22] Indeed, "[t]he ultimate question in any retaliation case is an intent to retaliate *vel non*." *Jensen v. Potter*, 435 F.3d 444, 449 n. 2 (3d Cir. 2006).

Likewise, Defendant's attempt to avoid liability by creating an environment so hostile Sifuentes will resign (rather than just fire him) is utterly apparent here. Constructive discharge generally is defined as employer conduct short of actual discharge that is nonetheless so severe that it would compel a reasonable employee to quit, and that in fact does compel the plaintiff employee to quit.[23] *See, e.g., Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986). Yet, the existence of **constructive discharge is _an issue of fact_ to be resolved by the jury**, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation. *Strickland v. United Parcel Service, Inc.*, 555 F. 3d 1224, 1229 (10th Cir.

---

[22] The notion of UPS and some courts that temporal proximity is the be all and end all of establishing causation is, kindly put, extremely misguided; as is the intellectually unsound belief accompanying such that retaliatory motives somehow mystically disappear after the passage of several months (or, sooner). One need only observe current events to realize that there are animosities flaring throughout the world and nation motivated by years and even centuries-old events that most certainly have not disappeared with the passage of time. In short, retaliatory motives do not magically evaporate after some arbitrary period. It is for a jury to decide – based on its real world experience – whether or not conduct was motivated by retaliatory motive or bias. A random causation date set by a court simply tells the employer how long to wait before striking.

[23] Likewise, an employer cannot evade and maneuver around such by, rather than firing an employee, offering them a demotion. The Kansas Supreme Court has recognized for some time the futility of an employer asserting such a posture in finding retaliatory demotion to be a logical and natural extension of wrongful termination that was necessary to keep employers from trying to make an end run around the law in just that way. *Brigham v. Dillon Companies, Inc.*, 262 Kan. 12, 935 P.2d 1054 (1997).

2009)(reversing grant of JMOL to UPS; "**whether the conditions at UPS were objectively intolerable is a question of fact for the jury.**").  As such, UPS's motion must be denied.

**UPS Has a Policy or Practice of Interfering With, Intimidating, Harassing, and Retaliating Against Employees Who Contemplate Filing an Injury Report or Pursue Their Lawful Workers' Compensation Rights.**

In considering the reasons UPS has given for its conduct and Plaintiff's treatment, it is proper for a jury to consider evidence that UPS has a pattern or practice of retaliation against injured workers and, also, evidence of the company's policies and practices related to lowering the costs of work-related injuries.  *Ramirez v. IBP, Inc.*, 145 F.3d 1346, *3 (Table) (10th Cir. 1998).  Likewise, evidence of UPS's accident prevention programs is relevant to the company's motivation to discourage the reporting of injuries and/or reduce the cost of injuries.  *Sanjuan v. IBP, Inc.*, 90 F.Supp.2d 1208, 1216 (D.Kan. 2000).  Further, evidence of UPS's insurance status is relevant to whether UPS was motivated to discourage reporting and/or reduce the cost of injuries.  *Id.* (evidence of insurance status is relevant to determining whether the company or its management has an incentive to fire employees in retaliation to save money).

Sifuentes has adduced evidence – as has been produced in other cases involving UPS – which demonstrates UPS offers financial incentives and rewards to its management and employees to discourage, reduce, and not to file injury reports and workers' compensation claims. AMF 48, 49. This fully supports Plaintiff's claims and theories and allows for a reasonable inference that Sifuentes' treatment was based on his engaging in protected conduct. The evidence also shows this unlawful conduct was carried out continuously throughout Sifuentes' career at UPS up until the time of his forced resignation or constructive discharge.  All of this fully supports Plaintiff's claims and theories and bolsters the already powerful evidence

exposing the pretextual nature of UPS's conduct. Further, the evidence shows this unlawful conduct is not a unique or isolated occurrence, but, rather, UPS corporate practice. AMF 50-52.

