IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

William Sifuentes,

        Plaintiff,

     vs.               CASE NO. 10-2178-RDR

United Parcel Service, Inc.,

        Defendant.

_____

## MEMORANDUM AND ORDER

Plaintiff, a retired UPS truck driver, alleges constructive discharge, illegal discrimination and retaliation during his employment with defendant. According to the pretrial order (Doc. No. 132, pp. 17-18), plaintiff asserts discrimination on the basis of age, race and physical disability. He alleges retaliation for and interference with asserting his rights against disability discrimination. He further claims harassment and hostile work environment, as well as a failure to accommodate, in violation of federal disability law. In addition, plaintiff alleges workers' compensation retaliation in violation of Kansas law. Plaintiff's federal statutory claims are brought under: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101. Plaintiff's state statutory claims are brought under the

Kansas Act Against Discrimination ("KAAD"), K.S.A. 44-1001 and the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. 44-1111.

This case is before the court upon defendant's motion for summary judgment. After spending considerable time examining the parties' lengthy submissions and the extensive citations to the discovery record, the court concludes that summary judgment is warranted largely because plaintiff's constructive discharge claim has procedural and substantive deficiencies and because plaintiff cannot demonstrate that defendant took a legally cognizable adverse employment action against plaintiff.[1]

## I.   SUMMARY JUDGMENT STANDARDS

Summary judgment is warranted if the materials on record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.CIV.P. 56(a). The court views "all of the facts in the light most favorable to the non-movant and reasonable inferences from the record must be drawn in favor of the non-moving party." Piercy v. Maketa, 480 F.3d 1192, 1197 (10th Cir. 2007). From this viewpoint, the court attempts to determine whether a reasonable jury could return a verdict in favor

---

[1] While the court does not want to expend much time and space here criticizing counsel, we cannot ignore that the criticism of "lengthy, immaterial, repetitive, argumentative and duplicative facts" stated by Judge Robinson in Daniels v. United Parcel Service, Inc., 797 F.Supp.2d 1163, 1171 (D.Kan. 2011) rings true in this case and the same adjectives could also apply to some of the legal contentions. The court would have preferred to have produced an opinion more quickly in this matter, but counsel's approach did not do the court or their clients any favors toward that end.

of the non-moving party.  Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004).  "While we view the record in the light most favorable to the non-moving party, that party must still identify sufficient evidence requiring submission to the jury to survive summary judgment."  Piercy, 480 F.3d at 1197.  In other words, the court may consider evidence produced by the moving party as well as the absence of admissible evidence in favor of an essential element of the non-moving party's claim.  Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).  "If the evidence [in support of a claim] is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986)(interior citations omitted).  "[P]urely conclusory allegations of discrimination" which are devoid of "concrete particulars" are not sufficient to avoid summary judgment. Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 119 (2d Cir. 2010)(interior quotations omitted); see also, Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(non-moving party must set forth specific facts admissible in evidence from which a rational jury could find for non-movant).  "Unsubstantiated allegations carry no probative weight . . . evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  Bones, 366 F.3d at 875.

## II.  UNCONTROVERTED FACTS

The following factual statements are considered uncontroverted

for the purposes of this order.  Plaintiff was born in 1948 and began working for defendant in 1971, according to the parties' stipulation in the pretrial order.  Doc. No. 132, p. 2.  Plaintiff was a feeder driver during most of his career with defendant, including the years 1977 through February 2011, when he retired upon reaching 40 years with the company.  From 2001 forward, plaintiff drove trucks out of defendant's James Street facility in Kansas City, Kansas.  Feeder drivers drive tractor-trailer trucks long distances along various routes.  The drivers bid for the routes, also called "jobs," in accordance with a labor contract and defendant's policies.  Seniority was given precedence.  At the end of plaintiff's career, the bids were made annually.  But, a few years earlier the bids were done each April and December.  In 2009 and 2010, plaintiff generally worked Monday through Friday, driving 9 to 11 hours per day.

There were approximately 80 feeder drivers who worked out of the James Street facility.  As of January 2011 only 5 of the drivers were under age 40; 59 drivers were over age 50 and 13 drivers were over age 60.  Doc. No. 140-1, p. 19.  These numbers were roughly the same between the years 2007 and 2011.  Doc. No. 140-2, p. 17.  Plaintiff recalled having four Hispanics in the feeder department at the facility and one of those men did not drive out on the road.  Plaintiff's deposition at pp. 185 & 265.  Plaintiff was among the top ten drivers in terms of seniority from 2008 until his retirement.  Plaintiff was paid an hourly wage, plus a certain dollar amount per

4

mile driven.   Sometimes plaintiff earned overtime as well.

Tractors were assigned to bid jobs, not to drivers, by the "Kansas Feeder Scheduler."  The Feeder Scheduler who assigned the tractors plaintiff drove during most of the time relevant to this case was a man named Gerald Reeves.  Each tractor was identified by number.  Generally, the Feeder Scheduler did not know or consider which driver was performing or would perform each job when he made tractor assignments.  Indeed, tractor assignments were made before drivers made bids on the jobs.  Id. at p. 258.  The drivers saw the tractor numbers assigned to a job when they made a bid for the job.  The tractor assignments, however, could and did change for various reasons after the bidding process was completed and the drivers were assigned to jobs.  Numerous factors, including load, terrain and equipment availability, were relevant to making tractor assignments. The Feeder Scheduler was also responsible for changing job start times and schedules.  Plaintiff testified that he had very little contact with Gerald Reeves when he was the Feeder Scheduler.  Id. at p. 248.

UPS employees are trained and required to immediately report any unsafe condition or equipment to management and to notify their supervisor or manager of any work-related injuries or vehicle accidents, regardless of severity.   When an employee reports a work-related injury or accident, the employee receives follow up safety training.

Drivers are trained to fill out "DVIR" forms to give notice of

issues regarding the performance or safety of the tractor-trailers. Drivers are required to do a pre-trip inspection of their tractors before they drive their routes and to make a post-trip report regarding any safety or non-safety issues.   Mechanics and supervisors determine whether the tractor-trailers are safe to drive and comply with Department of Transportation ("DOT") requirements.   Drivers are required to note any safety issue on the DVIR.   Id. at p. 61.   If safety issues cannot be fixed, then the tractor is "red-tagged" and cannot be taken on the road.   Id. at pp. 61-62, 65.   According to DOT regulations and union directives, drivers did not have to drive unsafe tractors.   Id. at pp. 62, 208.