**The So-Called Safety Methods and Training of UPS Are Pretextual; This is a Transparent Ploy of Retaliation Under the Guise of a Legitimate Concern.**

Plaintiff has put forth evidence amply demonstrating UPS retaliates and harasses against its employees through illusory safety training.[24]   AMF 45, 52. Indeed, Sifuentes, who had an impeccable safety record and was awarded for his years of safe driving, was repeatedly harassed and subjected to abusive and humiliating training in direct response to his injury reports.  AMF 18-25. UPS, again, brazenly tries to defend its unlawful conduct by asserting it subjects all employees to this type of retaliation.   Yet, from this evidence, viewed properly, a jury could rationally find that UPS is utilizing this tactic to retaliate against, harass, and intimidate employees who file or even contemplate filing injury reports or workers' compensation claims. AMF 33, 45, 50, 52. Indeed, an email which surfaced in other another UPS workers' compensation retaliation case stated managers were to aggressively carry out so-called safety training until "repeaters" – the disparaging and telling name given by UPS to employees who have filed more than one injury report – either stop filing injury reports, quit, or are fired.  AMF 50 (UPS "repeaters" email). This is entirely consistent with the unlawful conduct experienced by Sifuentes in this case.

---

[24] It is permissible for a jury to conclude that this conduct or practice was paying management to fire injured employees or that such a program creates an atmosphere of aggression, harassment, and retaliation. *Sanjuan v. IBP, Inc.*, 78 F.Supp.2d 1195, 1197 (D.Kan. 1999).  A jury is also permitted to find that evidence showing a hostile atmosphere whereby management harassed and yelled at injured employees would discourage injured workers from seeking medical attention and reporting their injuries. *Id*.  From this evidence, a jury would also be permitted to conclude that the employer profited from this program, or it would not have put the program in place. *Id*. Further, in evaluating the employer's conduct, a jury is permitted to consider evidence of any policies prohibiting discrimination, harassment, or retaliation; and, that, while these policies address a number of specific types of prohibited conduct, they do *not* specifically address discrimination, harassment, or retaliation of or against injured employees or those who file workers' compensation claims.  *Id*.  **Plaintiff has put forth evidence showing all this**.

This is not a novel theory. In fact, OSHA recently announced it would be closely watching companies like UPS that utilize purported safety training to actually harass and retaliate against employees contemplating or who do file injury reports or workers' compensation claims. OSHA, *Employer Safety Incentive and Disincentive Policies and Practices* (March 12, 2012). But, what particularly makes this conduct of UPS even more malicious is that it is carried out under the guise of a legitimate concern – workplace safety. That is, obviously, no one can argue that workplace safety is not important; thus, what better way for UPS to mask its retaliation, harassment, and interference. Yet, the evidence in this case clearly demonstrates the UPS facility Plaintiff worked at had a history of safety issues and the company routinely falsifies injury reports and lies about the nature and frequency of injuries. AMF 47, 49. Thus, under the guise of professed concern over safety, UPS subjects its employees to "training" which, in actuality, is a means to "mask" and carry out retaliation and discrimination. AMF 52. This unlawful corporate policy and conduct has gone on at UPS for decades. Pl. Ex. __ (*Robidoux, et al. v. United Parcel Service, Inc.*, Case No. 29644 (Sup.Ct., Hartford, Conn. 1985)).

Plaintiff has presented abundant, uncontroverted evidence amply demonstrating the illusory nature of UPS's so-called "safety training" and that this was carried out with Sifuentes in a retaliatory and otherwise unlawful fashion. AMF 18-21, 45, 47, 50-52. This powerful evidence levels all of UPS's arguments, fully exposes Defendant's outright fabrications, and amply demonstrates the elements of Plaintiff's retaliatory discharge claim and pretext. UPS's summary judgment motion should be denied.