Plaintiff asserts in his deposition that he was assigned old junky tractors by defendant from 1989 forward (Id. at pp. 124, 451), and that the best tractor he drove was assigned in 2010.   Id. at p. 257.   Plaintiff's major complaint was that the tractors were rough-riding.   Several drivers made similar complaints.   Id. at pp. 187 & 189; see also, Id. at p. 242 (every driver going to Williams, Iowa had old, worn-out tractors); Doc. No. 174-3, p. 73 (all drivers wanted newer, better tractors); Doc. No. 175-4, p. 29 (all the tractors, even new tractors, rode rough); Doc. No. 175-1, p. 72 (everybody has to drive an old tractor at James Street); Doc. No. 175-2, pp. 75-76 (other drivers drove old rough-riding tractors at James Street); Doc. No. 140-5, p. 8 (UPS trucks were rough-riding in general because they used leaf springs). Some of the tractors assigned

to plaintiff's job were driven by other drivers when plaintiff's shift was over.  Id. at 183 & 196; Doc. No. 141-3, p. 7.  Some tractors were driven 24 hours a day.  Id. at p. 67.  Plaintiff had other problems with the tractors he was assigned which included:  broken seats; fumes in the cab; broken shocks; and a broken seat belt system.  These problems were resolved with repairs or some other fix, but not immediately.  Id. at p. 94.  Rough-riding tractors were more of a constant complaint.  Plaintiff often complained about the condition of his tractors and often requested a smoother-riding tractor.

Plaintiff was assigned a new tractor in 2008, but it had a stiff seat.  Id. at p. 195.  He complained, but drove it for quite a while before he got a different tractor.  Id.

Plaintiff testified that from 2006 until he retired, he never knowingly put himself or the public at risk by driving an unsafe tractor or knowingly violate any DOT rules or regulations.  Id. at p. 208.  Plaintiff also testified that he drove a tractor with a broken stop on a seat belt in 2009 or 2010.  He considered this to be a safety issue.  Id. at pp. 92-93 & 524-25.

Plaintiff had permanent physical restrictions, but none which permanently prevented him from doing the essential functions of his job.  He testified and alleged in the final pretrial order that he could and did perform his feeder driver job duties without accommodation.  Id. at p. 224; Doc. No. 132, p. 4.  He never offered defendant a document from a health care provider stating that he could

7

not perform the essential functions of his feeder driver job without a smoother riding tractor.  Id. at p. 219.  Sometime in 2008, plaintiff passed along a note from a doctor requesting a better, smoother seat for plaintiff because bouncing in a truck could cause irritation to his prostate.  Id. at p. 200-01.  Plaintiff had prostate surgery on November 25, 2008.  He was released to work with a temporary 25-pound lifting restriction on December 12, 2008. Plaintiff alleges that he requested and was denied temporary work which was compatible with the lifting restriction.  He was released to regular duty with no lifting restriction on December 29, 2008. After taking his scheduled vacation in January through mid-February 2009, plaintiff returned to work in his bid job in February 2009 with no medical restrictions.  In June 2010, plaintiff took a leave of absence for shoulder surgery.  Plaintiff was released by his doctor to return to regular duty on January 2, 2011 without medical restrictions.  Plaintiff took his previously scheduled vacation weeks in January 2011 and retired February 1, 2011.

During plaintiff's employment, he reported numerous work-related injuries and filed several workers' compensation claims. Plaintiff testified that 1991-1992 was the last year he worked without missing time because of sickness or injury.  Id. at p. 413.  Plaintiff alleges and the court assumes for the purposes of this opinion that plaintiff was verbally warned several times about filing or requesting to file injury reports and that he and other employees who filed injury

reports were closely watched and supervised by defendant.  Plaintiff was told that he would have to take safety tests on a computer because he had filed so many injury reports; it took plaintiff two or three weeks to do the tests.  Id. at pp. 349 & 361.

A substantial number of James Street facility feeder drivers were eligible to retire at any time without providing notice between 2008 and 2011.  Defendant's managerial team in Kansas attempted to anticipate the number and types of vacant positions that might occur in each department.  So, they asked employees from time to time regarding their retirement plans.  Plaintiff alleges and the court assumes for the purposes of this opinion that plaintiff was asked several times when he would retire.

Plaintiff bid a job in 2009.  When he bid the job, the start time was listed as 6:30 a.m.  Plaintiff was assigned the job in May 2009, but on May 18, 2009, the start time was changed to 5:45 a.m.  Doc. No. 174-2, p. 107.  Plaintiff complained about the change, but management did not return the start time to 6:30 a.m.

On April 3, 2009, plaintiff filed an administrative complaint with the EEOC alleging discrimination.  He alleged constructive discharge in the administrative complaint, although he did not retire from his job until he reached 40 years of service in 2011.  Plaintiff filed this case in this court on April 5, 2010.

During the course of this order the court may refer to other facts which the court considers uncontroverted for the purposes of this

opinion.

III.   SUMMARY JUDGMENT IS WARRANTED AGAINST PLAINTIFF'S CLAIMS.

This order will proceed with a discussion of plaintiff's claims under the federal statutes alleged in the complaint and plaintiff's claim of workers' compensation retaliation.   The court will assume that the rules and standards applicable to the federal statutory claims are generally applicable to plaintiff's state law claims under the KAAD and the KADEA.   See Best v. State Farm Mut. Auto. Ins. Co., 953 F.2d 1477, 1479 (10th Cir. 1991); Goico v. Boeing Co., 347 F.Supp.2d 955, 979 n.4 (D.Kan. 2004); Munoz v. Western Resources, Inc., 225 F.Supp.2d 1265, 1269 (D.Kan. 2002);   Williams v. Prison Health Services, Inc., 159 F.Supp.2d 1301, 1312 & 1313-14 (D.Kan. 2001).

A.   Plaintiff's constructive discharge claim must be dismissed for procedural and substantive reasons.

1.   Plaintiff did not properly exhaust his administrative remedies as to his constructive discharge claim.

Plaintiff alleges that he was forced to retire or constructively discharged in February 2011.   Defendant contends that plaintiff's constructive discharge claim must be dismissed because plaintiff failed to file an administrative charge which properly alleged constructive discharge.   This case presents a somewhat odd situation. Plaintiff asserts that he repeatedly pleaded constructive discharge within an administrative charge and his court complaint (see Doc. No. 173, p. 56), even though he did not leave employment for several months or more than a year after those documents were filed.