**UPS is Not Absolved from Liability or Complying with the Law by Proclaiming Its Conduct is "Business Judgment" Based on Purported Good Faith Beliefs; The Jury or Finder of Fact – Not a Judge – Must Be Allowed to Assess this Unproven, Biased, and Controverted Assertion.**

UPS desperately clings to the frequently invoked but redundant "business judgment rule" (a corporate governance principle) which cannot overcome the evidence that its claims of good faith belief in its decision-making do not withstand rational scrutiny. The business judgment rule is simply one restatement of the rule that a plaintiff must point to evidence from which a jury could conclude that the adverse action was motivated by unlawful considerations; it does not immunize all explanations styled as "business judgments" from judicial review for illegal discrimination. When an employer invokes the business judgment rule, "[t]he reality of the entire situation must be examined." *Beaird v. Seagate Technology, Inc.*, 145 F. 3d 1159, 1169 (10th Cir. 1998) (*quoting Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir.1993). A claimed business judgment may be so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination. *Id*. If the doctrine were interpreted to prohibit any challenge an employer's so-called "beliefs," it would defeat the entire purpose of the discrimination laws. *Id. See, e.g., also Justice v. Crown Cork and Seal Co., Inc.*, 527 F.3d 1080, 1089, 1092 n. 5 (10th Cir. 2008).[25]

Supreme Court mandate, set forth in *Reeves v. Sanderson Plumbing Company*, 120 S.Ct. 2097 (2000), and other binding precedent, expressly states this court "must disregard all evidence favorable to the moving party that the jury is not required to believe" and that credence should be given to evidence favoring or supporting UPS **_only_** to extent it comes from disinterested witnesses **_and_** is uncontradicted **_and_** unimpeached. *Id*. at 2110-11. UPS's assertions of good faith business judgment – be it through declarations or otherwise – cannot

---

[25] The position of UPS that an employer's conclusions regarding the medical condition and abilities of an employee seeking an ADA accommodation can never be second guessed was firmly rejected for several reasons by the Tenth Circuit in *Justice*. *Id*. First, the Tenth Circuit found this would improperly require a court at summary judgment to resolve a disputed material fact in favor of the employer – the moving party. *Id*. at 1089. Also, the Court stated this would allow the employer to make an end run around the protections of the ADA. *Id*. at 1092, n.5.

withstand this requirement.  A jury must be allowed to evaluate and weigh the live testimony and demeanor of UPS management and decide whether to believe it (and seeing if they can all testify in perfect harmony with one another, as with UPS's current motion, which it asks the court to give blind deference to).  Contrary to Defendant's assertions, "a jury is entitled to reject an employer's explanation for a given action and, if supported by the evidence, may reasonably `infer from the falsity of the explanation that the employer is dissembling to cover up [an illegal] purpose.'"  *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F. 3d 1232, 1241-42 (10th Cir. 2002).  Defendant's motion should be denied; a jury needs to evaluate UPS's assertions of good faith business judgment.[26]

## IV.  <u>CONCLUSION</u>

Although not required to prove his case in a "mini-trial" at summary judgment, Plaintiff has amply demonstrated <u>*all*</u> the elements of his claims **and** pretext.  However, on the contrary, UPS has failed to meet its burden  *- as required of the moving party* – to demonstrate the absence of a genuine issue of material fact **_and_** that it is entitled to judgment as a matter of law.  Evaluating the evidence as required, in its totality, in context, and in the light most favorable to Plaintiff, and disregarding all evidence favorable to UPS not required to be believed, including that coming from biased sources or controverted, a reasonable jury could easily find Sifuentes was subjected to severe and pervasive harassment and multiple adverse actions – based on his impairments, age, race, and injuries or workers' compensation claims – which occurred under circumstances giving rise to an inference of discrimination and that would dissuade a reasonable

---

[26] In this case, the questions left for the jury will not require second guessing of UPS management's business decisions but, rather, will require an evaluation of the credibility of these managers' testimony about the reasons for those decisions and Plaintiff's treatment; thus, the trier of fact will evaluate truthfulness, not business decision making.  If an employer could simply put forth declarations at summary judgment baldly asserting good faith business judgment that were accepted by a court at face value, a plaintiff would never get in front of a jury.  This would effectively eviscerate the fair employment laws of this nation and implicate serious Constitutional concerns.

individual in his situation from exercising his rights and compel him to resign.  Resolution of the numerous disputed fact-laden issues surrounding UPS's motion requires credibility determinations and evaluation of the evidence which cannot be made by a court at summary judgment.  UPS's motion should be denied.