An essential element of a constructive discharge is that the alleged victim quit his employment.  Regan v. Faurecia Automotive Seating, Inc., 679 F.3d 475, 481 (6th Cir. 2012); Tatum v. Arkansas Department of Health, 411 F.3d 955, 960 (8th Cir. 2005); Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999). Plaintiff had not quit his employment when he says he alleged a constructive discharge.  So, plaintiff could not have properly alleged constructive discharge in his administrative claim or the complaint in this case.  See Herron v. Daimler Chrysler Corp., 388 F.3d 293, 303 n.2 (7th Cir. 2004)(four-month delay between filing EEOC complaint and decision to leave employment is inconsistent with notice of constructive discharge); Powell v. Safer Foundation, 2010 WL 4481780 *3 (N.D.Ill. 11/1/10)(impossible for EEOC charges to have mentioned constructive discharge when they were filed prior to plaintiff's resignation, so plaintiff barred from claiming constructive discharge).

Plaintiff asserts that the constructive discharge claim is properly considered because it is related to plaintiff's hostile work environment claim which (it is undisputed) was raised in plaintiff's administrative claim.  Cases from the Tenth Circuit disagree with this position.  In Chapman v. Carmike Cinemas, 307 Fed.Appx. 164, 174 (10th Cir. 1/12/09), the court held that a constructive discharge claim involved a discrete and identifiable act (the forced discharge) which was a separate actionable unlawful practice and which required an

11

administrative charge.   A similar result is found in <u>Paige v. Donovan</u>, 2011 WL 5520298 *2-3 (D.Colo. 11/14/11).   In <u>Paige</u>, the plaintiff filed two administrative charges before she retired from her employment.   The court held that the charges did not satisfy the administrative exhaustion requirement for the plaintiff's constructive discharge claim even though it appeared from an investigative report that plaintiff had said that she was being forced to retire.   See also, <u>Butler v. Potter</u>, 345 F.Supp.2d 844, 852-53 (E.D.Tenn. 2004).

Administrative exhaustion is required for claims brought under Title VII, ADEA and ADA.   <u>Apsley v. Boeing Co.</u>, 691 F.3d 1184, 1210 (10th Cir. 2012)(Title VII and ADA); <u>Shikles v. Sprint/United Management Co.</u>, 426 F.3d 1304, 1317 (10th Cir. 2005)(ADEA).   It is also a requirement under the KAAD.   <u>Parsells v. Manhattan Radiology Group</u>, 255 F.Supp.2d 1217, 1226-7 (D.Kan. 2003); <u>Sandlin v. Roche Laboratories, Inc.</u>, 991 P.2d 883, 888 (Kan. 1999).   Since "administrative remedies generally must be exhausted as to each discrete instance of discrimination or retaliation" (<u>Apsley</u>, 691 F.3d at 1210)), and plaintiff has not exhausted his administrative remedies as to his constructive discharge claim, defendant is entitled to have that claim dismissed.

    2.   <u>The fact record does not support a viable constructive discharge claim</u>.

Defendant also argues that plaintiff cannot establish that he

was constructively discharged.  "A constructive discharge occurs
when a reasonable person in the employee's position would view [his]
working conditions as intolerable and would feel that [he] had no other
choice but to quit."  Tran v. Trustees of State Colleges, 355 F.3d
1263, 1270 (10th Cir. 2004); Williams, 159 F.Supp.2d at 1314 (applying
same standard to KAAD constructive discharge claim).

According to defendant, plaintiff claims that he was "repeatedly
harassed" because:  1) in 2006 he was criticized for being in the "Top
50" of all employees with respect to the number of injuries he suffered
in the course of his UPS employment; 2) he was forced to take safety
quizzes via a computer for approximately two weeks; 3) he was told
that management would be observing him for compliance with safety
policies and warned of consequences for failing to do so; 4) after
suffering an injury his supervisor required plaintiff to undergo
additional training; 5) he was continuously assigned "rough-riding"
tractors which required various repairs; and 6) UPS made changes to
his bid job including changing the start time on his bid job from 6:30
a.m. to 5:45 a.m.  Doc. No. 138, pp. 31-32.

Plaintiff's response to defendant's summary judgment motion
describes the alleged harassment and hostile work environment leading
to a constructive discharge as follows:

> Here, the continuous, repeated, and ongoing actions taken
> against Sifuentes, including, continually and repeatedly
> refusing to provide him with a properly maintained vehicle,
> assigning him dangerous vehicles, demanding to know when
> he is going to retire and why he won't retire, and chastising

13

and threatening him about his injuries and injury reports
and workers' compensation claims . . .

Doc. No. 173, p. 52.  Plaintiff also alleges that he made requests

for accommodation of his alleged physical disability which were

"repeatedly ignored" and therefore he was "subjected to working

conditions exacerbating his impairments [and] placed in a truly

untenable situation."  Doc. No. 173, p. 54.

The court does not believe that the record supports a material

issue of fact as to a constructive discharge claim.  A reasonable jury

examining the record before the court could not conclude that

defendant "continually and repeatedly refused" to provide defendant

with a properly maintained vehicle or assigned plaintiff a dangerous

vehicle, unless one considered a rough-riding tractor to be improperly

maintained or dangerous.  There is evidence in the record that for

about two decades plaintiff and other drivers working for UPS in their

Kansas City area facilities drove rough-riding tractors.  Plaintiff

and other drivers complained about rough-riding tractors, but there

is no indication that such tractors were typically considered a safety

issue or that safety problems were continually or repeatedly ignored

so that the safety of drivers and the public was threatened.[2]  There

is no testimony that rough-riding tractors were characterized as

safety problems on the DVIR forms completed by drivers or that such

---

[2]The record includes a report by an employee other than defendant who was concerned
that he might jam his head against the ceiling of a tractor because of a rough ride
and a low ceiling.  This appears to be an isolated case of a direct safety threat
from a rough-riding tractor.

tractors were in violation of DOT regulations.   There were instances when repairs had to be made to seats or shocks, but the repairs were eventually made or plaintiff switched to a different tractor.   There was also an instance when plaintiff requested a repair to a seat belt which did not provide enough leeway when there were bumps in the road. This situation was not remedied immediately; it took a number of days. But it was not a long-term issue.

The record before the court also does not support a finding that plaintiff was continuously and repeatedly badgered about retiring, or chastised continuously concerning his injury record and workers' compensation claims.   A reasonable fact finder could determine that plaintiff was questioned about his retirement plans several times over the course of many months or years.   Plaintiff testified in this deposition at page 329 that he was asked about retirement by two supervisors at least twice a year every year from 2006 to 2010.   A reasonable fact finder could also determine that plaintiff was chastised at least once and warned multiple times regarding his injury record.   The warnings were that plaintiff would be watched more closely or would have to do additional training or safety education. But, this did not happen "continuously."   Nor did it occur with a frequency or intensity that would make work intolerable for a reasonable person.   There is little or no evidence that harsh language was used toward defendant.   Plaintiff stated in his deposition that he did not recall "mean" comments about his age.   Plaintiff's

deposition, p. 341.  Once, however, plaintiff was asked why he didn't just quit or retire, after he inquired about making an injury report. This isolated comment was not made by plaintiff's normal supervisor. It, in addition to more tactful and possibly legitimate inquiries about his retirement plans, were insufficient to make working conditions intolerable. Furthermore, as the record makes clear, plaintiff spent the vast majority of his time driving and doing other activities away from contact with and supervision by defendant's personnel.