     **WHEREFORE**, for the above reasons, Plaintiff respectfully submits that Defendant's Motion for Summary Judgment should be denied.


## PLAINTIFF'S REQUEST FOR ORAL ARGUMENT AND HEARING

     Plaintiff hereby requests oral argument and hearing on this motion.


Respectfully submitted,

POPHAM LAW FIRM

By: s/ Dennis E. Egan
Dennis E. Egan    KS Bar No. 70672
712 Broadway, Suite 100
Kansas City, MO 64105
(816) 399-5202
degan@pophamlaw.com  *email*

LAW OFFICES OF FREDRICK D. DEAY, II
Fredrick D. Deay, II    KS Bar No. 15035
7575 W. 106th Street, No. 14
Overland Park, KS 66212
(913) 649-0687
fddpai2@hotmail.com  *email*

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 25th day of May, 2012, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

ARMSTRONG TEASDALE LLP

Jennifer L. Arendes
Narcisa P. Symank
7700 Forsyth Blvd., Suite 1800
St. Louis, MO  63105
jarendes@armstrongteasdale.com
nsymank@armstrongteasdale.com

Laurence R. Tucker
2345 Grand Boulevard, Suite 1500
Kansas City, Missouri 64108-2617
lrtucker@armstrongteasdale.com

***Attorneys for Defendant***

<u>s/ Dennis E. Egan</u>
***Attorney for Plaintiff***

## PLAINTIFF'S EXHIBIT LIST

|  | DESCRIPTION |
|---|---|
| 1 | Plaintiff's Third Amended Answers to Defendant's First Interrogatories |
| 2 | Joseph Dooley Deposition |
| 3 | Regina Daniels Deposition |
| 4 | William Sifuentes Deposition |
| 5 | Letter of "Concern" to William Sifuentes family |
| 6 | William Sifuentes Deposition in Daniels v. UPS |
| 7 | Jerry Graham Deposition |
| 8 | Dennis Brown Deposition |
| 9 | Gerald Reeves Deposition |
| 10 | Mic Haynes Deposition |
| 11 | Brad Foth Deposition |
| 12 | Robert Hill Deposition |
| 13 | Wesley Epperson Deposition |
| 14 | NY Times Article about UPS Blame the Worker Safety Approach |
| 15 | Not Used |
| 16 | EEOC |
| 17 | Grievance of 6/23/2008 |
| 18 | Grievance of 9/16/2008 |
| 19. | Dr. Stuckemeyer Letter |
| 20 | Complaint in Sifuentes v. UPS |
| 21 | Pretrial Order |
| 22 | Stephen Stuke |
| 23 | James Shockley Deposition |
| 24 | EEOC Determinations |
| 25 | EEOC Consent Decree |
| 26 | UPS "Focus on Abilities" |
| 27 | Keith Jones v. UPS Verdict |
| 28 | UPS ADA Manual |
| 29 | UPS Code of Conduct- Workplace Health and Safety Section |
| 30 | Chappell v. UPS SJ Order |
| 31 | Samborski Deposition |
| 32 | Bleish Deposition |
| 33 | Robidoux v. UPS order |
| 34 | OSHA Worst Best LIST |
| 35 | Not Used |
| 36 | UPS Email re: Targeting "repeaters" |
| 37. | Not used |
| 38 | Declaration of Kathleen Carpenter |
| 39 | Picinich Order |
| 40 | Supervisor emails re: Sifuentes Medical condition |
| 41 | Bleish Declaration |
| 42 | Rosner Letter in Response to Request for Accommodation by Plaintiff |