Plaintiff and numerous other drivers at the James Street facility had long driving careers with defendant, in spite of "rough-riding" tractors, occasional questions about retirement plans and defendant's safety quizzes or other measures to encourage safety and discourage injuries.[3]  The court does not believe any reasonable jury would consider plaintiff's conditions of employment to be intolerable.  We note in this regard that plaintiff testified that he had his best tractor in twenty years in 2010, shortly before he stopped actively working for defendant.  He said the tractor ran well and rode fairly nice.  Id. at p. 257.

Plaintiff cites various cases for the proposition that a constructive discharge claim may be grounded upon an employer's

---

[3] The court acknowledges plaintiff's contention that defendant's safety quizzes and other actions were intended to discourage injury reports and workers' compensation claims, not to encourage safety.  The court does not believe the motive behind defendant's actions is critical to determining whether a reasonable person would consider plaintiff's working conditions intolerable.

refusal to accommodate an employee's physical disability or an employer's withdrawal of accommodations which had previously been granted.  Doc. No. 173, pp. 54-55 (citing Talley v. Family Dollar Stores, 542 F.3d 1099 (6th Cir. 2008) and other cases).  The plaintiffs in the cases cited by plaintiff could not perform their jobs without an accommodation.  Therefore, the failure to make an accommodation could logically be viewed as a constructive discharge.  In contrast, plaintiff in this case expressly states that he could perform his job and did in fact perform his job without an accommodation.  Thus, plaintiff was not constructively discharged because of a refusal to grant an accommodation that was required for him to perform his job.

For the same reason, plaintiff's requests for a smoother-riding tractor were not requests for a "reasonable accommodation" as that term is defined by federal regulations.  A "reasonable accommodation" is defined as:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o).  Providing a smoother-riding tractor for plaintiff does not fall into any one of these definitions.  See

17

also <u>Kocsis v. Multi-Care Management, Inc.</u>, 97 F.3d 876, 883 n.

11 (6th Cir. 1996)(no duty to accommodate where employee did not

need accommodation in order to perform her job); <u>Insalaco v. Anne</u>

<u>Arundel Co. Pub. Schs.</u>, 2012 WL 253405 *3 (D.Md. 2012)(same).

The court concludes that the failure of provide plaintiff with

a smoother-riding tractor did not make plaintiff's working conditions

intolerable and that a reasonable jury could not find that plaintiff

was constructively discharged.

B.  <u>Most of plaintiff's claims cannot be considered to be legally</u>
<u>cognizable adverse employment actions</u>.

Among other arguments, defendant contends that it is entitled

to summary judgment because no adverse employment action was taken

against plaintiff.

1.  <u>The meaning of "adverse employment action" and</u>
<u>"materially adverse" action as required for plaintiff's</u>
<u>claims</u>.

An adverse job action is an element of a claim for age, race or

disability discrimination.  See <u>EEOC v. C.R. England, Inc.</u>, 644 F.3d

1028, 1038 (10th Cir. 2011 (10th Cir. 2011)(ADA claim); <u>Piercy</u>, 480 F.3d

at 1203 (Title VII claim); <u>Sanchez v. Denver Public Schools</u>, 164 F.3d

527, 531 (10th Cir. 1998)(ADEA and Title VII claims).  An adverse

action is also an element of a claim of retaliation for asserting age,

race or disability discrimination.  See <u>Proctor v. United Parcel</u>

<u>Service</u>, 502 F.3d 1200, 1208 (10th Cir. 2007)(retaliation for filing

EEOC disability claim); <u>Hinds v. Sprint/United Management Co.</u>, 523

F.3d 1187, 1202 (10th Cir. 2008)(ADEA retaliation claim); Piercy, 480
F.3d at 1198 (retaliation for filing EEOC complaint).

The Supreme Court has stated that an adverse employment action
includes conduct constituting "a significant change in employment
status, such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing a
significant change in benefits." Burlington Indus., Inc. v. Ellerth,
524 U.S. 742, 761 (1998).  In the context of a retaliation claim, the
Supreme Court has stated that an individual is not protected from "all
retaliation," but is protected from retaliation that produces "an
injury or harm" which reaches a level of seriousness such that it "well
might have dissuaded a reasonable worker from making or supporting
a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v.
White, 548 U.S. 53, 67-68 (2006) (interior quotation omitted).  This
is considered a "materially adverse" action, which is a more lenient
standard than an "adverse employment action." Piercy, 480 F.3d at
1203 n. 12.

In C.R. England, 644 F.3d at 1040, the Tenth Circuit provided
further guidance as to the meaning of "adverse employment action."
The court noted that a liberal definition has been applied taking "'a
case-by-case approach, examining the unique factors relevant to the
situation at hand.'" Id. (quoting, Hillig v. Rumsfeld, 381 F.3d 1028,
1031 (10th Cir. 2004)).  While the Tenth Circuit acknowledged the
previously quoted statement from the Supreme Court in Ellerth, the

court stated that actions which cause harm to future employment prospects, like a negative job reference, can also be considered an adverse employment action.  Id.  The court cautioned that more than "de minimus harm" or a "de minimus impact" upon an employee's job opportunities or job status must be shown and that "mere inconvenience or an alteration of job responsibilities" will not qualify as an adverse employment action.  Id.

In Semsroth v. City of Wichita, 555 F.3d 1182, 1184-85 (10th Cir. 2009), the Tenth Circuit emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise which requires an objective inquiry that does not turn on a plaintiff's personal feelings.  In making a decision, the court is obliged to consider the "'constellation of surrounding circumstances, expectations and relationships.'" Barone v. United Airlines, Inc., 355 Fed.Appx. 169, 183 (10th Cir. 2009)(quoting White, 548 U.S. at 69 (interior quotation omitted)).

It should be noted that most cases with the issue of whether there has been an adverse employment action or a materially adverse action, including Ellerth and White, involve decisions which make or refuse changes in schedules or duties or job status, as opposed to the continuation of long-standing practices in the assignment of vehicles or equipment.

2.    A reasonable jury would not find that most of
plaintiff's claims satisfy the criteria of an adverse
employment action.

Plaintiff appears to describe defendant's adverse employment

actions as follows:

> [Plaintiff] continually was forced to drive dangerous,
> unsafe, and improperly maintained tractors; he was
> subjected to unfavorable schedule changes; UPS failed to
> accommodate him or even respond to his accommodation
> requests; he was repeatedly and abusively subjected to
> hostile criticism for exercising his rights; he was forced
> to take part in illusory safety training; UPS ignored and
> failed to respond to his reports or complaints regarding
> his discrimination, harassment, and retaliation; and UPS
> never addressed or remedied the multiple and continuous
> adverse actions he reported and was subjected to.

Doc. No. 173, p. 64.

From this description and a review of the record, the vast

majority of plaintiff's claims do not fall within the categories of

actions which are exemplary of adverse employment actions.

Plaintiff's claims largely do not involve pay, benefits, tenure at

the company, job responsibilities or future job prospects which were

diminished or altered to plaintiff's disadvantage by a discriminatory

act.  Specifically, the court finds that plaintiff's claims regarding

criticism, illusory safety training, ignoring reports and complaints

and failing to respond to alleged adverse actions, are not themselves

adverse employment actions.  The court also rejects plaintiff's claim

that defendant's "failure to accommodate" plaintiff was an adverse

employment action because, as explained earlier in this opinion,

plaintiff did not make a valid request for a "reasonable

accommodation."

As to plaintiff's assertion that he was "continually . . . forced" to drive "dangerous, unsafe and improperly maintained tractors," it is difficult or impossible for the court to examine "unique factors relevant to the situation at hand" or the "constellation of surrounding circumstances, expectations and relationships" when the alleged acts of discrimination or retaliation are so inexactly described.   From the court's review of plaintiff's deposition, plaintiff suffered physical harm from exposure to diesel fumes in 1992, 2002 and 2004 (p. 89), but this is beyond the statute of limitations; he had a slow tractor for a unknown period of time in 2006 (p. 184); also in November 2006 he had a tractor seat with bad shocks, but this was fixed (pp. 104-07); a new tractor was assigned to him in 2006, but it was reassigned (p. 181); in 2007 or 2008, he had a seat with a broken valve, but it was fixed after a few days (p. 92); in October 2008, plaintiff submitted a note from his doctor requesting a better, smoother seat for plaintiff due to a prostate problem (p. 200); toward the end of 2008 he had a new tractor with a bad seat and he switched to a different tractor (pp. 176-77); and in 2009 plaintiff's tractor had a seat belt system which lacked a working clip to adjust to a bumpy ride – the seat belt system was fixed after two or three weeks (p. 93).

We note that other courts have refused to categorize a failure to provide better equipment or vehicles, or the assignment of less

desirable equipment or vehicles, as an adverse job action when such action did not preclude job performance and did not cause unreasonably dangerous conditions.  See Markel v. Board of Regents, 276 F.3d 906, 911 (7th Cir. 2002); Dauer v. Verizon Communications, Inc., 613 F.Supp.2d 446, 456-57 & 473 (S.D.N.Y. 2009) rev'd on other grds, 618 F.3d 112 (2d Cir. 2010); King v. City of New Kensington, 2008 WL 4492503 *11 (W.D.Pa. 9/30/2008)(assignment of worst police vehicles could be an adverse job action if it limits ability to perform job); Gonzalez v. Florida Dept. of Highway Safety, 237 F.Supp.2d 1338, 1354 (S.D.Fla. 2002)(denial of new patrol car is not an adverse job action).

     As to most of plaintiff's claims, we conclude that a reasonable jury could not find that the condition of tractors assigned to plaintiff precluded plaintiff's job performance or was so dangerous as to have constituted an adverse employment action.  For the most part, plaintiff has not supplied specific facts which would demonstrate issues with job performance or dangerous conditions. Plaintiff does not identify tractor numbers; plaintiff does not identify specific dates; plaintiff does not describe how the performance of the tractors (with regard to smoothness of ride) compared with the normal ride of tractors; and plaintiff does not describe how serious the problems or dangers were for specific tractors assigned to him as compared with most tractors.  Nor does plaintiff appear to have the personal knowledge to compare his tractor assignments with the tractor assignments of a significant number of

23

other drivers.   In the main, he relies upon a general and unspecified complaint that he, more than most drivers, received old, junky tractors over the last twenty years of his employment.   This is insufficient to establish an adverse employment action for a discrimination claim.

The tractor with the seat belt issue seems somewhat different from the more general complaint about rough-riding tractors.   This was a tractor with a specific mechanical problem involving a clip on the seat belt.   There is no claim that the Feeder Scheduler or some other employee assigned the tractor to plaintiff's job with knowledge of the seat belt problem.   Rather, the claim appears to be that when plaintiff brought attention to the problem, it was not resolved promptly.   It took two or three weeks.   While plaintiff does not assert that he ever refused to drive the tractor, he does state that he was forced to drive it and that it was a bad experience which caused pancreatitis.   Upon such circumstances, the court believes that a reasonable jury could consider this an adverse employment action.

As for plaintiff's "schedule changes," plaintiff asserts in his deposition that every job he had since 2005 was altered after he bid it in one of the following ways:   a change of tractor; change of start time; taking double trailers away; or taking hookup time away.   Plaintiff's deposition at pp. 267-68.   When this happened or how often it happened is not exactly clear.   Plaintiff said he started to pull at lot of single trailers the last couple of years of his employment.

24

Id. at p. 51.  But, he also said it started happening between 2006 and 2008.  Id. at p. 357.  The start time change appears to refer to a change from 6:30 a.m. to 5:45 a.m. for a job he bid in 2009. Plaintiff also makes a general claim that at some unspecified date he was given half-full or empty trailers to pull under dangerous conditions.  Id. at 357.

Of all of these matters, the only claims which might concern pay or benefits relate to the assignment of single trailers and loss of hookup time.  The claim regarding pulling empty or half-empty trailers does not relate to the old or shabby condition of the equipment, or to pay or benefits.

Plaintiff does not claim he received any formal disciplinary sanction which had an impact upon his pay, benefits or chances for promotion.  Rather, the bulk of plaintiff's argumentation relates to defendant's assignment of less desirable equipment to his job.

In summary, after attempting a thorough review of plaintiff's claims and of the record, the court concludes that a reasonable jury could not find that plaintiff has alleged or could prove an adverse employment action except as to his claim that defendant deprived him of the opportunity to make money from pulling double trailers and doing hookup duties and from the assignment of a truck with a broken seat belt system.

3.  A reasonable jury would not find that plaintiff could prove a materially adverse action as to most of plaintiff's claims.

Similarly, the court further holds that, as to most of plaintiff's claims, a reasonable jury could not find on this record that the more lenient standard of "materially adverse" action is satisfied.  Again, the court is working from the general description of plaintiff's claims as taken from plaintiff's response to the summary judgment motion and from the court's review of the record.

a.  Failure to respond to complaints

Plaintiff asserts rather generally that defendant ignored and failed to respond to his reports and complaints without describing whether the reports and complaints were formal or informal or setting out the details of the complaints.  It seems to the court that a failure to respond to an informal complaint or request would not dissuade an employee from making a formal claim of discrimination. After examining other cases as well as the evidentiary record, the court finds that plaintiff has failed to set forth a concrete allegation of an action or non-action which would dissuade a reasonable employee from making a serious complaint about discrimination.  See Keller v. Crown Cork & Seal USA, Inc., 2012 WL 3196002 *5-6 (10th Cir. 8/8/2012)(failure to respond to hostile work environment complaints in addition to other allegedly hostile conduct not sufficient to establish hostile work environment in retaliation for opposition to discrimination or constructive discharge);

Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1309 & 1318 (10th Cir. 2006)(supervisor's failure to get back to plaintiff after committing to look for a desirable transfer opportunity is not actionable conduct); Johnson v. Weld Cnty, 594 F.3d 1202, 1216 (10th Cir. 2010)(supervisors giving employee the "cold shoulder," not answering questions, and avoiding the employee not sufficient to support retaliation claim); Daniels v. UPS, Inc., 797 F.Supp.2d 1163, 1195-96 (D.Kan. 2011)(failure to investigate discrimination complaint or to follow up with employee regarding discrimination complaint is not a materially adverse action).

### b. Illusory safety training

Plaintiff asserts that he was forced to take part in "illusory safety training." This action apparently occurred because plaintiff made an injury report and/or had a record of several work-related injuries. It occurred prior to plaintiff filing a charge of discrimination in 2009. Plaintiff was paid for the time he spent in safety training. The training lasted a number of weeks, but it was not a permanent requirement. Other employees went through the same training. Given these circumstances, the court does not believe the safety training constituted a "materially adverse" action which would dissuade a person in plaintiff's position from making a discrimination complaint. See Keller, 2012 WL 3196002 at * 5-6 (strict application of policies, increased supervision, write-ups, and angry or critical means and methods of communication with supervisors do not rise to

materially adverse actions); <u>Daniels</u>, 797 F.Supp.2d at 1194 (close supervision of employee's time sheets and verbal warnings are not materially adverse actions).

### c.   <u>Hostile criticism</u>

Plaintiff asserts that he was repeatedly and abusively subjected to hostile criticism for exercising his rights.  The record does not support this characterization.  There is no evidence of harsh, vulgar or profane language.  Plaintiff was on the road by himself when he was at work.  He did not have frequent or continuous contact with other employees or supervisors during work days.  There is no record of frequent or hostile criticism or discipline which would dissuade a reasonable employee from filing a complaint of discrimination or exercising his rights under the law.  Moreover, extremely angry comments by a supervisor have not been considered sufficient to constitute a materially adverse action.  <u>Keller</u>, 2012 WL 3196002 *1-2 & *5-6 (loud and heated remarks and instruction to "stop complaining"); <u>Mickelson</u>, 460 F.3d at 1309 & 1318 (demeaning e-mail, angry comments); <u>Haney v. Preston</u>, 2010 WL 5392670 *11-12 (D.Kan. 12/22/2010)(harsh comments); <u>Turrentine v. United Parcel Service, Inc.</u>, 645 F.Supp.2d 976, 991 (D.Kan. 2009)(citing various cases to support holding that hostile, intimidating meeting was not a materially adverse action).

### d.   <u>Failure to accommodate – bad tractors</u>

Plaintiff asserts that defendant failed to accommodate him or

respond to his accommodation requests and that defendant forced him to drive dangerous, unsafe and improperly maintained tractors. These claims are connected to a large extent since plaintiff describes his accommodation requests as asking for a better tractor. The court does not believe a reasonable jury would consider this conduct to be a materially adverse action which would dissuade a person in plaintiff's position from filing a discrimination complaint for the following reasons. According to plaintiff, he had been assigned "junk" tractors to drive for defendant for at least twenty years. Other drivers often drove the very same tractors after plaintiff finished his shift. Many drivers complained about the rough-riding tractors defendant assigned them. Assuming arguendo that there was a retaliatory motive which may have influenced a tractor assignment, the court does not believe a reasonable jury could conclude that the assignment was a materially adverse action because there is no specific proof as to which tractor assignment was retaliatory, or how rough the ride was from a specific tractor as compared to the "average" tractor, or how the rough ride may have caused plaintiff harm, or how great that harm was over how long a period of time. From the perspective of someone in plaintiff's position, the assignment of a rough-riding tractor was a normal occurrence for most or all drivers, not an adverse change. Some tractors were worse than others. Nevertheless, plaintiff and the other drivers performed their jobs well and safely over the course of long careers. Also, there is no

claim that the tractors violated safety standards because of their rough rides.   Under these conditions, the court concludes that plaintiff has not provided sufficient specific facts supporting a claim of a materially adverse action relating to the assignment of rough-riding tractors.

As for other mechanical problems with the tractors assigned to plaintiff, most of those issues, or at least the ones which arose during the last seven years of plaintiff's employment, were addressed by mechanics in the normal course of practice for the facility where defendant worked.   The only matter which the court believes a reasonable jury could consider sufficient to constitute a material adverse action is the delay in repairing the faulty seat belt system.

e.   Failure to accommodate temporary work restriction

Plaintiff has also asserted that defendant retaliated against plaintiff and violated the ADA by failing to grant plaintiff's alleged request for work compatible with a lifting restriction near the end of 2008 (prior to filing his administrative complaint) as plaintiff was recuperating from prostate surgery.   Defendant had no obligation under the ADA to grant an "accommodation" under these circumstances because plaintiff was not making that request on the basis of a permanent disability.   See Aldrich v. Boeing Co., 146 F.3d 1265, 1269-70 (10th Cir. 1998) cert. denied, 526 U.S. 1144 (1999); Rebarchek v. Farmers Co-op. Elevator and Mercantile Ass'n, 60 F.Supp.2d 1145, 1151-52 (D.Kan. 1999).   Thus, this action by defendant should not be

considered a failure to grant an accommodation.  Moreover, plaintiff does not attempt to describe the adverse consequences of defendant's alleged decision to withhold work compatible with a lifting restriction.  So, the court cannot conclude that this could possibly constitute a materially adverse employment action.

### f.  Schedule changes

Finally, the court does not believe changing the start time for plaintiff's job from 6:30 a.m. to 5:45 a.m. constitutes a materially adverse action which would dissuade an employee from making a discrimination complaint.  Plaintiff disliked the time change in part because it required him to wait longer at his destination to meet another truck and because he thought the change was unnecessary.  The court assumes that most people would be dissatisfied with the change and the court expects most people would prefer to start a job 45 minutes later in the morning.  Nevertheless, the court does not believe this shift in time is so significant or so disadvantageous to a person in plaintiff's position as to deter that person from complaining about discrimination.  See McGowan v. City of Eufala, 472 F.3d 736, 742-43 (10th Cir. 2006)(denial of a requested change from night shift to day shift is not a materially adverse action where there was no difference in pay, benefits or workload); see also, Jones v. Wichita State University, 528 F.Supp.2d 1222, 1242-43 (D.Kan. 2007)(change of shifts not materially adverse).  We also note that plaintiff could have bid for a different job with a different start time within a year.

Given his seniority, plaintiff probably could have secured a different job.  In other words, plaintiff would not be stuck with the 5:45 a.m. start time for the rest of his career with defendant.

Of the various schedule changes alleged by plaintiff, only the ones involving the assignment of double trailers and the loss of hookup time could be viewed by a reasonable jury as a materially adverse action.  The court does not believe the assignment of empty or half-empty trailers should be considered a materially adverse action, given the absence of facts in the record with regard to time, place, frequency and the extent of the danger as compared to the normal responsibilities of a feeder driver.

> 4.  The same standards for a materially adverse action apply to plaintiff's ADA interference claim.

Plaintiff argues that he is also bringing a claim for interference with the exercise of his ADA rights under 42 U.S.C. § 12203(b).[4]  The Tenth Circuit, however, has interpreted the test for claims under this section to be the same as the test for claims for retaliation against the exercise of ADA rights under 42 U.S.C. §

---

[4] The ADA provisions prohibiting retaliation and interference are contained in 42 U.S.C. § 12203 which reads in part as follows:

> (a) Retaliation
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> (b) Interference, coercion, or intimidation
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

12203(a).   See <u>Selenke v. Medical Imaging of Colorado</u>, 248 F.3d, 1249, 1264 (10th Cir. 2001); see also, <u>Anderson v. United Parcel Service, Inc.</u>, 2011 WL 4048795 *13 (D.Kan. 9/13/2011); <u>Coleman v. Blue Cross Blue Shield</u>, 487 F.Supp.2d 1225, 1252 (D.Kan. 2007); <u>Conrad v. Board of Johnson County Commissioners</u>, 237 F.Supp.2d 1204, 1243 (D.Kan. 2002); <u>Powers v. Tweco Products, Inc.</u>, 206 F.Supp.2d 1097, 1114 (D.Kan. 2002).   Therefore, as regards defendant's contention that plaintiff has not alleged an adverse employment action, the court's ruling shall be the same towards plaintiff's interference claim as it is for plaintiff's retaliation claim.   Even if "interference" was construed with a more liberal standard than retaliation, as advocated in <u>Brown v. City of Tucson</u>, 336 F.3d 1181, 1188-93 (9th Cir. 2003), the court would not alter our ruling on this record.

> 5.  <u>Plaintiff's allegations do not satisfy the standards for an adverse action which would permit a recovery for workers' compensation retaliation</u>.

An "adverse job action" for purposes of a workers' compensation retaliation claim in Kansas appears limited to discharges, demotions and suspensions.   See <u>Brigham v. Dillon Cos., Inc.</u>, 935 P.2d 1054, 1056, 1059-60 (Kan. 1997)(extending retaliation claims to cover demotions in addition to discharges); <u>Velazquez v. Tyson Fresh Meats, Inc.</u>, 2007 WL 2994068 *10 (D.Kan. 10/12/2007)(recognizing that Kansas courts have extended such claims to demotions, but limiting claims to discharges and demotions); <u>Mondaine v. American Drug Stores, Inc.</u>, 2006 WL 626045 (D.Kan. 1/26/2006)(extending the <u>Brigham</u> holding to

include suspensions); <u>Patton v. AFG Industries, Inc.</u>, 92 F.Supp.2d 1200, 1207 (D.Kan. 2000) (extending <u>Brigham</u> holding to suspensions without pay).  Plaintiff has not alleged this kind of adverse job action.  Therefore, summary judgment is warranted against plaintiff's claim of workers' compensation retaliation.

    C.  <u>Plaintiff's ADA harassment/hostile work environment claim lacks adequate factual support</u>.

Plaintiff fails to set forth evidence from which a reasonable jury could find that plaintiff was a victim of illegal harassment or a hostile work environment.  Assuming that such a claim can be made under the ADA, the court would have to consider all the circumstances including:  "(1) the frequency of the discriminatory misconduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening and humiliating or merely an offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's work performance."  <u>MacKenzie v. City & County of Denver</u>, 414 F.3d 1266, 1280 (10th Cir. 2005).  To be successful, a plaintiff must show that his work environment, viewed objectively and subjectively, was "'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment. . .'"  <u>Id.</u> (quoting, <u>Penry v. Fed. Home Loan of Topeka</u>, 155 F.3d 1257, 1261 (10th Cir. 1998)).  A few isolated or sporadic comments are insufficient to establish a hostile work environment; instead there must be a steady barrage of offensive

remarks.  <u>Chavez v. New Mexico</u>, 397 F.3d 826, 832 (10th Cir. 2005).

The record in this case would not support a reasonable finding that plaintiff was subjected to a hostile work environment.  The record is devoid of evidence that plaintiff's work environment was permeated with discriminatory intimidation, ridicule and insult.  Plaintiff was on the road in his tractor most of the day.  The only conduct which was frequent and allegedly severe was the assignment of rough-riding tractors.  The court concluded earlier that this conduct as a matter of law under these circumstances did not constitute a materially adverse action.  For the same reasons, it does not meet the higher standard of proof for a hostile work environment.

To the degree that plaintiff is claiming that there was an ongoing retaliatory pattern of harassment, again the court believes there is insufficient specific proof which would allow any rational jury to conclude that the continuing assignment of rough-riding tractors, the occasional mechanical issues, and the other matters discussed in section IIIB of this opinion, together were sufficient to constitute a materially adverse pattern of conduct after considering all of the circumstances objectively from the perspective of a reasonable person in plaintiff's position.  Plaintiff had his best riding tractor in 2010.  Apparently, the most serious safety issue after 2005 involved a broken seat belt system which eventually was fixed, as were other mechanical issues.  Plaintiff had a new tractor, but an uncomfortably stiff seat for a period in 2008 before he was able to switch to a

different tractor.  In other words, any pattern was not pervasive, persistent and severe.  The tractor issues and strict supervision or warnings plaintiff endured over the course of many years do not amount to a materially adverse pattern of activity which would dissuade a person in plaintiff's position from filing a complaint.  For these reasons and others discussed earlier in this opinion, summary judgment is warranted against a claim of a hostile work environment or retaliatory harassment based upon a pattern of conduct.

D.   Plaintiff cannot demonstrate that the arguable adverse employment actions were illegally motivated.

As explained earlier, the court finds that there is a material issue of fact as to whether the alleged delay in fixing the seat belt system and the alleged scheduling issues regarding double trailers and hookup time qualify as adverse employment actions or materially adverse actions.  Given the absence of direct evidence of discrimination or retaliation as to these alleged actions, a burden-shifting framework of analysis should be applied to determine whether there is a material issue of fact that illegal discrimination or retaliation caused these alleged actions to occur.  See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1195 (10th Cir. 2008). Plaintiff bears a burden of production to establish a prima facie case of discrimination and retaliation.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)(Title VII); Carter v. Pathfinder Energy Services, Inc., 662 F.3d 1134, 1141 (10th Cir. 2011)(ADA); Sanders v.

S.W. Bell Tele., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008)(ADEA);
Hinds, 523 F.3d at 1201-02 (retaliation).  One of the elements of a
prima facie case of discrimination is that the challenged action
occurred under circumstances giving rise to an inference of
discrimination.  EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir.
2007).  One of the elements of a prima facie case of retaliation is
that there is a causal connection between the protected activity and
the materially adverse action.  Hinds, 523 F.3d at 1201-02.
Plaintiff fails to provide colorable evidence for these elements.

### 1.  Delay in fixing seat belt system

Regarding the failure to fix the seat belt over a period of two
or three weeks, plaintiff points to no plausible evidence suggesting
that this occurred because of plaintiff's age, race or physical
disability.  Plaintiff's primary evidence of age bias appears to be
inquiries regarding whether plaintiff would retire.  One of the
inquiries was crudely stated and may have provided some evidence of
bias.  But, the person who made that statement is not alleged to have
had anything to do with the seat belt problem.  Thus, plaintiff has
failed to demonstrate a nexus exists between that statement and the
delay in fixing the seat belt system as required to produce an
inference of discrimination.  Cone v. Longmont United Hosp. Ass'n,
14 F.3d 526, 531 (10th Cir. 1994).  The other inquiries regarding
retirement are innocuous and do not make out a claim of intentional
age discrimination.  Carter v. Newman Memorial County Hosp., 49

Fed.Appx. 243, 245-46 (10th Cir. 2002)(involving several conversations about retirement and general questions); <u>Cone</u>, 14 F.3d at 531 (isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions); <u>Robertson v. Waddell & Reed, Inc.</u>, 2008 WL 2549034 *5 (D.Kan. 6/23/2008)(limited retirement inquiries not probative).

The situation is the same as to bias on the basis of plaintiff's race or ethnic background.  There is no specific evidence to suggest that employees involved in fixing or delaying the fix to the seat belt issue were motivated by defendant's race or ethnic background. Plaintiff's main evidence for this contention is his general observation that he did not see what happened to him at work happen to other employees with the same frequency.  Other drivers received rough-riding tractors or had to pull singles instead of doubles, but plaintiff testified that he did not believe it happened as much to others as it happened to him.  Given the nature of his work as a long-distance trucker driving alone in his truck during the great majority of his working hours, plaintiff does not offer a foundation providing any confidence in the accuracy of this observation.  It is mere speculation.  It provides no grounds for a claim that the seat belt problem persisted unnecessarily because of defendant's bias against Hispanics. Cf., <u>Bateman v. United Parcel Service, Inc.</u>, 31 Fed.Appx. 593, 597-98 (10th Cir. 2002)(disregarding UPS driver's testimony that co-workers were treated more favorably as either

speculative or based on hearsay); see also Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986) cert. denied, 480 U.S. 919 (1987)("statistics" obtained by general observation and the environment were in the nature of personal beliefs, conjecture and speculation which were insufficient to support inference of discrimination).  Nor is the evidence regarding the small number of Hispanic drivers at the James Street facility sufficient to create an inference of discrimination as regards this alleged adverse employment action.  See Cuenca v. University of Kansas, 265 F.Supp.2d 1191, 1205-06 (D.Kan. 2003)(disregarding broad statistical comparison of number of Hispanics on college faculty to percentage of Hispanics in Kansas as evidence of discrimination in termination of Hispanic professor).  There are no statistics in the record regarding repairs given to Hispanic drivers as opposed to other drivers or comparing the tractors assigned to UPS drivers on the basis of race or ethnic origin.

Plaintiff also presents no evidence that defendant's bias against the physically disabled was a cause of the seat belt issue. Plaintiff asserts that defendant had a policy which required employees to be 100% healed and able to return to their regular jobs in order to work for defendant.  This alleged policy has nothing to do with a delay in fixing a seat belt system.  Plaintiff also argues that an inference of discrimination may be drawn from defendant's alleged failure to respond to plaintiff's complaints and accommodation

requests.   There are no grounds for inferring, however, that this conduct was motivated by a bias against plaintiff's physical disability.   We note again that defendant did not violate the ADA by rejecting what plaintiff has characterized as requests for accommodation.

To reiterate, a prima facie case of retaliation under the ADA requires proof of that a causal connection existed between the protected activity and the materially adverse action.   Picture People, 684 F.3d at 988.   Here, plaintiff has offered no evidence from the circumstances or timing of events in this case to suggest that the delay in fixing the seat belt system occurred because defendant wanted to retaliate against plaintiff for asserting his rights under the ADA.

### 2.   Double trailers – hookup time

The court further finds that plaintiff has also failed to make a prima facie case of discrimination or retaliation with regard to plaintiff's claims regarding pulling double trailers and hookup time. But, assuming that a prima facie case was made, defendant has set out evidence that scheduling decisions were made for legitimate business reasons relating to change in volume, equipment and customer needs. Doc. No. 140-5, p. 8; Doc. No. 140-3, p. 10.   Therefore, plaintiff has the burden to produce evidence demonstrating a genuine issue of material fact exists as to whether this justification is mere a pretext for illegal discrimination or retaliation.   See Hinds, 523 F.3d at

1197; C.R. England, 644 F.3d at 1051.  Plaintiff must present evidence that the proffered business considerations are so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude the reason is unworthy of belief.  Hinds, 523 F.3d at 1197 (quoting Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir. 2006)).  Plaintiff has set forth no information to suggest that defendant's claim of valid business reasons for its scheduling decisions are incoherent, weak, inconsistent or contradictory.

IV.  CONCLUSION.

For the above-stated reasons, defendant's motion for summary judgment shall be granted.

**IT IS SO ORDERED.**

Dated this 26th day of November, 2012 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge